**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| JONES ENERGY, INC., *et al.*,[1] | ) | Case No. 19-32112 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

**DECLARATION OF CARL F. GIESLER, JR.,**
**CHIEF EXECUTIVE OFFICER OF JONES ENERGY, INC.,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Carl F. Giesler, Jr., hereby declare under penalty of perjury:

1.     I am the Chief Executive Officer and a director of Jones Energy, Inc. ("JEI") and the above-captioned debtors and debtors in possession (collectively, the "Debtors"), a publicly traded oil and gas company.  I was appointed as Chief Executive Officer of the Debtors effective July 23, 2018, and I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.     I have over two decades of experience in the oil and gas industry, including serving as the Chief Executive Officer and a director of Glacier Oil & Gas Corp. and its predecessor companies (collectively, "Glacier") and leading the oil and gas investment efforts as a Managing Director with Harbinger Group, Inc.  I also have served in various oil and gas principal investing, financial, and other roles with Harbinger Capital Partners, AIG Financial Products, and Morgan Stanley, and, in addition to those of JEI and Glacier, I have served on the boards of Compass

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Jones Energy, Inc. (7968); Jones Energy, LLC (8861); CCPR Sub LLC (0942); Jones Energy Finance Corp. (6247); Jones Energy Holdings, LLC (5091); Jones Energy Intermediate, LLC (3552); JRJ Opco, LLC (1488); Nosley Acquisition, LLC (1548); Nosley Assets, LLC (6460); Nosley Midstream, LLC (8315); and Nosley SCOOP, LLC (1108).  The location of Jones Energy, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is:  807 Las Cimas Parkway, Suite 350, Austin, TX 78746.

Production Partners, LP and North American Energy Partners, Inc. I am a CFA Charterholder, and I received a bachelor's degree from the University of Virginia in 1994 and a juris doctor from Harvard Law School in 1999.

3.      I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of (a) the Debtors' chapter 11 petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and (b) the emergency relief that the Debtors have requested pursuant to the motions and applications described herein (the "First Day Motions").

4.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, information obtained from other members of the Debtors' management team and the Debtors' advisors, and/or my opinions based upon my experience and knowledge. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify as to the facts set forth herein.

## Introduction

5.      The Debtors are an Austin, Texas-based independent oil and gas company engaged in the exploration, development, production, and acquisition of oil and gas properties in the Anadarko Basin in Oklahoma and Texas. As is well known, operating and market conditions in the oil and gas industry have undergone a profound transformation in recent years leading many companies to seek chapter 11 relief. The Debtors were able to navigate successfully through the last several years of industry distress through a combination of efforts to raise capital, optimize operations, and reduce expenses.

6.      In short and as further described herein, the Debtors explored nearly every measure to avoid filing these chapter 11 cases.  Beginning in January 2016, using cash on hand from equity raises and borrowings from their revolving credit facility, the Debtors implemented a debt buyback program of their unsecured notes to de-lever their balance sheet by over $100 million.  The Debtors also raised approximately $166 million in two separate equity raises in 2016 to further supplement their cash on hand.  The Debtors then used a portion of their cash to purchase acreage in the Western Anadarko Basin and in the Merge area of the Anadarko basin to facilitate a drilling growth program.  As certain of those drilling efforts began to produce revenues below estimates, the Debtors divested a number of non-core acreage holdings to further raise capital.  In 2016, in order to reduce expenses, the Debtors made the difficult decision to reduce their workforce by approximately one-third.  During the period when the price of oil was dropping precipitously to $30 a barrel, the Debtors had a significant percentage of their exposure to oil hedged at a price in excess of $80 a barrel.  As a result, the Debtors received a material liquidity infusion through proceeds from their hedge portfolio over the three-year period from 2015 to 2017.

7.      The Debtors also explored joint drilling ventures or "DrillCos" to optimize the value of and cash flow from their holdings while minimizing capital expenditures, sharing risk with the DrillCo partner, and allowing the DrillCo partner to finance drilling to secure acreage.  Those ventures did not come to fruition.

8.      In early 2018, the Debtors also raised first lien secured debt to improve liquidity, further develop their acreage, and attempt to capture a discount in their debt trading prices to buy back additional debt and de-lever their balance sheet.  During 2018, the Debtors further made several changes to senior management to, among other reasons, optimize operations, improve cost efficiencies, and explore liability management options.

9.      None of these actions were enough to completely right-size the Debtors' balance sheet.  During the last year, the Debtors continued to explore and implement liability management alternatives to seeking chapter 11 relief.  To that end, the Debtors engaged Evercore Group L.L.C. ("Evercore") to initiate two concurrent processes.  First, the Debtors assessed "strategic alternatives," approaching approximately twenty potential strategic partners about various potential combinations, asset sales, and other transactions that might help the Debtors better manage their liabilities.  Certain strategic partners executed non-disclosure agreements and conducted significant diligence but, ultimately, opted not to move forward.

10.     Second, the Debtors engaged in earnest with a group of organized unsecured bondholders in an attempt to reach agreement on a viable out-of-court restructuring transaction. These discussions first focused on incumbent equity relinquishing a minority equity stake in exchange for a corresponding debt reduction.  The discussions then evolved into transactions that contemplated exchanging a substantial majority of equity for a more considerable debt reduction. Nevertheless, and against the backdrop of declining commodity prices and liquidity, the Debtors continued to struggle to grow into their leverage profile and, ultimately, a further equitization of the Debtors' funded debt became necessary to preserve the Debtors as a going concern.[2]

11.     As a result, and shortly after the formation of an ad hoc group of first lien secured bondholders in late November 2018, the Debtors began folding the first lien secured bondholders into their creditor negotiations towards a value-maximizing, de-leveraging transaction.  As these restructuring discussions progressed, the Debtors' liquidity position continued to decline.  While oil prices generally climbed during the first three quarters of 2018, the Debtors' did not fully

---

[2]     The Debtors received a qualified opinion from their auditors, as reflected in the Debtors' Form 10-K for the fiscal year ended December 31, 2018.

capture this increase due to their hedging positions.  Furthermore, the Debtors' liquidity was impacted negatively by adverse pooling in the Merge in the latter half 2017 and early 2018.

12.     In the face of declining liquidity and based on the state of the restructuring discussion with their creditors, the Debtors elected to skip interest payments on their senior secured first lien notes and unsecured notes due on March 15 and April 1, 2019, in the aggregate amount of $41.5 million, each with 30-day grace periods, to preserve liquidity and further facilitate creditor negotiations on a comprehensive restructuring.  On March 20, 2019, the Debtors and the ad hoc groups of creditors representing a supermajority of the secured first lien and unsecured bondholders reached a deal in principle that was documented quickly into a restructuring support agreement, a copy of which is attached hereto as **Exhibit A**  (the "Restructuring Support Agreement").  On April 3, 2019, the Debtors launched the solicitation of the *Joint Chapter 11 Plan of Reorganization of Jones Energy, Inc. and its Debtor Affiliates* (the "Plan") and filed these chapter 11 cases with approximately $16.0 million cash on hand and in advance of the expiration of the 30-day grace period on April 15, 2019.

13.     As a result of these efforts, the Debtors commence these cases with the Plan that eliminates the Debtors' over $1 billion in funded debt obligations and enjoys the support of overwhelming majorities of the bondholder creditor classes, with approximately 92% of its secured bondholder and approximately 83% of its unsecured bondholder classes already submitting votes in favor of the Plan.

14.     Importantly, these creditors that are party to the Restructuring Support Agreement agreed to leave trade creditors unimpaired.  The Debtors' requests for various "first-day" relief, which also are supported by the creditors party to the Restructuring Support Agreement, are further aimed at preserving operational continuity during these chapter 11 cases.  The proposed Plan,

however, does not provide a recovery under the Plan for any other creditors junior to the bondholders at JEI, including the preferred equity holders, the common equity holders, and the counterparties to the tax receivables agreement. The absence of recovery to these stakeholders has no bearing on the operational continuity of the Debtors' business.

15.     The expedited nature of these chapter 11 cases—together with the expected corresponding lower administrative expenses compared to a longer case—is one of the cornerstones of the compromise with the creditors embodied in the Plan and is fundamental to their continued support. The Restructuring Support Agreement sets out the requirements for the creditors' support of the Plan, including key milestones. Notably, if the Debtors fail to adhere to these provisions, the creditors can withdraw their votes of support for the Plan.

16.     Contemporaneously herewith, the Debtors filed a scheduling motion that seeks an order setting dates and deadlines in connection with the approval of the Plan that are consistent with the agreed-to milestones. Specifically, the Debtors propose the following schedule:

| Event | Date |
|---|---|
| Confirmation Hearing Objection Deadline | **May 1, 2019** |
| Combined Hearing on Approval of the Disclosure Statement and Confirmation of the Plan | **May 6, 2019** |
| Deadline for Entry of the Disclosure Statement Order and Confirmation Order | **May 7, 2019** |
| Effective Date | **Confirmation Order + 14 days** |

17.     While the Debtors are seeking to confirm the Plan swiftly, the proposed schedule does not require the shortening of any statutory notice periods. When the Debtors commenced

solicitation on April 3, 2019 (the "Solicitation Date"), the Debtors also sent notices of, among other things, their intention to commence these chapter 11 cases and the key dates above to creditors and equity holders, regardless of their ability to vote on the Plan. Thus, the Debtors' creditors and equity holders received 28 days' notice of the Plan objection deadline and 33 days' notice of the proposed hearing to confirm the Plan.



18.     The Restructuring Support Agreement also includes two key features that ensure the Debtors' access to liquidity both during the pendency of these chapter 11 cases and following the consummation of the restructuring transaction. Before soliciting the Plan, the Debtors and their bondholders agreed to a proposed form of order for the consensual use of cash collateral. Further, the bondholders agreed to provide a committed exit financing facility of up to $20 million with ingrained flexibility to allow the Debtors to replace the exit facility with a larger, more traditional, and more cost-efficient revolving facility for working capital. The Debtors already are working with proposed lenders for this larger financing facility. Consensus on cash collateral use

and certainty on exit financing are key components of the Restructuring Support Agreement and critical to preserving and maximizing value for the Debtors' estates.

19.     In sum, the Plan provides the Debtors with a right-sized capital structure that completely equitizes all of their funded debt and will allow the Debtors to realize the value of their assets and implement a growth-oriented drilling program without the overhang of its historical leverage profile.   In addition, the compromises and settlements embodied in the Plan and the negotiated support in the Restructuring Support Agreement preserve value by enabling the Debtors to avoid extended, value-eroding litigation that could delay the Debtors' emergence from chapter 11.   Instead of litigating with the first lien secured bondholders and the unsecured bondholders over asserted claims and potential recoveries, these creditors have agreed to support the Plan and its swift confirmation, consent to the use of cash collateral, and backstop exit financing—each of which provides significant value to the Debtors and their estates.   The Debtors' Plan is a significant achievement and provides a clear and viable path to long-term financial success.

20.     To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history, business operations, and assets;

- **Part II** describes the Debtors' prepetition capital structure and indebtedness;

- **Part III** describes the circumstances leading to the commencement of these chapter 11 cases;

- **Part IV** summarizes the key terms of the Restructuring Support Agreement and the proposed timeline for these chapter 11 cases; and

- **Part V** sets forth the evidentiary basis for the relief requested in each of the First Day Motions.

**Part I:**
**The Debtors' History, Operations, and Assets**

A.     **History and Corporate Structure.**

21.     Jones Energy, the Debtors' predecessor company, was formed in 1988 by Jonny Jones, a third-generation oil and gas entrepreneur, in continuation of his family's long history in the oil and gas business.  Mr. Jones currently serves as the Chairman of the Board of JEI.  Over the past three decades, the Debtors have grown by applying their industry knowledge, low-cost drilling and completion methods, and horizontal drilling expertise to find and develop oil and gas assets and execute strategic acquisitions.

22.     In December 2009, Jones Energy formed Jones Energy Holdings, LLC ("JEH"), a Delaware limited liability company, through investments made by the Jones family, certain members of Jones Energy's management, and private equity funds managed by Metalmark, among others.  JEH acts as a holding company of operating subsidiaries that own and operate the assets used in the exploration, development, production, and acquisition of oil and gas properties.[3]

23.     In March 2013, JEI, a Delaware corporation, was formed to become a publicly traded entity and the holding company of JEH.  JEI's sole material asset is its equity interest in JEH.  As the sole managing member of JEH, JEI is responsible for all operational, management, and administrative decisions relating to JEH's business and consolidates the financial results of JEH and its subsidiaries.  JEI launched an initial public offering in July 2013, issuing 12.5 million shares of Class A common stock at an offering price of $15.00 per share.  These shares were

---

[3]     JEH's subsidiaries include:  Jones Energy, LLC, a Texas limited liability company ("Jones LLC"); CCPR Sub LLC, a Delaware limited liability company; Jones Energy Finance Corp. ("JEF"), a wholly owned subsidiary formed for the sole purpose of co issuing certain of JEH's debt; JRJ Opco, LLC, a Texas limited liability company; Nosley Acquisition, LLC, a Delaware limited liability company ("Nosley Acquisition"); Nosley Assets, LLC, a Delaware limited liability company ("Nosley Assets"); Nosley Midstream, LLC, a Delaware limited liability company ("Nosley Midstream"); and Nosley SCOOP, LLC, a Delaware limited liability company ("Nosley SCOOP")—all of which are Debtors.

subsequently listed on the New York Stock Exchange ("<u>NYSE</u>").  On November 26, 2018, and as further explained herein, JEI shifted trading of its shares to the OTCQX.  As of the Petition Date, JEI trades under the symbol "JONE" on the OTCQX.

24.     The following graphic depicts the Debtors' simplified corporate structure, which is also attached hereto as **Exhibit B**:



B.     **Assets and Operations.**

25.     Since formation, the Debtors have drilled approximately 970 total wells as an operator (including over 790 horizontal wells) and gained considerable experience and expertise in the Anadarko Basin in Oklahoma and Texas, focusing on both the Eastern Anadarko Basin in Oklahoma, targeting the liquids-rich Woodford shale and Meramec formations in the Merge area of the STACK/SCOOP plays (the "<u>Merge</u>"), and the Western Anadarko Basin (the "<u>WAB</u>") in the

Texas panhandle region straddling Texas' eastern border with Oklahoma, targeting the liquids-rich Cleveland and Marmaton formations, among others.



| | Producing Wells | | Identified Drilling Locations | |
|---|---|---|---|---|
| | Gross | Net | Gross | Net |
| Western Anadarko | 561 | 466 | 1,252 | 803 |
| Eastern Anadarko | 163 | 38 | 6,506 | 1,168 |
| Other | 7 | 4 | 12 | 4 |
| All Properties | 731 | 508 | 7,770 | 1,975 |

26.    The Anadarko Basin is among the largest, most prolific, and most active onshore producing oil and gas basins in the United States, characterized by significant midstream infrastructure, multiple producing horizons, and extensive well control collected over 100 years of development.   Nearly 100% of the Debtors' proved reserves and approximately 95% of the Debtors' average daily net production are located in the Anadarko Basin.

27.    The Debtors leverage their extensive geologic and geophysical knowledge of and operating experience in the Anadarko Basin to identify and exploit the most profitable exploration and development opportunities.  The formations the Debtors target are generally characterized by oil and/or liquids-rich natural gas content, extensive production histories, long-lived reserves, high drilling success, and attractive initial production rates.  The Debtors focus on formations in their operating areas that offer significant development potential and to which they can apply their technical understanding and operational excellence to increase reserves, production, and cash flow.

28.    The Debtors' acreage in the Merge and WAB is shown below.



29.    The Debtors' revenues are derived primarily from the sale of oil and gas production, including from the sale of natural gas liquids ("NGLs") that are extracted from natural gas through processing.  As of the Petition Date, the Debtors had approximately 325,346 gross (166,477 net) total acres under lease and estimated proved reserves of approximately 60,750 MBOE of crude oil, NGLs, and natural gas, of which approximately 89% were proved developed.

30.    The Debtors' oil is generally sold under short-term, extendable, and cancellable agreements with unaffiliated purchasers based on published price bulletins reflecting an established field posting price.  As such, the prices the Debtors' customers pay for oil is directly correlated to market prices.  The Debtors' natural gas is sold under both long-term and short-term gas purchase agreements, and it is sold at various delivery points at or near producing wells to natural gas gathering and marketing companies.  On nearly all of the Debtors' natural gas production, the Debtors are paid for the extracted NGLs based on a negotiated percentage of the

proceeds that are generated from the customer's sale of the liquids or on other negotiated pricing arrangements.  The Debtors do not own any material oil, liquid, or natural gas pipelines or other assets for the transportation of those commodities.

31.     The typical oil and gas lease agreement covering the Debtors' properties provides for the payment of royalties to the mineral owner for all oil and gas produced from any wells drilled on the leased premises.  The lessor royalties and other leasehold burdens on their properties generally range from 17% to 25%.  Approximately 94% of the Debtors' leases (based on net acreage) are held by existing production and do not require lease rental payments.

### Part II:
### Debtors' Prepetition Capital Structure

32.     As of the Petition Date, the Debtors had approximately $1.009 billion in total outstanding principal amount of funded debt obligations as well as outstanding preferred equity with a stated aggregate liquidation preference of approximately $25.9 million.  In anticipation of this filing, the Debtors unwound their mark-to-market secured liabilities to hedge counterparties on April 10, 2019, for approximately $15.4 million.  In addition, certain of the Debtors are also party to that certain Tax Receivable Agreement, dated as of July 29, 2013, by and between JEH, Metalmark, Wells Fargo Central Pacific Holdings, Inc., and certain of JEI's current and former equity owners (the "TRA"), which, as described more fully herein, among other things, obligates JEI to make certain payments to parties to the TRA with respect to tax benefits associated with the exchange of certain JEH units into JEI stock.

| Obligation | Maturity | Annual Interest Expense | Approximate Principal Amount |
|---|---|---|---|
| Senior Secured Revolving Credit Facility (the "RBL") | Nov. 2019 | $0 | $0.00 |
| 9.25% Senior Secured First Lien Notes (the "First Lien Notes") | March 2023 | $41.6 million | $450.0 million |
| 6.75% Senior Unsecured Notes (the "2022 Notes") | April 2022 | $27.6 million | $409.1 million |
| 9.25% Senior Unsecured Notes (the "2023 Notes") | March 2023 | $13.8 million | $150.0 million |
| | Total: | $83.0 million | $1.009 billion |

| Preferred Equity | Shares | Approximate Liquidation Preference |
|---|---|---|
| 8.0% Series A Perpetual Convertible Preferred Stock ("Series A Preferred Stock") | 518,655 | $25.9 million |

### A.    Senior Secured Revolving Credit Facility.

33.    The Debtors had the RBL with a syndicate of banks, which, since February 2018, almost exclusively was used for derivative contracts with lenders party to that certain Credit Agreement, dated as of December 31, 2009, among JEH, as borrower, JEI, as parent guarantor, the lender parties thereto, and Wells Fargo Bank, National Association, as administrative agent (the "RBL Credit Agreement").  Substantially all of the Debtors' personal property assets and oil and gas properties were pledged as collateral to secure their obligations under the RBL.  The RBL was set to mature on November 6, 2019.

34.    In November 2017, the Debtors modified certain leverage ratio covenants in the RBL Credit Agreement, increasing the borrowing base under the RBL Credit Agreement to $350.0 million.  In connection with the offering of the First Lien Notes, the borrowing base was reduced to $50.0 million, effective February 14, 2018.  On June 27, 2018, the Debtors entered into an amendment to the RBL Credit Agreement to, among other things, (a) remove the financial maintenance covenants contained therein, including the current ratio, total leverage ratio, and

senior secured leverage ratio, (b) align certain of the other covenants contained therein to be consistent with the terms of the indenture governing the First Lien Notes, (c) reduce lender commitments to twenty-five dollars ($25.00), and (d) reduce the borrowing base to twenty-five dollars ($25.00) for the remainder of the life of the facility.  Additionally, outstanding borrowings of $25.0 million were repaid in connection with the closing of the amendment.

35.     In the days prior to the Petition Date, the Debtors paid off and terminated the RBL Credit Agreement and unwound their hedges because their hedge counterparties were unwilling to provide firm commitments that their hedging agreements would "ride-through" the chapter 11 cases and remain in place post-emergence.  As a result, the Debtors are and will remain fully exposed to commodity price risk during these chapter 11 cases.

36.     The Debtors plan to enter into a new hedging program in connection with their exit financing as the Debtors likely will be able to obtain better terms for such a program when it is under the umbrella of a new credit facility and obtained when the Debtors are no longer in chapter 11.  The Debtors are willing to be substantially exposed to the commodity price risk in the interim given the proposed short duration of these chapter 11 cases.  The Debtors may reevaluate this decision to the extent there is any material delay to the anticipated effective date for these chapter 11 cases.

### B.     Senior Secured First Lien Notes.

37.     On February 14, 2018, JEH and JEF issued $450.0 million in aggregate principal amount of the First Lien Notes under an indenture dated as of February 14, 2018 (as amended, the "First Lien Notes Indenture"), by and among JEH and JEF, as issuers, JEI, Jones LLC, Nosley Acquisition, Nosley Assets, Nosley Midstream, and Nosley SCOOP, as guarantor parties thereto, UMB Bank, National Association, as trustee, and Wells Fargo Bank, National Association, as collateral agent.  Pursuant to the First Lien Notes Indenture, the First Lien Notes were issued at

97.526% of par, bear interest at a rate of 9.25% per year, payable semi-annually in arrears on March 15 and September 15 of each year, and will mature on March 15, 2023.  As of the Petition Date, there was approximately $450.0 million in principal and $24.2 million in accrued interest outstanding under the First Lien Notes.[4]

38.     The First Lien Notes are first-lien senior secured obligations of JEH and JEF and are secured by first-priority liens on substantially all assets and property, whether real, personal, or mixed, of the Debtors.

**C.     Senior Unsecured Notes.**

39.     On April 1, 2014, JEH and JEF issued $500.0 million in aggregate principal amount of the 2022 Notes under an indenture dated as of April 1, 2014 (as amended, the "2022 Notes Indenture"), by and among JEH and JEF, as issuers, JEI, Jones LLC, Nosley Acquisition, Nosley Assets, Nosley Midstream, and Nosley SCOOP, as guarantor parties thereto, and Wells Fargo Bank, National Association, as trustee.  Pursuant to the 2022 Notes Indenture, the 2022 Notes bear interest at a rate of 6.75% per year, payable semi-annually on April 1 and October 1 of each year, and will mature on April 1, 2022.  From January to April 2016, the Debtors repurchased approximately $91 million in face value of the 2022 Notes.  As of the Petition Date, there was approximately $409.1 million in principal and $14.8 million in accrued interest outstanding under the 2022 Notes.

40.     On February 23, 2015, JEH and JEF issued $250.0 million in aggregate principal amount of 2023 Notes under an indenture dated as of February 23, 2015 (as amended, the "2023 Notes Indenture"), by and among JEH and JEF, as issuers, JEI, Jones LLC, Nosley

---

[4]     On March 14, 2019, as negotiations with the First Lien Ad Hoc Group and Crossover Group (each as defined below) progressed, the Board determined not to make the three imminent interest payments on the First Lien Notes and Unsecured Notes, which interest payments totaled $41.5 million in the aggregate, and to enter into the 30-day grace periods under the applicable indentures.

Acquisition, Nosley Assets, Nosley Midstream, and Nosley SCOOP, as guarantor parties thereto, and Wells Fargo Bank, National Association, as trustee. Pursuant to the 2023 Notes Indenture, the 2023 Notes bear interest at a rate of 9.25% per year, payable semi-annually on March 15 and September 15 of each year, and will mature on March 15, 2023. In February 2016, the Debtors repurchased approximately $100 million in face value of the 2023 Notes. As of the Petition Date, there was approximately $150.0 million in principal and $8.1 million in accrued interest outstanding under the 2023 Notes.

41. The 2022 Notes and 2023 Notes (together, the "Unsecured Notes") are guaranteed on a senior unsecured basis by JEI and by all of its significant subsidiaries.

**D.    Preferred Equity.**

42. JEI's certificate of incorporation authorizes its Board of Directors (the "Board") to establish one or more series of preferred stock. On August 26, 2016, JEI issued 1,840,000 shares of its Series A Preferred Stock, par value $0.001 per share, pursuant to a registered public offering at $50 per share, of which approximately 518,655 remained issued and outstanding as of the Petition Date. Each share of Series A Preferred Stock has a liquidation preference of $50.00 per share and is convertible, at the holder's option at any time, into approximately 0.8534 shares of Class A common stock, subject to specified adjustments and limitations as set forth in the certificate of designations for the Series A Preferred Stock. Per the adjustments set forth in the certificate, following the delisting of JEI's Class A common stock from the NYSE on November 26, 2018, holders of Series A Preferred Stock were given the special right to convert their shares to Class A common stock at a premium to the existing conversion rate until January 14, 2019 (the "Preferred Stock Conversion Deadline"). The Preferred Stock Conversion Deadline was subsequently extended to March 29, 2019. On or after August 15, 2021, JEI has the right, at its option, to elect to cause all outstanding shares of Series A Preferred Stock to be automatically

converted into shares of Class A common stock at the conversion rate if the closing sale price of the Class A common stock equals or exceeds 175% of the conversion price for at least 20 trading days in a period of 30 consecutive trading days.

43.    Holders of Series A Preferred Stock are entitled to receive, when, as, and if declared by the Board, cumulative dividends at the rate of 8.0% per annum per share on the $50.00 liquidation preference per share of the Series A Preferred Stock, payable quarterly in arrears on February 15, May 15, August 15, and November 15 of each year.  Dividends may be paid in cash or, subject to certain limitations, in Class A common stock, or a combination thereof. The Board declared quarterly dividends on the Series A Preferred Stock in October 2016, January 2017, April 2017, July 2017, October 2017, and January 2018—each of these dividends was paid in cash, Class A common stock, or a combination thereof.  The Board declared contingent quarterly dividends on the Series A Preferred Stock in April 2018, July 2018, October 2018, and January 2019—these dividends ultimately were not paid in cash, as JEI was prohibited from paying cash dividends on the Series A Preferred Stock under the terms of its indebtedness, and were not paid with Class A common stock, as the perquisites for paying with stock were not met. Accordingly, these dividends accrued for holders of the Series A Preferred Stock.  As of the Petition Date, there were cumulative but unpaid dividends of approximately $4.51 per share of Series A Preferred Stock.

### E.    Common Equity.

44.    JEI's certificate of incorporation authorizes two classes of common stock:  Class A common stock and Class B common stock.  As of the Petition Date, JEI had approximately 7,107,520 shares of Class A common stock outstanding and no remaining shares of Class B common stock outstanding.  The Debtors have never declared or paid any cash dividends to Class A common stock holders and have only paid a stock dividend once, in March 2017.  In

addition, the First Lien Notes Indenture and the Unsecured Notes Indenture restrict the ability of JEI to pay cash dividends on the Class A common stock as long as any debt remains outstanding.

45.    Following JEI's initial public offering in July 2013, the Class A common stock was listed under the symbol "JONE" on the NYSE.  On March 23, 2018, the NYSE notified JEI that it was noncompliant with certain continued listing standards because the price of the Class A common stock over a period of 30 consecutive trading days had fallen below the minimum average closing price per share required to maintain a listing on the NYSE.

46.    On May 22, 2018, in order to cure that price deficiency, JEI's stockholders voted to grant the Board discretionary authority to effect a reverse stock split of the Class A common stock at a ratio between 1-for-5 and 1-for-20, and, on August 17, 2018, the Board approved a 1-for-20 reverse stock split of its Class A common stock and its Class B common stock, effective 5:00 p.m., New York City time, on September 7, 2018.  On September 21, 2018, the NYSE notified JEI that it had regained compliance with its continued listing standards, a direct result of the reverse stock split.

47.    On November 26, 2018, JEI's Class A common stock was de-listed from the NYSE and began trading on the OTCQX on November 27, 2018, due to JEI's noncompliance with the NYSE requirement to maintain a 30-trading day average global market equity capitalization of at least $15.0 million.  On January 18, 2019, JEI received notice from the OTC Markets Group Inc. that JEI's market capitalization had stayed below $5.0 million for more than 30 consecutive days and therefore no longer met the requirements for continued listing on the OTCQX.  JEI has until July 17, 2019 to regain compliance.

48.    The below chart shows the Debtors' Class A common stock price over the last five years charted against the price of oil over the same period of time:



49.     JEI's Class B common stock was held by the remaining owners of JEH prior to the initial public offering of JEI and has been exchanged (together with a corresponding number of common units representing membership interests in JEH ("JEH Units")) for shares of Class A common stock on a one-for-one basis.  The Class B common stock had no economic rights, but every share of Class B common stock entitled its holder to one vote on all matters to be voted on by the JEI's holders of Class A common stock on a pro rata basis.  There are currently no holders of Class B common stock.

50.     As of December 31, 2018, the only remaining holders of JEH Units that had not converted their JEH Units into JEI's Class A common stock were certain Jones family funds.  In March 2019, these remaining unitholders requested to convert all of their remaining JEH Units and Class B stock into JEI's Class A common stock.  Thus, prior to the Petition Date, the Debtors formed Jones Energy Intermediate, LLC ("JEI, LLC") to provide the Debtors with the option to preserve the "status quo" with respect to the U.S. federal income tax classification of JEH as a partnership in light of the decision of the minority equity holders of JEH to exercise their

contractual rights to exchange their JEH equity for JEI equity. To otherwise accomplish that goal, within 75 days of the formation of JEI, LLC, the Debtors would need to file an election with the Internal Revenue Service to cause JEI, LLC to be taxed as a corporation for U.S. federal income tax purposes. On April 1, 2019, JEI, LLC was added as a guarantor on the First Lien Notes, the Unsecured Notes, and the TRA.

   **F.    Tax Receivable Agreement.**

   51.    Certain of the Debtors are also party to the TRA. Under the TRA, holders are entitled to receive payments with respect to tax benefits associated with the exchange of certain JEH units into JEI stock as well as formulaic early termination payments triggered upon change in control.

   52.    In general, the TRA obligates JEI to make future cash payments to JEH members who exchange their JEH membership interests and JEI Class B common stock for shares of JEI's Class A common stock (each, an "Exchange"). The TRA creates a contingent payment obligation as partial consideration for each Exchange with payments computed by reference to JEI's future cash income tax savings generated by the applicable Exchange. The amount of each future TRA payment is equal to 85% for the applicable cash savings that JEI realizes as a result of income tax attributes arising from each Exchange. The actual amount and timing of each payment under the TRA is dependent on a number of factors, including the amount and timing of JEI's taxable income generated after an Exchange, which is offset by the applicable tax benefits, income tax rates in effect, the use of JEI's tax loss carryovers, including those created by an Exchange, and the portion of TRA payments that constitute imputed interest expense deductible by JEI.

   53.    For purposes of the TRA, cash savings in tax are generally calculated by comparing JEI's actual tax liability to the amount JEI would have been required to pay had it not been able to utilize any of the tax benefits created by each Exchange. While the detailed computations of TRA

payment obligations are complicated, pursuant to the TRA, each is based on a "*with and without*" methodology of actual tax savings in each tax year following an Exchange.

54.     The term of the TRA continues until all such tax benefits created by an Exchange are utilized or expire.  The payment obligations are accelerated if JEI exercises its right to terminate the TRA, JEI breaches any of the material obligations under the TRA, or certain mergers or other changes of control occur.  In any such case, JEI would be required to make an immediate payment equal to the present value of the anticipated future tax benefits from the Exchanges.  As of December 31, 2018, the Company estimated an early termination payment to be approximately $52.0 million.  This amount is a contingent liability and is not included in any financial statements.

55.     JEI accrues the TRA liability on its financial statements.  Effective December 31, 2018, as described in Note 13 to JEI's consolidated financial statements attached to JEI's Form 10K at pages F-33 to F-36, JEI's aggregate accrued TRA liability was reduced to zero because of valuation allowances against JEI's deferred tax assets.  In short, as of December 31, 2018, JEI did not expect to generate any future net tax benefits giving rise to payments under the TRA.

56.     Prior to the Petition Date, and on or about March 6, 2019, JEI retained Jackson Walker LLP ("Jackson Walker") as local and conflicts counsel.  As part of Jackson Walker's engagement, JEI requested that Jackson Walker, in place of its prior counsel, Baker Botts, L.L.P., represent it with respect to claims for payments arising under the TRA by the Metalmark parties.

57.     Also prior to commencing these cases, JEI, LLC executed a guaranty in favor of JEI, all present and future obligations, liabilities, covenants, and agreements required to be observed and performed, paid, or reimbursed by JEI under or relating to the TRA.

**Part III:**
**Circumstances Leading to These Chapter 11 Cases**

**A.      Market Decline and Industry-Specific Challenges.**

58.      Oil and gas prices have declined substantially since the second half of 2014, and notwithstanding a modest rebound starting in 2016, the market has remained volatile.   For example, during the past eight years, the NYMEX WTI oil price has ranged from a low of $26.19 per barrel in February 2016 to a high of $113.39 per barrel in April 2011 and was $63.89 as of April 12, 2019.   The NYMEX Henry Hub spot market price of gas has ranged from a high of $8.15 per million British thermal units ("MMBtu") in February 2014 to a low of $1.49 per MMBtu in March 2016 and was $2.66 per MMBtu as of April 12, 2019.   Despite the recent rebound, market uncertainty remains high.

59.      As noted above, the price paid to the Debtors for their oil and gas is generally based on short-term contracts and directly correlated to the oil and gas markets, so the Debtors have been directly affected by the sustained downturn in commodity prices and the continued volatility and uncertainty in those markets today.   These markets will likely continue to be volatile in the future, especially given the current opaque supply-and-demand outlook and geopolitical conditions. Additionally, NYMEX futures curves for both gas and oil indicate an expectation among traders in the derivatives market that these commodity prices are expected to either decline or remain constant over the next several years.



60.     The below charts show the price of oil and gas over the last five years and illustrate the adverse environment the Debtors have been operating in:





61.     These market conditions have affected oil and gas companies at every level of the industry around the world.  Independent oil and gas companies have been especially hard hit, however, as their revenues are generated from the sale of unrefined oil and gas.  Over 160 oil and gas companies have filed for chapter 11 since the beginning of 2015.[5]  Numerous other oil and gas companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or effectuated out-of-court restructurings.

62.     The Debtors, like their peers, have been affected by these macro-economic forces, and the trading prices of the Debtors' publicly traded securities reflect these circumstances.

---

[5]     Haynes and Boone, LLP, *Oil Patch Bankruptcy Monitor* (Jan. 7, 2019).



63.   Operating in this adverse macroeconomic environment has also negatively impacted the Debtors' liquidity.  The Debtors' cash position declined steadily through 2018 and, without a restructuring, is currently projected to continue depleting below a minimum sustainable level through 2019.



**B.      Exploration and Implementation of Strategic Alternatives.**

64.      Over the last three plus years, the Debtors explored and implemented a variety of initiatives to improve their financial position and extend their liquidity runway, including debt issuances and buybacks, acquisitions and divestitures, equity offerings, management shifts, DrillCos, and other strategic opportunities.   These efforts ultimately were unsuccessful in delevering the Debtors to a sustainable level for long-term growth.

65.      As the oil and gas market backdrop became more challenging, the Debtors anticipated difficulty growing into their capital structure and servicing their indebtedness.  Thus, beginning as early as 2015, the Debtors began evaluating and subsequently implementing a corporate growth and liability management strategy that focused on, among other things, adapting to the prolonged low-price commodity environment.  The Debtors were able to weather 2015, in part, due to their robust hedging program (implemented prior to the downturn) that offset the decline in commodities prices.  The positive impact of the Debtors' hedges was limited, however, by the tenor of the contracts.

66.      By early 2015, the Debtors focused on three primary initiatives:   (a) corporate growth through acquisitions of acreage that could serve as the base for future operations and cash flow growth;  (b) acquisition funding through public and private sources;  and (c) liability management through funding short- and long-term cash flows and reducing debt.  To that end, the Debtors took the following actions:

- In 2016, the Debtors participated in a debt buyback in which they purchased an aggregate principal amount of $190.9 million in face value of the Unsecured Notes for $90.6 million through several open-market and privately negotiated purchases, which provided an estimate of $61.9 million in interest savings.

- In mid-2016, the Debtors raised approximately $166 million in equity through issuances of preferred and common stock.

- In August 2016, the Debtors acquired producing and undeveloped oil and gas assets in the WAB (the "WAB Acquisition"), including interests in 174 wells and approximately 25,000 net acres in Lipscomb and Ochiltree Counties in the Texas Panhandle.

- In September 2016, the Debtors acquired oil and gas properties located in the Merge (the "Merge Acquisition"), including 16,975 undeveloped net acres in Canadian, Grady, and McClain Counties, Oklahoma.

- Over the past four years, the Debtors divested a range of non-core acreage holdings, including their entire position in the primarily gas-focused Arkoma Basin region in southeastern Oklahoma in August 2017 (the "Arkoma Divestiture") and several non-core assets in the WAB in January 2019 (the "WAB Divestitures").

- The Debtors renegotiated service contracts and modified their operations to reduce drilling activities, even at one point suspending all drilling operations for several months, and took the difficult step of terminating approximately one-third of their workforce in 2016.

67.     The Debtors also retained several advisors to assist them in their strategic initiatives.  In November 2017, the Debtors engaged Credit Suisse to explore strategic alternatives to enhance the Debtors' liquidity, evaluate strategic merger and acquisition opportunities, and address their capital structure.  In early 2018, the Debtors engaged Evercore to explore strategic and liability management options.

68.     On February 5, 2018, the Debtors, working with Credit Suisse, implemented an offer of $450.0 million in the First Lien Notes.  The offering was originally structured so as to optimize the Debtors' development of and expand their strategic options for their Merge assets by granting the Debtors the flexibility to unrestrict subsidiaries that hold the Merge assets.  The Debtors also intended to use a portion of the proceeds to repurchase some of the Unsecured Notes at a discount to par or an exchange of some of the Unsecured Notes for new second lien notes.

69.     In opposition to the offering, however, an ad hoc group of primarily holders of Unsecured Notes and some holders of First Lien Notes organized and retained Davis Polk & Wardwell LLP (the "Crossover Group").  The Crossover Group informed the Debtors that

its members had entered into a cooperation agreement (the "<u>Cooperation Agreement</u>") that extended to the maturity of the Unsecured Notes and indicated to the Debtors that they opposed the deal and would be unlikely to participate in the notes buyback on the terms that the Debtors had contemplated. The Debtors ultimately amended the deal and used the proceeds from the offering to repay almost all borrowings under the RBL in order to shore-up liquidity to support operations and eliminate a number of restrictive covenants contained in the RBL.

70. In parallel to the $450 million First Lien Note capital raise, beginning in October 2017, the Debtors started working with Tudor, Pickering, Holt & Co. to evaluate potential drilling joint ventures that would enable the continued development of their WAB properties whereby a third party would agree to fund a substantial portion of the expense of drilling and completing wells on the Debtors' assets. The deal evolved into a WAB and Merge combined DrillCo in February 2018 and a term sheet was signed with a reputable counterparty in April 2018. Following delays in consummating the DrillCo due, in part, to transitions in the Debtors' leadership, nine Merge wells that were included in the DrillCo performed in the aggregate below expectations, which undercut the counterparty's confidence in the Debtors' assets and operating capability. In late August 2018, the counterparty's board ultimately did not support entry into the DrillCo and walked from the fully negotiated deal.

71. During the same time period in 2018, the Debtors terminated their two top executives, the Chief Executive Officer and the President, in April and appointed the then-Chief Operating Officer as the interim Chief Executive Officer. In July 2018, I was hired as the Chief Executive Officer and, shortly thereafter, began implementing a number of operational and personnel changes. Later that year, the Debtors' Chief Financial Officer resigned and, in January 2019, the Debtors' Chief Operating Officer resigned and the Debtors elevated Mr. Kirk

Goehring to become the Chief Operating Officer and Mr. Thomas Hester to become the Chief Financial Officer.

### C.   Noteholder Discussions.

72.    In furtherance of the Debtors' exploration of liability management options, in June 2018, the Debtors retained Kirkland & Ellis LLP ("Kirkland") as restructuring counsel to assist, along with the Debtors' investment bank, Evercore, the Board and management in exploring all available alternatives to address its capital structure.

73.    The Debtors then began two parallel paths.  The first focused on exploring strategic transaction alternatives.   The second focused on negotiating a potential value-maximizing out-of-court restructuring transaction with the Debtors' organized Crossover Group.

74.    The Debtors, with the assistance of Evercore, commenced outreach to approximately twenty potential strategic partners about various potential combinations, asset sales, and other transactions.   Certain strategic partners executed non-disclosure agreements and conducted significant diligence but, ultimately, opted not to move forward with any transaction.

75.    In parallel, the Debtors proactively initiated discussions with the Crossover Group regarding the potential contours of an out-of-court deleveraging transaction that would increase the Debtors' financial flexibility to optimize the value of the Debtors' core Merge and WAB assets for the benefit of all stakeholders, including equity.  Throughout 2018, the Debtors continued to engage with Crossover Group, focusing on potential out-of-court debt-for-equity transactions.  The Crossover Group retained Houlihan Lokey as its investment bank in April 2018 and increased its aggregate holdings to nearly 90% of the Unsecured Notes by October 2018.

76.    In August 2018, the Debtors and certain noteholders signed nondisclosure agreements to facilitate discussions regarding potential transactions to address the Debtors' capital structure.  Over the remainder of 2018, the Debtors and the Crossover Group exchanged several

term sheets and held in-person meetings in an attempt to achieve a restructuring transaction. These transactions initially contemplated an exchange of a minority equity stake in JEI for a corresponding reduction in funded debt. As negotiations continued amidst declining commodity prices (and related reductions in the trading prices of the Debtors' debt), the negotiations migrated to majority equity stakes in exchange for greater debt reductions. Although the parties were unable to reach agreement regarding an out-of-court restructuring and publicly cleansed their term sheets on two separate occasions,[6] the Debtors and the Crossover Group nevertheless continued to engage through their respective advisors.

77.     As talks with the Crossover Group continued, the NYMEX WTI oil price fell from $74.55 per barrel on October 1, 2018 to $51.93 on November 30, 2018. In late November 2018, as oil prices continued to fall, an ad hoc group of holders of over 50% of the First Lien Notes represented by Milbank LLP (the "First Lien Ad Hoc Group") organized and subsequently retained Lazard Frères & Co. LLC as financial advisor. In February 2019, shortly after the Debtors cleansed for the second time their term sheet with the Crossover Group, the members of the Crossover Group purchased nearly 40% of the principal outstanding of First Lien Notes. At this point, the Debtors could not reach a comprehensive restructuring transaction without the support of both the Crossover Group and the First Lien Ad Hoc Group.

78.     Accordingly, beginning in February 2019, the Debtors engaged in robust, arm's-length negotiations with both the First Lien Ad Hoc Group and the Crossover Group regarding a broader, comprehensive restructuring of the Debtors' balance sheet. Between the two

---

[6]     *See* Jones Energy, Inc., Current Report (Form 8-K) (Oct. 15, 2018); Jones Energy, Inc., Current Report (Form 8-K) (Apr. 2, 2019).

ad hoc groups and the Debtors (which hold just over 3.5% of the Unsecured Notes), approximately 92% of the First Lien Notes and 91% of the Unsecured Notes reportedly were represented.

79.     When an in-court implementation became a material possibility, the Debtors engaged Alvarez & Marsal North America, LLC ("A&M") as restructuring advisor in January 2019 and Jackson Walker as conflicts and co-counsel in early-March 2019.

80.     On April 2, 2019, after extensive, arm's-length negotiations that played out over several months, the Debtors executed the Restructuring Support Agreement with both First Lien Ad Hoc Group and the Crossover Group (together, the "Consenting Stakeholders"), which will maximize stakeholder recoveries, allow operational continuity, and ensure a viable enterprise upon emergence.  A timeline of the key liability management efforts and related events is as follows:



### D.   TRA Discussions.

81.   During the course of the Debtors' restructuring negotiations, the Debtors, through Jackson Walker, also have been in discussions with counsel for Metalmark regarding the TRA.  In the days leading up to the Petition Date, Metalmark executed a joinder to the Restructuring Support Agreement.

**Part IV:**
**Restructuring Support Agreement, Plan, and Committed Exit Facility**

A.       **Restructuring Support Agreement and Plan.**

82.       The Restructuring Support Agreement is result of significant and lengthy negotiations with the First Lien Ad Hoc Group, the Crossover Group, and Metalmark and is a significant achievement for the Debtors in the face of continued price volatility and the unique composition of the two ad hoc groups.  Each of the ad hoc groups holds a blocking position in the First Lien Notes, preventing the Debtors from confirming a consensual chapter 11 plan without the consent of both bondholders groups.  The Restructuring Support Agreement provides for the reorganization of the Debtors as a going concern with a substantially deleveraged capital structure and sufficient liquidity to fund the Debtors' post-emergence business plan.  The following graphic compares the Debtors' current capital structure with the proposed capital structure contemplated by the parties:



83. The proposed Plan further provides for the following treatment of claims:

    (a)    holders of administrative and priority claims will receive payment in full in cash;

    (b)    holders of general unsecured claims—including all trade claims—against Debtors other than JEI and/or JEI, LLC will receive payment in full in cash;

(c)     holders of claims under the First Lien Notes will receive their pro rata share of 96% of the new common equity of the reorganized Debtors (the "New Common Equity");

(d)     holders of claims under the Unsecured Notes will receive their pro rata share of (a) 4% of the New Common Equity and (b) new warrants exercisable for up to a 15% ownership stake in the reorganized Debtors;

(e)     holders of other secured claims will receive payment in full in cash, the collateral securing their claims, reinstatement, or such other treatment as to render their claims unimpaired; and

(f)     holders of general unsecured claims against JEI and/or JEI, LLC and holders of existing equity interests and will not receive a recovery.

84.     In addition to entirely deleveraging the Debtors' balance sheet, the Restructuring Support Agreement provides the Debtors with the ability to use cash collateral on an uncontested basis during the cases and obtain incremental liquidity by way of an exit facility at the conclusion of the cases.  These features ensure the Debtors have and will continue to have sufficient liquidity to fund operations during and after these proceedings, enabling business continuity into the foreseeable future.   Moreover, the Restructuring Support Agreement contains settlements of disputes that, if litigated, could delay the Debtors' emergence from chapter 11 and impose significant costs that would divert funds from operations and inhibit growth.  Instead, the Debtors have secured an expedited path to confirmation of their Plan that will minimize the administrative costs to the estates and hasten the Debtors' ability to capitalize on its new, lower debt profile and focus on its ongoing operational and strategic initiatives.

85.     The Debtors filed the chapter 11 cases to implement their prepackaged restructuring pursuant to the terms of the Restructuring Support Agreement and Plan, thereby bolstering their long-term growth prospects and operating performance.   The Plan, which represents the successful culmination of months of restructuring efforts and numerous compromises and concessions by the Debtors' noteholders, gives the Debtors the best opportunity

to maximize value for the benefit of their stakeholders.  Given the level of support among the Debtors' financial stakeholders, and considering the still uncertain and challenging oil and gas market backdrop, it is important to proceed efficiently to confirmation.

**B.      Committed Exit Facility.**

86.      In addition, as part of the Restructuring Support Agreement, certain Consenting Stakeholders have agreed to provide the Reorganized Debtors with a post-emergence financing in the form of a new exit credit facility in an aggregate principal amount of up to $20.0 million (the "Committed Exit Facility").  The Restructuring Support Agreement provides flexibility for the Committed Exit Facility to be replaced with a larger, traditional and more cost-efficient reserve-based exit facility provided by third-party lenders either during the chapter 11 process through the Effective Date or afterwards.  The funds provided by an exit facility will be used to satisfy ongoing operating expenses and to fund future drilling activities.  Based on the analysis of the Debtors' management team and advisors, the Committed Exit Facility is being obtained on the most favorable terms available in light of the circumstances of the chapter 11 cases.  The Committed Exit Facility gives the Debtors sufficient liquidity to fund their operations following consummation of the Plan and the restructuring transactions contemplated therein until a new facility can be attained.

**C.      Investigation Committee Investigation.**

87.      On January 30, 2019, the Board authorized the formation of a committee of independent directors (the "Investigation Committee") to:  (a) review, consider, and evaluate any potential claims or causes of actions arising from the prepetition acts and decisions of management and the Board that could belong to the Debtors' estates (the "Investigation"); and (b) to review, consider, evaluate, and, to the extent necessary, take action with respect to any releases, exculpations, and indemnifications granted in connection with a comprehensive restructuring

transaction.  The Board appointed two independent directors, Tara W. Lewis and L. Spencer Wells, to serve as the Investigation Committee's members and to conduct and oversee the Investigation with the assistance of the Debtors' advisors.

88.     The Investigation Committee immediately commenced the Investigation.  The scope of the Investigation was intentionally set broadly to capture any potential claim arising in the relevant prepetition period.  After initial fact-gathering interviews, the Investigation Committee identified approximately a dozen company actions to examine, including equity offerings, tax distributions to JEH unitholders, debt repurchases, acreage acquisitions and divestitures, preferred dividend distributions, a cash-for-equity exchange, and the incurrence of the First Lien Notes (the "Historical Transactions").

89.     To date, the Investigation Committee and its advisors have collected approximately 20,000 electronic and hard copy documents from five custodians and conducted three in-person interviews with members of the Debtors' management during the relevant period.  The Investigation Committee has carefully evaluated the facts and circumstances of the Historical Transactions to determine whether any colorable claims for actual fraudulent transfer, constructive fraudulent transfer, preferential subordination, recharacterization, breach of fiduciary duty, or corporate waste exist and further to assess the appropriateness of the proposed Debtor and third-party releases included in the Plan which encompass those claims.  Based on the work and analysis performed to date, the Investigation Committee recommended that the Board approve and support the releases set forth in the Restructuring Support Agreement and incorporated into the Plan, which recommendation was adopted in full.

90.     The Debtors and the Investigation Committee reserve all rights to continue the Investigation, including further analysis of the Historical Transactions, as necessary, and the

expansion of the scope of the Investigation to include other potential Debtors' activities or transactions.

**D.    Proposed Confirmation Timeline.**

91.     As previewed, contemporaneously herewith, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing Plan and Disclosure Statement Objection and Reply Deadlines and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the Combined Hearing Notice, (V) Waiving the Requirement That the U.S. Trustee Convene a Meeting of Creditors, and (VI) Granting Related Relief* seeking an order scheduling dates and deadlines in connection with the approval of the Disclosure Statement and confirmation of the Plan.  The Debtors' ability to move swiftly through these chapter 11 cases is important and fundamental to the support of the Consenting Stakeholders.  Failure to consummate the restructuring in accordance with the milestones set forth in the Restructuring Support Agreement could cost the Debtors the benefits of the compromises embodied therein.  To avoid harm to the Debtors' business, or losing the value inherent in the Restructuring Support Agreement, the time for the Debtors to move forward is now.

**Part V:**
**First Day Motions**

92.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business

operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift

and smooth restructuring of the Debtors' balance sheet, including:

**Administrative Motions:**

- "Joint Administration Motion": *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief.*

- "Scheduling Motion": *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing Plan and Disclosure Statement Objection and Reply Deadlines and Related Procedures, (III) Approving the Solicitation Procedures, (IV) Approving the Combined Hearing Notice, (V) Waiving the Requirement That the U.S. Trustee Convene a Meeting of Creditors, and (VI) Granting Related Relief.*

- "Creditor Matrix Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) Waiving the Requirement to File Equity Lists and Modifying Equity Holder Notice Requirements, (III) Authorizing Redaction of Certain Personal Identification Information, (IV) Extending the Time, and, upon Plan Confirmation, Waiving the Requirement, to File Schedules and Statements of Financial Affairs, and (V) Granting Related Relief*

- "Claims, Noticing, Solicitation, and Administrative Agent Application": *Debtors' Emergency Application for Entry of an Order Appointing Epiq Corporate Restructuring, LLC as Claims, Noticing, Solicitation, and Administrative Agent.*

**Finance Motions:**

- "Cash Management Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Maintain Existing Business Forms, (C) Pay Any Prepetition or Postpetition Amounts Outstanding on Account of the Bank Fees, and (D) Continue to Perform the Intercompany Transactions, and (II) Granting Related Relief.*

- "Cash Collateral Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief.*

**Operational Motions:**

- "Wages Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief.*

- "Lienholders Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of (A) Operating Expenses, (B) Marketing Expenses, (C) Shipping and Warehousing Claims, (D) 503(b)(9) Claims, (E) HSE and Other Claims, (F) Outstanding Orders, and (II) Granting Related Relief.*

- "Royalty Payments Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Payment of (A) Obligations Owed to Holders of Mineral and Other Interests and (B) Joint Interest Billings, (II) Limiting Notice, and (III) Granting Related Relief.*

- "Equity Trading Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and Preferred Stock and (II) Granting Related Relief.*

- "Insurance Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (C) Continue the Surety Bond Program and (II) Granting Related Relief.*

- "Utilities Motion": *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief.*

- "Taxes Motion": *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees, (II) Making Certain Entity Classification Elections, and (III) Granting Related Relief.*

93.    I have consulted with advisors regarding and understand each of the First Day Motions and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

94.    I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption and maximum value preservation during the pendency of these chapter 11 cases.  Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to the Debtors, their businesses, and their estates. Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Court should grant the relief requested in each of the First Day Motions.  Notably, the First Day Motions

also are supported by the parties to the Restructuring Support Agreement representing the over

$1 billion that is being equitized pursuant to the proposed Plan.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  April 14, 2019                    */s/ Carl F. Giesler, Jr.*
                                          Carl F. Giesler, Jr.
                                          Chief Executive Officer
                                          Jones Energy, Inc.

## **<u>Certificate of Service</u>**

  I certify that on April 14, 2019, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

            */s/ Matthew D. Cavenaugh*
            Matthew D. Cavenaugh

# EXHIBIT A

**Restructuring Support Agreement**

EXECUTION VERSION

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.   ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.**

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto and as amended, supplemented, or otherwise modified from time to time in accordance with Section 13 hereof, this "**Agreement**"), is made and entered into as of April 2, 2019 (the "**Execution Date**"), by and among the following parties (each of the following described in sub clauses (i) through (iii) of this preamble, collectively, the "**Parties**"):[1]

   i.    Jones Energy, Inc., Jones Energy, LLC, CCPR Sub LLC,  Jones Energy Finance Corp., Jones Energy Holdings, LLC, Jones Energy Intermediate, LLC, JRJ Opco, LLC, Nosley Acquisition, LLC, Nosley Assets, LLC, Nosley Midstream, LLC, and Nosley SCOOP, LLC (collectively, the "**Company Parties**");

   ii.   the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, First Lien Notes (collectively, the "**Consenting First Lien Noteholders**") that have executed and delivered to Counsel to the Company Parties counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement; and

   iii.  the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, 2022 Notes and 2023 Notes (collectively, the "**Consenting Unsecured Noteholders**" and, together with the Consenting First Lien Noteholders, the "**Consenting Stakeholders**") that have executed and delivered to Counsel to the Company Parties counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement.

---

[1]   Capitalized terms used, but not defined in the preamble and recitals to this Agreement, have the meanings given to them in Section 1 of this Agreement or the Plan (defined herein), as applicable.

*RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arm's length negotiated or been apprised of certain restructuring transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in (i) the prepackaged chapter 11 plan of reorganization attached hereto as **Annex 1** (the "**Plan**"), (ii) the Cash Collateral Order (as defined below) attached hereto as **Annex 2**, (iii) the Committed Exit Facility Term Sheet (as defined below) attached hereto as **Annex 3**, (iv) the Exit Commitment Letters (as defined below) attached hereto as **Annex 4**, (v) the Management Compensation Term Sheet (as defined below) attached hereto as **Annex 5**, (vi) the corporate governance term sheet attached hereto as **Annex 6** (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Governance Term Sheet**"), and (vii) the term sheet for the New Warrants Documentation attached hereto as **Annex 7** (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**New Warrants Term Sheet**" and, such transactions as described in this Agreement, the Plan, the Cash Collateral Order, the Committed Exit Facility Term Sheet, the Exit Commitment Letters, the Management Compensation Term Sheet, the Governance Term Sheet, and the New Warrants Term Sheet, the "**Restructuring**");

**WHEREAS**, the Debtors intend to commence voluntary reorganization cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") to effect the Restructuring through the Plan;

**WHEREAS**, the Consenting First Lien Noteholders have agreed to the Company Parties' use of cash collateral in accordance with the terms and conditions set forth in any order (a "**Cash Collateral Order**") entered in the Chapter 11 Cases authorizing the use of cash collateral (whether interim or final), which order(s) shall be substantially in the form attached hereto as **Annex 2**;

**WHEREAS**, the Consenting Stakeholders or affiliates thereof committed to provide the reorganized Company Parties with an exit financing facility *pro rata* to each respective Consenting Stakeholder's holdings of New Common Equity as of the Effective Date (the "**Committed Exit Facility**") on the terms and conditions set forth in the term sheet attached hereto as **Annex 3** (the "**Committed Exit Facility Term Sheet**") and the commitment letter attached hereto as **Annex 4** and related fee letters with respect thereto (the "**Exit Commitment Letters**");

**WHEREAS**, as of the date hereof, the Consenting First Lien Noteholders hold, in the aggregate, approximately 84 percent of the aggregate principal amount outstanding under the First Lien Notes Indenture;

**WHEREAS**, as of the date hereof, the Consenting Unsecured Noteholders hold, in the aggregate, approximately 84 percent of the aggregate principal amount outstanding under the Unsecured Notes Indentures;

**WHEREAS**, the Parties agree that this Agreement, the Plan, and the Restructuring are the product of arm's-length and good-faith negotiations among all of the Parties; and

2

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring on the terms and conditions set forth in this Agreement and the Plan.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**   *Definitions and Interpretation.*

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

(a)   "**2022 Notes**" means the 6.75% Senior Notes due April 1, 2022 issued pursuant to the 2022 Notes Indenture.

(b)   "**2022 Notes Indenture**" means that certain indenture entered into among the Company Parties party thereto, and UMB Bank, National Association or any successors thereto, as indenture trustee, dated as of April 1, 2014, and as may be amended or supplemented from time to time in accordance with its terms.

(c)   "**2023 Notes**" means the 9.25% Senior Notes due March 15, 2023 issued pursuant to the 2023 Notes Indenture.

(d)   "**2023 Notes Indenture**" means that certain indenture entered into among the Company Parties party thereto, and UMB Bank, National Association or any successors thereto, as indenture trustee, dated as of February 23, 2015, and as may be amended or supplemented from time to time in accordance with its terms.

(e)   "**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules attached to this Agreement in accordance with <u>Section 14.05</u> hereof (including the Plan).

(f)   "**Agreement Effective Date**" means the date on which the conditions set forth in <u>Section 2</u> hereof have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

(g)   "**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to such Party.

(h)   "**Alternative Exit Facility**" means an exit financing facility to be provided in lieu of the Committed Exit Facility with the consent of, and on terms and conditions (and in an amount) reasonably acceptable to the Company Parties and the Required Consenting First Lien Noteholders.

(i)   "**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation,

dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, tender offer, exchange offer, consent solicitation, recapitalization, plan of reorganization, share exchange, business combination, joint venture, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to, in whole or in part, or is inconsistent with the terms of the Restructuring; *provided*, *however*, that "Alternative Restructuring Proposal" shall not include any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to any Alternative Exit Facility.

(j)      "**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

(k)      "**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

(l)      "**Business Day**" means any day other than a Saturday, Sunday, or other day on which the New York Stock Exchange or the NASDAQ is closed for trading.

(m)      "**Cash Collateral Order**" has the meaning set forth in the recitals to this Agreement.

(n)      "**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

(o)      "**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

(p)      "**Committed Exit Facility**" has the meaning set forth in the recitals to this Agreement.

(q)      "**Committed Exit Facility Term Sheet**" has the meaning set forth in the recitals to this Agreement.

(r)      "**Company Claims and Interests**" means any Claim against, or Interest in, a Company Party.

(s)      "**Company Parties**" has the meaning set forth in the recitals to this Agreement.

(t)      "**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring.

(u)      "**Confirmation Hearing**" has the meaning set forth in Section 4(a)(iv) hereof.

(v)      "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

(w)      "**Consenting First Lien Ad Hoc Group Noteholders**" means the Consenting First Lien Noteholders that are members of the First Lien Ad Hoc Group.

(x)      "**Consenting First Lien Noteholders**" has the meaning set forth in the preamble to this Agreement.

(y) "**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

(z) "**Consenting Unsecured Noteholders**" has the meaning set forth in the preamble to this Agreement.

(aa) "**Counsel to the Company Parties**" means Kirkland & Ellis LLP and Jackson Walker LLP.

(bb) "**Counsel to the Crossover Group**" means Davis Polk & Wardwell LLP and Haynes and Boone, LLP.

(cc) "**Counsel to the First Lien Ad Hoc Group**" means Milbank LLP and Porter Hedges LLP.

(dd) "**Crossover Group**" means the *ad hoc* group of crossover holders of First Lien Notes and Unsecured Notes represented by Davis Polk & Wardwell LLP, Haynes and Boone, LLP, and Houlihan Lokey Capital Inc.

(ee) "**Definitive Documents**" means the documents set forth in Section 3.01 hereof.

(ff) "**Disclosure Statement**" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

(gg) "**Execution Date**" has the meaning set forth in the preamble to this Agreement.

(hh) "**Exit Commitment Letters**" has the meaning set forth in the recitals to this Agreement.

(ii) "**Exit Facility**" means the Committed Exit Facility and any Alternative Exit Facility, as applicable.

(jj) "**Exit Facility Documents**" means, collectively, the agreements, documents, or instruments related to the Exit Facility and any agreements, commitment letters, documents, or instruments related thereto.

(kk) "**Finance Documents**" means, collectively, (i) the First Lien Notes Indenture, the 2022 Notes Indenture, and the 2023 Notes Indenture, and (ii) all other documents entered into pursuant to or in connection with the foregoing documents in clause (i) of this definition.

(ll) "**First Day Pleadings**" means the pleadings that the Company Parties determine, in consultation with the Required Consenting Noteholders, are necessary or desirable to file before the first hearing in the Chapter 11 Cases on or immediately after the Petition Date.

(mm) "**First Lien Ad Hoc Group**" means the *ad hoc* group of holders of First Lien Notes represented by Milbank LLP, Porter Hedges LLP, and Lazard Frères & Co. LLC.

(nn)    "**First Lien Notes**" means the 9.25% Senior Secured First Lien Notes due March 15, 2023 issued pursuant to the First Lien Notes Indenture.

(oo)    "**First Lien Notes Claim**" means any Claim on account of the First Lien Notes.

(pp)    "**First Lien Notes Indenture**" means that certain indenture entered into among the Company Parties parties thereto, and UMB Bank, National Association or any successors thereto, as indenture trustee, dated as of February 14, 2018, and as may be amended or supplemented from time to time in accordance with its terms.

(qq)    "**First Lien Steering Committee**" means each of the following holders (and/or investment advisors, sub-advisors, members, or managers of funds and accounts holding First Lien Notes) that are members of the First Lien Ad Hoc Group:  Citigroup Global Markets Inc., Oaktree Capital Management, L.P., and Silver Point Capital, L.P.

(rr)    "**Governance Documents**" means the organizational and governance documents for the reorganized Company Parties and their subsidiaries, including, without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, and limited partnership agreements (or equivalent governing documents), which Governance Documents shall be in accordance with this Agreement (including Governance Term Sheet).

(ss)    "**Governance Term Sheet**" has the meaning set forth in the recitals to this Agreement.

(tt)    "**Insolvency Proceeding**" means any corporate action, legal proceeding, or other procedure or step taken in any jurisdiction in relation to:

(i)    the suspension of payments, a moratorium of any indebtedness, winding up, bankruptcy, liquidation, dissolution, administration, receivership, administrative receivership, judicial composition or reorganization (by way of voluntary arrangement, scheme, or otherwise) of any Company Party, including under the Bankruptcy Code;

(ii)    a composition, conciliation, compromise, or arrangement with the creditors generally of any Company Party or an assignment by any Company Party of its assets for the benefit of its creditors generally or any Company Party becoming subject to a distribution of its assets;

(iii)    the appointment of a liquidator, receiver, administrator, administrative receiver compulsory manager, or other similar officer in respect of any Company Party or any assets of any Company Party; or

(iv)    any procedure or step in any jurisdiction analogous to those set out in paragraphs (i) to (iii) above.

(uu)    "**Interest**" means any equity security as defined in section 101(16) of the Bankruptcy Code.

(vv)    "**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Annex 9**.

(ww)    "**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction.

(xx)    "**Management Compensation Term Sheet**" means the term sheet attached hereto as **Annex 5**.

(yy)    "**Management Incentive Plan**" means any equity incentive program for the members of the management team of the reorganized Company Parties to be established as contemplated under the Management Compensation Term Sheet, and in accordance with this Agreement and the Definitive Documents.

(zz)    "**Milestones**" means the milestones set forth in Section 4 hereof.

(aaa)    "**New Warrants Documentation**" means the definitive documentation with respect to the New Warrants to be issued in accordance with the Plan.

(bbb)    "**New Warrants Term Sheet**" has the meaning set forth in the recitals to this Agreement.

(ccc)    "**Outside Date**" means the date that is 75 days after the Petition Date.

(ddd)    "**Parties**" has the meaning set forth in the preamble to this Agreement.

(eee)    "**Permitted Transfer**" means each transfer of any Company Claims and Interests that meet the requirements of Section 9.01 hereof.

(fff)    "**Permitted Transferee**" means each transferee of any Company Claims and Interests who meets the requirements of Section 9.01 hereof.

(ggg)    "**Petition Date**" means the first date on which any of the Company Parties commences a Chapter 11 Case.

(hhh)    "**Plan**" has the meaning set forth in the recitals to this Agreement.

(iii)    "**Plan Effective Date**" means the date on which all conditions precedent to the effectiveness of the Plan have been satisfied or waived in accordance with the terms of the Plan, and the Plan thereby becomes effective.

(jjj)    "**Plan Supplement**" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Debtors no later than seven (7) days before the commencement of the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and additional documents filed with the Bankruptcy Court prior to the Plan Effective Date as amendments to the Plan

Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions set forth herein.

(kkk)   "**Qualified Marketmaker**" means an entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims and Interests (or enter with customers into long and short positions in Company Claims and Interests), in its capacity as a dealer or market maker in Company Claims and Interests and (ii) is, in fact, regularly in the business of making a market in Claims against issuers or borrowers (including debt securities or other debt).

(lll)   "**Required Consenting First Lien Noteholders**" means, as of the relevant date, Consenting First Lien Noteholders that collectively hold at least a majority of the aggregate outstanding principal amount of First Lien Notes held by all of the Consenting First Lien Noteholders as of such date, which must include no fewer than two members of the First Lien Ad Hoc Group.

(mmm)"**Required Consenting Noteholders**" means the Required Consenting First Lien Noteholders and the Required Consenting Unsecured Noteholders.

(nnn)   "**Required Consenting Unsecured Noteholders**" means, as of the relevant date, Consenting Unsecured Noteholders that collectively hold at least a majority of the aggregate outstanding principal amount of Unsecured Notes held by all of the Consenting Unsecured Noteholders as of such date.

(ooo)   "**Restructuring**" has the meaning set forth in the recitals to this Agreement.

(ppp)   "**Securities Act**" means the Securities Act of 1933, as amended.

(qqq)   "**Securities Rules**" means Rules 501(a)(1), (2), (3), and (7) promulgated under the Securities Act.

(rrr)   "**Solicitation Materials**" means all solicitation materials in respect of the Plan.

(sss)   "**Support Period**" means the period commencing on the Agreement Effective Date and ending on the earlier of (i) the date on which this Agreement is terminated as to a Party in accordance with Section 12 hereof and (ii) the Plan Effective Date.

(ttt)   "**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 12 hereof.

(uuu)   "**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

(vvv)   "**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that the transferee is bound by the terms of this Agreement, substantially in the form attached hereto as **Annex 7**.

(www) "**Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar entity with respect to the First Lien Notes or the Unsecured Notes.

(xxx)   "**Unsecured Notes**" means each of and, collectively, the 2022 Notes and 2023 Notes.

(yyy)   "**Unsecured Notes Claim**" means any Claim on account of the Unsecured Notes.

(zzz)   "**Unsecured Notes Indentures**" means each of and, collectively, the 2022 Notes Indenture and the 2023 Notes Indenture.

1.02.   <u>Interpretation</u>.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)   unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)   unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time in accordance with this Agreement; *provided* that any capitalized terms herein that are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)   unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)   the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)   captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)   references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws; and

(i)   the use of "include" or "including" is without limitation, whether stated or not.

**Section 2.**     *Effectiveness of this Agreement.*

2.01.   This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(b)     holders of at least 80 percent of the aggregate outstanding principal amount of the First Lien Notes shall have executed and delivered counterpart signature pages of this Agreement to (i) the Company Parties, the Consenting Unsecured Noteholders, Counsel to the  First Lien Ad Hoc Group, and Counsel to the Crossover Group in a redacted form that removes such Consenting First Lien Noteholders' holdings of securities in the Company Parties and (ii) Counsel to the Company Parties in an unredacted form (to be held by such counsel on a professionals' eyes only basis);

(c)     holders of at least 77 percent of the aggregate outstanding principal amount of the Unsecured Notes shall have executed and delivered counterpart signature pages of this Agreement to (i) the Company Parties, the Consenting First Lien Ad Hoc Group Noteholders, Counsel to the First Lien Ad Hoc Group, and Counsel to the Crossover Group in a redacted form that removes such Consenting Unsecured Noteholders' holdings of securities in the Company Parties and (ii) Counsel to the Company Parties in an unredacted form (to be held by such counsel on a professionals' eyes only basis);

(d)     each Consenting Stakeholder that is participating in the Committed Exit Facility as of the date hereof shall have executed and delivered the Exit Commitment Letters with respect to its ratable share of the Committed Exit Facility; and

(e)     Counsel to the Company Parties shall have given notice to counsel to the other Parties in the manner set forth in <u>Section 14.13</u> hereof (by email or otherwise) that the conditions to the Agreement Effective Date set forth in this <u>Section 2</u> have occurred or are otherwise waived.

**Section 3.**     *Definitive Documents.*

3.01.   The Definitive Documents governing the Restructuring shall consist of the following:

(a)     the Plan and the Plan Supplement;

(b)     the Confirmation Order;

(c)     the Disclosure Statement and its exhibits;

(d)     the Solicitation Materials;

(e)     the order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials;

(f)        the Cash Collateral Order;

(g)        the Exit Facility Documents;

(h)        the Governance Documents;

(i)        the Management Compensation Term Sheet and Management Incentive Plan; and

(j)        the New Warrants Documentation.

3.02.    The Definitive Documents not executed or not in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including the annexes hereto), as they may be modified, amended, or supplemented in accordance with <u>Section 13</u> hereof.  Further, except as expressly contemplated in this Agreement (including the annexes hereto), the Definitive Documents not executed or not in a form attached to this Agreement as of the Execution Date shall be consistent with this Agreement and otherwise in form and substance reasonably acceptable to the Company Parties and the Required Consenting First Lien Noteholders; *provided* that the New Warrants Documentation shall also be in form and substance reasonably acceptable to the Required Consenting Unsecured Noteholders.

**Section 4.**        *Milestones.*

(a)        The following Milestones shall apply to this Agreement:

(i)        no later than the first Business Day following the Agreement Effective Date, the Company Parties shall commence a process to solicit and obtain proposals and written commitments from third-party providers of reserve based loans for a potential Alternative Exit Facility;

(ii)        no later than April 15, 2019, the Company Parties shall commence the Chapter 11 Cases and shall file the Plan and Disclosure Statement;

(iii)        no later than April 18, 2019, the Bankruptcy Court shall have entered the Cash Collateral Order on an interim basis;

(iv)        no later than May 7, 2019, the Bankruptcy Court shall have entered an order approving the Disclosure Statement and the Confirmation Order;[2]

---

[2]    The Company Parties will request a hearing for entry of such orders (the "<u>Confirmation Hearing</u>") on the soonest date after the deadline for holders in voting classes to submit ballots with respect to the Plan that is reasonably practicable (subject to the Bankruptcy Court's availability), but in no event, on the date that is later than 1 Business Day before May 7, 2019.

(v)     no later than the earlier of (a) the entry of the Confirmation Order or (b) 35 days after the Petition Date (unless the Plan Effective Date has already occurred), the Bankruptcy Court shall have entered the Cash Collateral Order on a final basis; and

(vi)     no later than 14 days after entry of the Confirmation Order, the Plan Effective Date shall have occurred.

(b)     The Milestones may be extended by the Company Parties with the prior written consent, with email from counsel being sufficient, of the Required Consenting First Lien Noteholders.

**Section 5.** *Commitments of the Consenting Stakeholders.*

5.01.   General Commitments, Forbearances, and Waivers.

(a)     Affirmative Commitments.   During the Agreement Effective Period, each Consenting Stakeholder agrees, severally, and not jointly, in respect of all of its Company Claims and Interests to:

(i)     support the Restructuring, and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which it is legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring;

(ii)     take all steps reasonably necessary and desirable to consummate the Restructuring in accordance with this Agreement;

(iii)     support, and not object to, delay, impede, or take any other action to interfere with the Company Parties' efforts to obtain an Alternative Exit Facility, including with respect to the Company's marketing efforts, discussions, negotiations, or information sharing with any potential lender thereunder;

(iv)     give any notice, order, instruction, or direction to the applicable Trustee(s) necessary to consummate the Restructuring;

(v)     negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents to which it is required to be a party or to which it has consent rights pursuant to Section 3.02 hereof; and

(vi)     negotiate in good faith any additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay, or are necessary to effectuate the consummation of the Restructuring.

(b)      Negative Commitments.  During the Agreement Effective Period, each Consenting Stakeholder agrees in respect of all of its Company Claims and Interests that it shall not directly or indirectly:

(i)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring;

(ii)      propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)      file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement;

(iv)      exercise any right or remedy for the enforcement, collection, or recovery of any of the Company Claims and Interests other than to enforce this Agreement, the Cash Collateral Order, the Confirmation Order, or any other Definitive Document or as otherwise permitted under this Agreement;

(v)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or any of the transactions implementing the Restructuring as contemplated in this Agreement, against the Company Parties or the other Parties other than to enforce this Agreement, the Cash Collateral Order, the Confirmation Order, or any other Definitive Document or as otherwise permitted under this Agreement; or

(vi)      object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; *provided*, *however*, that nothing in this Agreement shall limit the right of any Party to exercise any right or remedy provided under this Agreement, the Cash Collateral Order, the Confirmation Order, or any other Definitive Document or as otherwise permitted under this Agreement.

5.02.  Commitments with Respect to Chapter 11 Cases.

(a)      During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall, subject to receipt by such Consenting Stakeholder, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials:

(i)      vote each of its Company Claims and Interests to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan to the Company's solicitation agent on or before April 11, 2019;

(ii)      to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, not select on its ballot(s) the "opt-out" with respect to the releases set forth in the Plan; and

(iii)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (ii) above;

*provided*, *however*, that nothing in this Agreement shall prevent any Party from changing, withholding, amending, or revoking (or causing the same) its timely election or vote with respect to the Plan if this Agreement has been validly terminated with respect to such Party.

(b)     During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims and Interests, severally, and not jointly, will not object to any motion or other pleading or document filed by a Company Party in the Chapter 11 Cases in furtherance of the Restructuring that is consistent with this Agreement.

**Section 6.     *Additional Provisions Regarding the Consenting Stakeholders' Commitments.***

6.01.     Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)     be construed to prohibit any Consenting Stakeholder from appearing as a party in interest in any matter to be adjudicated in a Chapter 11 Case, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering, impeding, or taking any other action to delay, interfere, or impede, directly or indirectly, the Restructuring;

(b)     affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee) in a manner consistent with its obligations under Section 5.01(a) hereof;

(c)     impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring;

(d)     prevent any Consenting Stakeholder from enforcing this Agreement, the Cash Collateral Order, the Confirmation Order, or any other Definitive Document, or from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, such documents;

(e)     prohibit a Consenting Stakeholder from withdrawing a vote on the Plan solely upon the Termination Date with respect to such Consenting Stakeholder (other than as a result of the occurrence of the Effective Date); *provided* that upon the withdrawal of its vote on or after the Termination Date with respect to such Consenting Stakeholder (other than as a result of the occurrence of the Effective Date), such vote shall automatically be deemed void *ab initio* and such Consenting Stakeholder shall have a reasonable opportunity to change its vote;

(f)     (i) prevent any Consenting Stakeholder from taking any action which is required by applicable Law, (ii) require any Consenting Stakeholder to take any action which is prohibited by applicable Law or to waive or forego the benefit of any applicable legal professional privilege, or (iii) require any Consenting Stakeholder to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations; *provided*, *however*, that if any Consenting Stakeholder proposes to take any action that is otherwise inconsistent with this Agreement in order to comply with applicable Law, such Consenting Stakeholder shall provide advance reasonable

notice to the Company Parties, Counsel to the Company Parties, Counsel to the First Lien Ad Hoc Group, and Counsel to the Crossover Group;

(g)    prevent any Consenting Stakeholder by reason of this Agreement or the transactions implementing the Restructuring from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like;

(h)    subject to the terms of Sections 5.01 and 5.02 hereof, prevent any Consenting Stakeholder from exercising any right under any Finance Document, nor shall anything contained in this Agreement be deemed to constitute a waiver or amendment of any provision of any Finance Document other than as expressly set forth herein;

(i)    prevent any Consenting Stakeholder from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, or priority of its Company Claims and Interests in accordance with the terms of the relevant Finance Documents (including, without limitation, the filing of a proof of claim against any Company Party); or

(j)    prohibit any Consenting Stakeholder from taking any action that is not inconsistent with this Agreement.

**Section 7.**    ***Commitments of the Company Parties.***

7.01.    <u>Affirmative Commitments</u>.  Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a)    support and take all steps reasonably necessary and desirable to consummate the Restructuring in accordance with this Agreement;

(b)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring contemplated herein, support and take all steps reasonably necessary and desirable to address any such impediment;

(c)    use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals with respect to the Restructuring;

(d)    actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring;

(e)    use commercially reasonable efforts to obtain proposals and written commitments for a potential Alternative Exit Facility;

(f)    upon reasonable request of the Consenting Stakeholders, inform the advisors to the Consenting Stakeholders as to:

(i)        the material business and financial (including liquidity) performance of the Company Parties;

(ii)       the status and progress of the negotiations of the Definitive Documents;

(iii)      the status of obtaining any necessary or desirable authorizations (including consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange; and

(iv)      the status and progress of the Company Parties' efforts to solicit proposals and written commitments for a potential Alternative Exit Financing;

(g)       inform counsel to the Consenting Stakeholders as soon as reasonably practicable after becoming aware of:

(i)        any event or circumstance that has occurred, or that is reasonably likely to occur (and if it did so occur), that would permit any Party to terminate, or would result in the termination of, this Agreement with respect to such Party;

(ii)       any matter or circumstance which they know, or suspect is likely, to be a material impediment to the implementation or consummation of the Restructuring;

(iii)      any notice of any commencement of any material involuntary Insolvency Proceedings, legal suit for payment of debt, or enforcement of a security interest by any person in respect of any Company Party;

(iv)      a breach of this Agreement (including a breach by any Company Party);

(v)       any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made; and

(vi)      any material operations or financial developments of the Company Parties.

(h)       make commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(i)        negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring as contemplated by this Agreement;

(j)        (i) provide counsel for the Consenting Stakeholders a reasonable opportunity to review draft copies of all First Day Pleadings and "second day" pleadings, (ii) to the extent reasonably practicable, provide counsel to any Consenting Stakeholders materially affected by such filing a reasonable opportunity to review draft copies of other documents that the Company Parties intend to file with the Bankruptcy Court and, in each case (i) and (ii), the Company Parties shall consult in good faith with such Consenting Stakeholders regarding the form and substance of the First Day Pleadings;

(k)     make commercially reasonable efforts to operate their businesses in the ordinary course, taking into account the Restructuring and the Chapter 11 Cases;

(l)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring as contemplated by this Agreement;

(m)     timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Noteholders, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases;

(n)     timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Noteholders, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan reorganization, as applicable; and

(o)     use commercially reasonable efforts to seek additional support for the Restructuring from their other material stakeholders to the extent reasonably prudent and, to the extent the Company Parties receive any Joinders or Transfer Agreements, to notify the Consenting Stakeholders of such Joinder and Transfer Agreements.

7.02.   Negative Commitments.  Except as set forth in Section 8.01 hereof, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Restructuring described in this Agreement;

(c)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(d)     file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement and the Definitive Documents.

**Section 8.     *Additional Provisions Regarding Company Parties' Commitments.***

8.01.   Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable

Law; *provided* that, to the extent that any such action or inaction is inconsistent with this Agreement or would be deemed to constitute a material breach hereunder, including a determination to pursue an Alternative Restructuring Proposal, the Company Parties shall provide the Consenting Stakeholders, Counsel to the First Lien Ad Hoc Group, and Counsel to the Crossover Group with written notice two (2) Business Days prior to when any Company Party intends to take such action or inaction; *provided*, *further*, that any such inaction or action shall not impede any parties rights to terminate this Agreement pursuant to <u>Section 12</u>.

8.02.    Subject to the terms of <u>Section 8.01</u> and <u>Section 12</u> hereof each Company Party and its respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall not solicit Alternative Restructuring Proposals, but shall have the right to:

(a)    consider, respond to, and facilitate any Alternative Restructuring Proposals (or inquiries or indications of interest with respect thereto) that may be received by the Company Parties;

(b)    provide access to non-public information concerning any Company Party to any person or entity or enter into Confidentiality Agreements or nondisclosure agreements with any person or entity in connection with any Alternative Restructuring Proposal (or inquiries or indications of interest with respect thereto) that may be received by the Company Parties; and

(c)    engage in discussions or negotiations with respect to Alternative Restructuring Proposals (or inquiries or indications of interest with respect thereto) that may be received by the Company Parties; and

(d)    enter into or continue discussions or negotiations with holders of Company Claims and Interests (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee or the United States Trustee), or any other person or entity regarding the Restructuring or Alternative Restructuring Proposals; *provided* that the Company Parties shall (x) provide a copy of any written Alternative Restructuring Proposal (and notice of any oral Alternative Restructuring Proposal) within two (2) Business Days of the Company Parties' or their advisors' receipt of such Alternative Restructuring Proposal to the advisors to the First Lien Ad Hoc Group and the Crossover Group, and (y) provide such information necessary to the advisors to the First Lien Ad Hoc Group and the Crossover Group regarding such discussions as necessary to keep the First Lien Ad Hoc Group contemporaneously informed as to the status and substance of such discussions; *provided*, *further*, that nothing in this Section 8 shall limit the Company Parties' ability to engage in marketing efforts, discussions, and/or negotiations with any party regarding an Alternative Exit Facility.

8.03.    Nothing in this Agreement shall:

(a)    impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the implementation of the Restructuring; or

(b)    prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.**      *Transfer of Interests and Securities.*

9.01.   During the Support Period, a Consenting Stakeholder shall not Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 promulgated under the Securities Exchange Act of 1934, as amended) in any Company Claims and Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)      in the case of any Company Claims and Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A promulgated under the Securities Act, (2) a non-U.S. person in an offshore transaction as defined in Regulation S promulgated under the Securities Act, (3) an institutional accredited investor (as defined in the Securities Rules), or (4) a Consenting Stakeholder; and

(b)      either (i) the transferee executes and delivers to Counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claims and Interests Transferred) to Counsel to the Company Parties at or before the time of the proposed Transfer; and

(c)      with respect to the Transfer of any Interests in a Company Party, such Transfer shall require at least five (5) Business Days' notice to Counsel to the Company Parties and not (i) violate the terms of any order entered by the Bankruptcy Court with respect to preservation of net operating losses or (ii) in the reasonable business judgment of the Company Parties and their legal and tax advisors, adversely (A) affect the Company Parties' ability to maintain the value of and utilize the Company Parties' net operating loss carryforwards or other tax attributes or (B) the Company Parties' ability to obtain the regulatory consents or approval necessary to effectuate the Restructuring.

9.02.   Upon compliance with the requirements of <u>Section 9.01</u> hereof, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims and Interests.  Any Transfer in violation of <u>Section 9.01</u> hereof shall be void *ab initio*.

9.03.   This Agreement shall in no way be construed to preclude any Consenting Stakeholder from acquiring additional Company Claims and Interests; *provided*, *however*, that (a) such additional Company Claims and Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to Counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claims and Interests acquired) to Counsel to the Company Parties within five (5) Business Days of such acquisition.

9.04.   This <u>Section 9</u> shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims and Interests.  Notwithstanding

anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect after any Transfer according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.    Notwithstanding Section 9.01 hereof, a Qualified Marketmaker that acquires any Company Claims and Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims and Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims and Interests if (a) such Qualified Marketmaker subsequently Transfers such Company Claims and Interests within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 9.01 hereof; and (c) the Transfer otherwise is a Permitted Transfer under Section 9.01 hereof. Notwithstanding Section 9.01 and Section 9.03 hereof, to the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interests in Company Claims and Interests that the Qualified Marketmaker acquires from a holder of the Company Claims and Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

9.06.    Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfers set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any Company Claims and Interests in favor of a bank or broker dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 10.    *Representations and Warranties of Consenting Stakeholders.*** Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Agreement Effective Date:

(a)    it is the beneficial or record owner of the face amount of the Company Claims and Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims and Interests reflected in such Consenting Stakeholder's signature page to this Agreement, a Joinder, or a Transfer Agreement, as applicable (as may be updated pursuant to Section 9 hereof) and, having made reasonable inquiry, is not the beneficial or record owner of any other Company Claims and Interests other than those reflected in such Consenting Stakeholder's signature page to this Agreement, a Joinder, or a Transfer Agreement, as applicable (as may be updated pursuant to Section 9 hereof);

(b)    it has the full power and authority to act on behalf of, vote, and consent to matters concerning such Company Claims and Interests;

(c)    such Company Claims and Interests are free and clear of any pledge, lien, security interest, charge, Claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, Transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)      it has the full power to vote, approve changes to, Transfer, and compromise all of its Company Claims and Interests as contemplated by this Agreement subject to applicable Law; and

(e)      (i) it is either (A) a qualified institutional buyer as defined in Rule 144A promulgated under the Securities Act, (B) not a U.S. person (as defined in Regulation S promulgated under the Securities Act), or (C) an institutional accredited investor (as defined in the Securities Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 11.**      *Mutual Representations, Warranties, and Covenants.*      Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement:

(a)      it is validly existing and in good standing under the Laws of the jurisdiction of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and, with respect to the Company Parties, subject to the necessary approvals of the Bankruptcy Court to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.  For the avoidance of doubt, the Amended and Restated Jones Energy Noteholder Cooperation Agreement dated May 16, 2018, has been made available to all Parties.

**Section 12.**      *Termination Events.*

12.01.   Consenting Stakeholder Termination Events.  This Agreement may be terminated by (x) with respect to the Consenting First Lien Noteholders, by the Required Consenting First Lien Noteholders and (y) with respect to the Consenting Unsecured Noteholders, by the Required Consenting Unsecured Noteholders (such Consenting Stakeholders seeking to terminate,

the "Terminating Consenting Stakeholders"), in each case by the delivery to the Company Parties of a written notice in accordance with Section 14.13 hereof upon the occurrence of the following events:

(a)      the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Terminating Consenting Stakeholders and (ii) remains uncured (to the extent curable) for ten (10) Business Days after the Terminating Consenting Stakeholders transmit a written notice in accordance with Section 14.13 hereof detailing any such breach;

(b)      the Company Parties withdraw the Plan without the consent of the Required Consenting Noteholders;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring and (ii) either (1) such ruling, judgment, or order has been at the request of the Company Parties in contravention of any obligations set forth in this Agreement or (2) remains in effect for fifteen (15) Business Days after the Terminating Consenting Stakeholders transmit a written notice in accordance with Section 14.13 hereof detailing any such issuance; notwithstanding the foregoing, this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(d)      any Company Party (i) files with the Bankruptcy Court any Definitive Document, or amends or modifies, or files a pleading with the Bankruptcy Court seeking authority to amend or modify, any of the Definitive Documents, in a manner that is inconsistent with this Agreement or which is otherwise in form or substance not reasonably satisfactory to the Required Consenting First Lien Noteholders, or (ii) publicly announces its intention to take any such acts;

(e)      any Company Party files, or publicly announces that it will file, with the Bankruptcy Court any plan of reorganization other than the Plan, or files with the Bankruptcy Court any motion or application seeking authority to sell any material assets, without the prior written consent of the Required Consenting Noteholders;

(f)      any Company Party files, or publicly announces that it will file, with the Bankruptcy Court a motion, application, or adversary proceeding (or any Company Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) (i) challenging the validity, enforceability, or priority of, or seeking the avoidance or subordination of, the First Lien Notes Claims and Unsecured Notes Claims, or (ii) asserting any other cause of action against the Consenting Stakeholders;

(g)      the Bankruptcy Court enters a final order providing relief against the Consenting Stakeholders with respect to any of the causes of action or proceedings specified in Section 12.01(f) hereof;

(h)      the Bankruptcy Court enters any order authorizing the use of cash collateral that is not materially consistent with the Cash Collateral Order or otherwise consented to by the Required Consenting First Lien Noteholders;

(i)      the occurrence of any termination event or event of default under the Cash Collateral Order, as applicable, that has not been cured (if susceptible to cure) or waived in accordance with the terms thereof;

(j)      a breach by any Company Party or any other Party of any representation, warranty, or covenant of such Company Party or other Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring that (to the extent curable) remains uncured for a period of ten (10) Business Days after such Party's receipt of written notice and description of such breach;

(k)      a determination is made with respect to any Company Party that its continued support of the Restructuring Transactions would be inconsistent with its fiduciary obligations under applicable law;

(l)      any Company Party terminates its obligations under and in accordance with Section 12.02 hereof;

(m)      the Bankruptcy Court enters an order denying confirmation of the Plan;

(n)      the Bankruptcy Court enters an order, or any Company Party files a motion or application seeking an order (without the prior written consent of the Required Consenting Noteholders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one or more of the Chapter 11 Cases of a Company Party, (iv) terminating exclusivity under section 1121 of the Bankruptcy Code, or (v) rejecting this Agreement;

(o)      the failure to meet a Milestone, which has not been waived or extended in a manner consistent with Section 4 hereof, unless such failure is the result of any act, omission, or delay on the part of the terminating Consenting Stakeholder in violation of its obligations under this Agreement; or

(p)      other than for the purposes of implementing the Restructuring in accordance with the terms of this Agreement, one or more Insolvency Proceedings are commenced in respect of any Company Party that is an Obligor under (and as defined in) the Finance Documents that have not been dismissed within forty-five (45) days of the commencement thereof; *provided* that this termination right shall not apply to or be exercised by any Party that initiated or supported the initiation of the Insolvency Proceedings in question in contravention of any contrary obligation or restriction set out in this Agreement.

12.02.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to any Party upon prior written notice to all Parties in accordance with Section 14.13 hereof upon the occurrence of any of the following events:

(a)      with respect to the Consenting Unsecured Noteholders, the breach in any material respect by the Consenting Stakeholders holding an amount of Unsecured Notes that would result in non-breaching Consenting Unsecured Noteholders holding less than two-thirds of the aggregate

23

principal amount of the Unsecured Notes, of any provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after the receipt by counsel to the Crossover Group and counsel to the First Lien Ad Hoc Group of notice of such breach;

(b)     with respect to the Consenting First Lien Noteholders, the breach in any material respect by the Consenting Stakeholders holding an amount of First Lien Notes that would result in non-breaching Consenting First Lien Noteholders holding less than two-thirds of the aggregate principal amount of the First Lien Notes, of any provision set forth in this Agreement that remains uncured for a period of ten (10) Business Days after the receipt by counsel to the Crossover Group and counsel to the First Lien Ad Hoc Group of notice of such breach;

(c)     the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal, and the continued support of the Restructuring pursuant to this Agreement would be inconsistent with its fiduciary obligations;

(d)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring and (ii) remains in effect for fifteen (15) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.13 hereof detailing any such issuance; notwithstanding the foregoing, this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(e)     the Bankruptcy Court enters an order denying confirmation of the Plan.

12.03.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) each Company Party; (b) the Required Consenting First Lien Noteholders; and (c) the Required Consenting Unsecured Noteholders.

12.04.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice upon expiration of the earlier of (a) the Outside Date and (b) the Plan Effective Date.

12.05.  Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to entry of the Confirmation Order by the Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner

by the Parties in connection with the Restructuring and this Agreement or otherwise; *provided*, *however*, that any Consenting Stakeholder withdrawing or changing its vote pursuant to Section 6.01(e) hereof shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file a notice of such withdrawal or change with the Bankruptcy Court. Nothing in this Agreement shall be construed as prohibiting a Company Party, any Consenting Unsecured Noteholder, or any Consenting First Lien Noteholder from contesting whether any termination of this Agreement by a Party is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before the applicable Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against any Consenting Unsecured Noteholder or any Consenting First Lien Noteholder, (b) any right of any Consenting Unsecured Noteholder, or the ability of any Consenting Unsecured Noteholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against any Company Party or any Consenting First Lien Noteholder, or (c) any right of any Consenting First Lien Noteholder, or the ability of any Consenting First Lien Noteholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its Claims against any Company Party or any Consenting Unsecured Noteholder. No purported termination of this Agreement, except a termination pursuant to Section 12.02(b) hereof, shall be effective under this Section 12.05 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement. Nothing in this Section 12.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(b) hereof.

**Section 13.**      *Amendments and Waivers***.**

(a)      This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13.

(b)      This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party and (b) the following Parties: (i) the Required Consenting First Lien Noteholders and (ii) solely with respect to any modification, amendment, waiver, or supplement that materially and adversely alters the rights of such Parties, the Required Consenting Unsecured Noteholders. Notwithstanding the foregoing, the consent of each such affected Consenting Stakeholder shall also be required to effectuate any modification, amendment, waiver, or supplement (x) if the proposed modification, amendment, waiver, or supplement has a material, disproportionate (as compared to other Consenting Stakeholders holding Claims within the same class as provided for in the Plan) adverse effect on any of the Company Claims and Interests held by a Consenting Stakeholder, and (y) to amend the Outside Date.

(c)      Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio* as to any non-consenting Party affected thereby.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by a Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy by such Party.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.**     *Miscellaneous.*

14.01.  <u>Survival</u>.  Notwithstanding (a) any Transfer of any Company Claims/Interests in accordance with Section 9 hereof or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in <u>Section 12</u> and <u>Section 14</u> hereof (except for <u>Section 14.03</u> with respect to fees and expenses incurred after the termination of this Agreement, and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

14.02.  <u>Confidentiality</u>.  The Parties understand and acknowledge that this Agreement may be disclosed and filed with the Bankruptcy Court as an exhibit to the Disclosure Statement and included in the Solicitation Materials, *provided* that in such disclosure the executed signature pages to this Agreement shall be redacted and no individual holdings information shall be included, except as may be required by law.  The Company Parties shall not disclose to any person the amount or percentage of Claims held by any individual Consenting Noteholder, except as may be required by law.  If in either case such disclosure is required by law, the Company Parties shall provide each Consenting Noteholder with advanced notice of the intent to disclose and shall afford each Consenting Noteholder a reasonable opportunity to (i) seek a protective order or other appropriate remedy or (ii) review and comment upon any such disclosure prior to the Company Parties making such disclosure.

14.03.  <u>Fees and Expenses</u>.

(a)     The Company Parties shall pay and reimburse all reasonable and documented fees and expenses when due (including travel costs and expenses) and all outstanding and unpaid amounts incurred in connection with the Restructuring since the inception of the applicable fee or engagement letters of the attorneys, accountants, other professionals, advisors, and consultants of the Consenting Stakeholders (whether incurred directly or on their behalf and regardless of whether such fees and expenses are incurred before or after the Petition Date), including the fees and expenses of:  (i) the First Lien Ad Hoc Group, which shall include: (a) Milbank LLP, as counsel (b) Porter Hedges LLP, as local counsel, (c) Lazard, as investment banker (including any success or transaction fees when earned), (d) one board search firm selected by the Required Consenting First Lien Noteholders, and (e) on the Plan Effective Date, the reasonable and documented out-of-pocket expenses of the members of the First Lien Steering Committee (*provided*, that such expenses must be approved by the First Lien Ad Hoc Group and, with respect to each of Citigroup Global Markets Inc. and Silver Point Capital, L.P., shall not exceed $100,000) in each case, including all amounts payable or reimbursable under applicable fee or engagement

26

letters with the Company Parties (which agreements shall not be terminated by the Company Parties before termination of this Agreement) and the Cash Collateral Order; and (ii) the Crossover Group, including (a) Davis Polk & Wardwell LLP, as counsel, (b) Haynes and Boone, LLP, as local counsel, and (c) Houlihan Lokey Capital, Inc., as financial advisor (including any success or transaction fees when earned), in each case, including all amounts payable or reimbursable under applicable fee or engagement letters with the Company Parties (which agreements shall not be terminated by the Company Parties before the termination of this Agreement) and the Cash Collateral Order; *provided* that all invoices of such advisors for such fees and expenses outstanding as of the Agreement Effective Date that are received within 5 Business Days after the Agreement Effective Date shall be paid in full prior to the Petition Date; *provided*, *further*, that the Company Parties shall not be obligated to pay any fees and expenses under this <u>Section 14.03</u> and the Agreement upon and after the Termination Date.

(b)    The Commitment Premium (as defined in the Committed Exit Facility Term Sheet) shall be paid as set forth in the Committed Exit Facility Term Sheet.

14.04.  <u>Acknowledgement</u>. Notwithstanding any other provision of this Agreement, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.05.  <u>Annexes Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

14.06.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, during the Agreement Effective Period, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters specified in this Agreement, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring, as applicable, *provided*, *however*, that this <u>Section 14.06</u> shall not limit the right of any party hereto to exercise any right or remedy provided in this Agreement (including the approval rights set forth in <u>Section 3.02</u> hereof).

14.07.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement and, with respect to the parties thereto, the Amended and Restated Jones Energy Noteholder Cooperation Agreement dated May 16, 2018.

14.08.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO

CONTRACTS MADE AND TO BE PERFORMED IN NEW YORK, WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PRINCIPLES. Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in federal or state courts located in the City of New York, Borough of Manhattan.  Notwithstanding the foregoing consent to jurisdiction, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto; and (d) consents to entry of a final order or judgment by the Bankruptcy Court.

14.09.  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.10.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement; *provided* that signature pages executed by the Consenting Stakeholders shall be delivered in a form consistent with <u>Section 2.01</u> hereof.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.11.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.12.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or Transferred to any other person or entity.

14.13.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)  if to a Company Party, to:

Jones Energy, Inc.
807 Las Cimas Parkway, Suite 350
Austin, Texas 78746
Attention:  Carl Giesler
E-mail address:  cgiesler@jonesenergy.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Christopher Marcus, P.C., Brian E. Schartz, P.C., Anthony R. Grossi, and Rebecca Blake Chaikin
E-mail address: cmarcus@kirkland.com, bschartz@kirkland.com, anthony.grossi@kirkland.com, and rebecca.chaikin@kirkland.com

Jackson Walker LLP
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Attention: Matthew D. Cavenaugh
E-mail address: mcavenaugh@jw.com

(b)  if to a Consenting First Lien Noteholder, to:

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attention:  Evan R. Fleck and Michael W. Price
Email address:  efleck@milbank.com and mprice@milbank.com

(c)  if to a Consenting Unsecured Noteholder, to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention:  Brian M. Resnick and Benjamin Schak
Email address:  brian.resnick@davispolk.com and benjamin.schak@davispolk.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.14.  Independent Due Diligence and Decision Making.  Each of the Consenting Stakeholders hereby confirms that its decision to execute and deliver this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.  Each of the Consenting Stakeholders acknowledges that the Company Parties intend to disclose certain financial information contemporaneously with the public announcement of this Agreement (which may include one or more base or upside scenarios based on differing assumptions) and, regardless of such disclosure, confirms its decision to execute and deliver this Agreement (and to comply with its obligations hereunder).

14.15.  Enforceability of Agreement.  The Parties hereby acknowledge and agree: (i) that the provision of any notice or exercise of termination rights under this Agreement is not prohibited by the automatic stay provisions of the Bankruptcy Code, (ii) each Party waives any right to assert that the exercise of any notice or termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising notice and termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required, (iii) that they shall not take a position to the contrary of this Section 14.15 in the Bankruptcy Court or any other court of competent jurisdiction and (iv) they will not initiate, or assert in, any litigation or other legal proceeding that this Section 14.15 is illegal, invalid, or unenforceable, in whole or in part.  Notwithstanding anything herein to the contrary, following the commencement of the Chapter 11 Cases and unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and/or termination of this Agreement in accordance with its terms is not prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, the occurrence of any of the termination events in Sections 12.01, 12.03, and 12.04, shall result in automatic termination of this Agreement, to the extent any of the Terminating Consenting Stakeholders would otherwise have the ability to terminate this Agreement in accordance with Sections 12.01, 12.03, 12.04, five (5) calendar days following such occurrence unless waived in writing by all of the Terminating Consenting Stakeholders.

14.16.  Waiver.  If the Restructuring is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.17.  Specific Performance.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.18.  <u>Damages</u>.  Notwithstanding anything to the contrary in this Agreement, none of the Parties shall claim or seek to recover from any other Party on the basis of anything in this Agreement any punitive, special, indirect, or consequential damages or damages for lost profits.

14.19.  <u>Relationship Among Parties</u>.  Notwithstanding anything herein to the contrary, the agreements, representations, warranties, and obligations of the Consenting Stakeholders under this Agreement are, in all respects, several and not joint.  No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity or person.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement.  The Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Company Parties and the Consenting Stakeholders do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.  No action taken by any Consenting Stakeholder pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that any of the Consenting Stakeholders are in any way acting in concert or as such a "group."

14.20.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.21.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.22.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this Agreement on account of all Company Claims and Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims and Interests.

14.23.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to <u>Section 3.02</u> or <u>Section 13</u> hereof, or otherwise, including a written approval by the Company Parties, the Required Consenting First Lien Noteholders, or the Required Consenting Unsecured Noteholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

*[Signature pages follow.]*

31

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**JONES ENERGY, INC.**

By: _____
Name:   Carl F. Giesler, Jr.
Title:   Chief Executive Officer

**JONES ENERGY HOLDINGS, LLC**

By: _____
Name:   Carl F. Giesler, Jr.
Title:   Chief Executive Officer

**CCPR SUB LLC**

By: _____
Name:   Carl F. Giesler, Jr.
Title:   Chief Executive Officer

**NOSLEY MIDSTREAM, LLC**

By: _____
Name:   Carl F. Giesler, Jr.
Title:   Chief Executive Officer

**NOSLEY ASSETS, LLC**

By: _____
Name:   Carl F. Giesler, Jr.
Title:   Chief Executive Officer

**JONES ENERGY, LLC**

By: _____
Name:   Carl F. Giesler, Jr.
Title:   Chief Executive Officer

**NOSLEY SCOOP, LLC**

By: _____
Name:   Carl F. Giesler, Jr.
Title:   Chief Executive Officer

**JRJ OPCO, LLC**

By: _____
Name:   Carl F. Giesler, Jr.
Title:   Chief Executive Officer

**NOSLEY ACQUISITION, LLC**

By: _____
Name:   Carl F. Giesler, Jr.
Title:   Chief Executive Officer

**JONES ENERGY FINANCE CORP.**

By: _____
Name:   Carl F. Giesler, Jr.
Title:   Chief Executive Officer

**JONES ENERGY INTERMEDIATE, LLC**

By: _____
Name:   Carl F. Giesler, Jr.
Title:   Chief Executive Officer

## **Annex 2**

**Cash Collateral Order**

**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| JONES ENERGY, INC., *et al.*,[1] | ) | Case No. 19-____ (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

**INTERIM ORDER (I) AUTHORIZING POSTPETITION USE OF CASH
COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES, (III) MODIFYING AUTOMATIC STAY,
(IV) SCHEDULING FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors, as debtors-in-possession (collectively, the "Debtors"), pursuant to sections 105, 361, 362, 363, and 507 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), rule 4001-1(b) of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), and the Procedures for Complex Chapter 11 Bankruptcy Cases promulgated by the United States Bankruptcy Court for the Southern District of Texas (the "Complex Case Procedures") seeking entry of an interim order (this "Interim Order") and a final order (the "Final Order"), among other things:

(a)        Authorizing, pursuant to section 363(c) of the Bankruptcy Code, on an interim basis and upon the terms and conditions set forth in this Interim Order during the period following the date of commencement of the Chapter 11 Cases and pending the Final

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Jones Energy, Inc. (7968); Jones Energy, LLC (8861); CCPR Sub LLC (0942); Jones Energy Finance Corp. (6247); Jones Energy Holdings, LLC (5091); Jones Energy Intermediate, LLC (___); JRJ Opco, LLC (1488); Nosley Acquisition, LLC (1548); Nosley Assets, LLC (6460); Nosley Midstream, LLC (8315); and Nosley SCOOP, LLC (1108).  The location of Jones Energy, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is: 807 Las Cimas Parkway, Suite 350, Austin, TX 78746.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Hearing (as defined below), the use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") of the Prepetition Secured Parties (as defined below);

(b)      granting adequate protection to the Prepetition Secured Parties pursuant to sections 361 and 363(e) of the Bankruptcy Code on account of any diminution in value of the interest of the Prepetition Secured Parties in the Prepetition Collateral (as defined below), including Cash Collateral, resulting from the Debtors' use thereof during the pendency of the Chapter 11 Cases (as defined below);

(c)      modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors and the Prepetition Secured Parties to implement and effectuate the terms and provisions of this Interim Order and the Final Order and to deliver any notices of termination of the RSA (as defined below);

(d)      subject solely to entry of the Final Order, granting adequate protection liens on the proceeds and property recovered on account of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code or any similar state or federal law (collectively, the "Avoidance Actions");

(e)      subject solely to entry of the Final Order, and except to the extent of the Carve Out (as defined below), approving the waiver by the Debtors of any right to surcharge the Prepetition Collateral or the Adequate Protection Collateral (each, as defined below) pursuant to section 506(c) of the Bankruptcy Code or any other applicable principle of equity or law;

(f)      subject solely to entry of the Final Order, approving the waiver by the Debtors of any right to assert an "equities of the case" claim against the Prepetition Secured Parties pursuant to section 552 of the Bankruptcy Code; and

(g)      requesting that a final hearing (the "Final Hearing") be scheduled by the Court no later than 35 days following entry of this Interim Order to consider entry of the Final Order authorizing on a final basis, *inter alia*, the use of Cash Collateral and the provision of adequate protection to the Prepetition Secured Parties; and

due and sufficient notice of the Motion having been given under the circumstances; the Court having conducted a preliminary hearing on the Motion (the "Preliminary Hearing"), at which time the Debtors presented, among other things, the *Declaration of Carl F. Giesler, Jr., Chief Executive Officer of Jones Energy, Inc., in Support of First Day Pleadings* (the "First Day Declaration"); and the Court having reviewed the Motion, the First Day Declaration, the evidence adduced by the parties, and the representations of counsel at the Preliminary Hearing; and upon the entire record

made at the Preliminary Hearing; and the Court having considered the Interim Budget (as defined below) filed and served by the Debtors in accordance with the Complex Case Procedures; and it appearing to the Court that granting the relief sought in the Motion on the terms and conditions contained herein is necessary and essential to enable the Debtors to preserve the value of their businesses and assets and to prevent immediate and irreparable harm to the Debtors' estates and to facilitate the reorganization of the Debtors' businesses and that such relief is fair and reasonable; and the Court finds that good and sufficient cause appears therefor and that all objections to the entry of this Interim Order have been withdrawn or are overruled;

IT IS HEREBY FOUND AND DETERMINED THAT:

A.     This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. §§ 157(b)(2).  Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     On April __, 2019 (the "Petition Date"), the Debtors filed voluntary petitions for relief with this Court under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

C.     Without prejudice to the rights of any other party-in-interest in the Chapter 11 Cases (but subject to the limitations with respect to such rights contained in paragraphs 18 and 19 of this Interim Order), the Debtors acknowledge, admit, agree, and stipulate that:

    1.     As of the Petition Date, Jones Energy Holdings, LLC and Jones Energy Finance Corp., as issuers (the "First Lien Notes Issuers"), Jones Energy, Inc. ("JEI") and the other Debtors (excluding CCPR Sub LLC and JRJ Opco LLC), as guarantors (the "First Lien Notes Guarantors," and collectively with the First Lien Notes Issuers, the "First Lien Obligors"), UMB Bank, N.A., as trustee (in such capacity, the "First Lien Indenture Trustee"), and Wells Fargo Bank, National Association, as collateral agent (in such capacity, the "Collateral Agent"), were parties to that certain indenture (as amended or supplemented from time to time, the "First Lien Indenture") dated as of February 14, 2018. Pursuant to the First Lien Indenture, the issuers issued, and the guarantors guaranteed, the 9.250% Senior Secured First Lien Notes due 2023 (the "First Lien Notes").

3

2.       Pursuant to the First Lien Indenture and the First Lien Notes, as of the Petition Date, the First Lien Obligors were indebted to the First Lien Indenture Trustee and the holders of the First Lien Notes (the "First Lien Noteholders" and, together with the First Lien Indenture Trustee, the "First Lien Notes Secured Parties") in the aggregate amount of not less than $474.3 million, consisting of $450 million in the face amount of the First Lien Notes, plus accrued and unpaid interest, penalties, fees, expenses, reimbursements, indemnifications, and other "Obligations" as defined in the First Lien Indenture (collectively, the "First Lien Indebtedness").

3.       As of the Petition Date, Jones Energy, Holdings, LLC, as borrower, was also party to that certain Credit Agreement among the borrower, each of the lenders party thereto from time to time (the "Credit Agreement Lenders"), and Wells Fargo Bank, National Association, as administrative agent (in such capacity, the "Credit Agreement Agent" and, together with the Credit Agreement Lenders, the "Credit Agreement Secured Parties"),[3] dated as of December 31, 2009 (as amended or supplemented, from time to time, the "Credit Agreement").  The First Lien Obligors other than the borrower are guarantors of the borrower's obligations under the Credit Agreement pursuant to (i) the Guarantee and Collateral Agreement dated as of December 31, 2009, amended and continued (but not novated) by that certain Guarantee Agreement dated as February 14, 2018, and as otherwise amended and (ii) the Guarantee and Collateral Agreement dated as of January 29, 2014, as amended and continued (but not novated) by that certain Guarantee Agreement dated as of February 14, 2018, and as otherwise amended (all the foregoing, together with the Credit Agreement, the "Credit Agreement Documents").

4.       Pursuant to the terms of the Credit Agreement Documents, as of the Petition Date, the First Lien Obligors were indebted to the Credit Agreement Secured Parties in the aggregate amount of $0 (the "Credit Agreement Indebtedness" and, together with the First Lien Notes Indebtedness, the "Prepetition Indebtedness").[4]

5.       To secure the Prepetition Indebtedness, pursuant to (i) the Amended and Restated Collateral Agreement, dated as of February 14, 2018, between the First Lien Obligors (other than JEI) and the Collateral Agent and (ii) the Amended and Restated Collateral Agreement, dated as of February 14, 2018, between JEI and the Collateral Agent (collectively, the "Collateral Agreement" and, together with the First Lien Notes, the First Lien Indenture, and the Credit Agreement Documents, the "First Lien Documents"), the First Lien Obligors have granted to the Collateral Agent, for the ratable benefit of the Prepetition Secured Parties, liens on and security interests in (collectively, the "Prepetition Liens") all of the "Collateral" (as defined in the Collateral Agreement), consisting of substantially all of the Debtors' assets and property, whether real, personal or mixed,

---

[3]     The Credit Agreement Secured Parties and the First Lien Notes Secured Parties, collectively, are referred to herein as the "Prepetition Secured Parties."

[4]     [**NTD**:  If an agreement is reached with the hedge counterparties, this paragraph will be revised as necessary to account for hedge obligations under the Credit Agreement.]

wherever located and whether then owned or thereafter acquired (collectively, the "Prepetition Collateral").

6.      Each of the First Lien Documents is valid, binding, and, subject to bankruptcy laws, enforceable against the First Lien Obligors in accordance with its terms. Pursuant to the terms of the First Lien Documents, all amounts payable on account of the Prepetition Indebtedness are now fully due and payable by the First Lien Obligors. The First Lien Obligors are each jointly and severally indebted and liable to the Prepetition Secured Parties for such amounts without defense, counterclaim, or offset of any kind.

7.      The Prepetition Liens are valid, binding, perfected, enforceable, non-avoidable, first-priority liens on, and security interests in, the Prepetition Collateral, and are not subject to avoidance, disallowance, reduction, re-characterization, recovery, subordination, attachment, offset, counterclaim, defense, "claim" (as defined in the Bankruptcy Code), impairment, or any other challenge of any kind pursuant to the Bankruptcy Code or other applicable law.

8.      The Debtors will not challenge or seek to avoid the validity, enforceability, priority, or perfection of the Prepetition Indebtedness or the Prepetition Liens.

9.      All cash proceeds of the Prepetition Collateral, including all such cash proceeds of such Prepetition Collateral held in any of the Debtors' banking, checking, or other deposit accounts with financial institutions (in each case, other than trust, escrow, and custodial funds held as of the Petition Date in properly established trust, escrow, and custodial accounts), are Cash Collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.

D.      Subject to entry of the Final Order, and without prejudice to the rights of any other party (but subject to the limitations thereon described in paragraphs 18 and 19 of this Interim Order), each Debtor and the Debtors' estates, on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, and assigns, hereby forever, fully, and finally, waives and releases any and all claims (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights against each of the Prepetition Secured Parties, and each of their successors and assigns, whether arising at law or in equity, including any re-characterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law. The admissions, stipulations, agreements, and releases set forth in this Interim

Order are based upon and consistent with the results of the Debtors' investigation of the Prepetition Secured Parties' liens and claims.

E.      The preservation, maintenance, and enhancement of the value of the Debtors' assets are of the utmost significance and importance.  The Debtors lack sufficient available sources of working capital, however, to carry on the operation of their businesses without the use of Cash Collateral.  Moreover, the Debtors' need to use Cash Collateral is immediate; absent the ability to use Cash Collateral, the continued operation of the Debtors' businesses would not be possible, and immediate and irreparable harm to the Debtors and their estates would be inevitable.

F.      The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Prepetition Collateral to acquire equipment, inventory and other personal property, all of which constitute Prepetition Collateral under the First Lien Documents and, accordingly, is subject to the valid and perfected liens and security interests of the Collateral Agent for the ratable benefit of the Prepetition Secured Parties.

G.      The Debtors, certain holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold First Lien Notes (the "Consenting First Lien Noteholders") and certain holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold (i) 6.75% Senior Notes due 2022 issued pursuant to that certain indenture among the Debtors party thereto and Wells Fargo, National Association, as trustee, and (ii) of the 9.25% Senior Notes due 2023 issued pursuant to that certain indenture among the Debtors party thereto and UMB Bank, N.A., as trustee (the notes described in clauses (i) and (ii), the "Unsecured Notes," and the parties described in the foregoing, the "Consenting Unsecured Noteholders," and, together with the Consenting First Lien Noteholders, the "Consenting Stakeholders") are parties to that certain Restructuring Support Agreement dated as of April 2, 2019 (the "RSA").

H.     The Debtors desire to use Cash Collateral under section 363(a) of the Bankruptcy Code.  The [Prepetition Secured Parties] have consented to the Debtors' use of the Cash Collateral exclusively on, and subject to, the terms and conditions set forth herein and solely for the period from the date of entry of this Interim Order through the Termination Date (as defined below).

I.     The Preliminary Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and the Complex Case Procedures.  Notice of the Preliminary Hearing and the emergency relief requested in the Motion has been provided by the Debtors to:  (i) the Office of the U.S. Trustee for the Southern District of Texas; (ii) the holders of the [50] largest unsecured claims against the Debtors (on a consolidated basis); (iii) Wells Fargo Bank, N.A. as Administrative Agent under the Credit Agreement and Collateral Agent under the First Lien Notes; (iv) UMB Bank, N.A. as Indenture Trustee under the First Lien Notes and Unsecured Notes; (v) Milbank LLP, as counsel to the ad hoc group of certain first lien noteholders (the "First Lien Ad Hoc Group"); (vi) Davis Polk & Wardwell LLP, as counsel to the hoc group of certain crossover noteholders; (vii) the United States Attorney's Office for the Southern District of Texas; (viii) the Internal Revenue Service; (i) the United States Securities and Exchange Commission; (ix) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (x) the state attorneys general for states in which the Debtors conduct business; and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

J.     The adequate protection provided to the Prepetition Secured Parties, as set forth more fully in paragraph 5 of this Interim Order, for any diminution in the value of the Prepetition Secured Parties' interest in the Prepetition Collateral from and after the Petition Date for any reason whatsoever, including, without limitation, from the use of the Cash Collateral pursuant to

this Interim Order, the use, sale, lease, or other diminution in value of the Prepetition Collateral other than the Cash Collateral, or the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect such parties' interests in the Prepetition Collateral in accordance with sections 361, 362, and 363 of the Bankruptcy Code.  The adequate protection provided herein and other benefits and privileges contained herein are necessary in order to (i) protect the Prepetition Secured Parties from the diminution in the value of their respective interests in the Prepetition Collateral and (ii) obtain the foregoing consents and agreements.

K.      The Debtors stipulate that in permitting the Debtors to use Cash Collateral or in taking any other actions permitted by this Interim Order, none of the Prepetition Secured Parties or the Collateral Agent shall (i) have liability to any third party or be deemed to be in control of the operation of any of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, is used in the Internal Revenue Code, the Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any other federal or state statute) or (ii) owe any fiduciary duty to any of the Debtors, their creditors, or their estates, or shall constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.

L.      The Debtors stipulate that the Collateral Agent and each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code. Subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Collateral Agent or any of the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral.

M.     Based on the record before the Court, the terms of this Interim Order, including, without limitation, of the Debtors' use of Cash Collateral and the provision of adequate protection therefor, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms of this Interim Order were negotiated in good faith and at arm's length between the Debtors, [the Collateral Agent, the Prepetition Secured Parties] and [the Consenting Stakeholders].

N.     The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2), Local Rule 4001-1, and the Complex Case Procedures.  The permission granted herein to use Cash Collateral (and provide adequate protection therefor) is necessary, essential, and appropriate to avoid immediate and irreparable harm to the Debtors and their estates.  The Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates and creditors as its implementation will, among other things, allow the Debtors to preserve and maintain the value of their assets and businesses and enhance the Debtors' prospects for a successful reorganization.

Based upon the foregoing findings, stipulations, and conclusions, and upon the record made before the Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

**NOW, THEREFORE, IT IS HEREBY ORDERED, ON AN INTERIM BASIS:**

1.     <u>Motion</u>.  The Motion is granted, subject to the terms and conditions set forth in this Interim Order.  The Debtors shall not use any Cash Collateral except as expressly authorized and permitted herein or by subsequent order of the Court.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.     Use of Cash Collateral.  Subject to the terms and conditions of this Interim Order, including specifically the Carve Out, the Debtors are hereby authorized to use Cash Collateral in accordance with the Interim Budget during the period from the date of this Interim Order through and including the Termination Date for (i) working capital, general corporate purposes, and administrative costs and expenses of the Debtors incurred in the Chapter 11 Cases, including first-day relief, subject to the terms hereof and (ii) adequate protection payments to the Prepetition Secured Parties, as detailed in the Interim Budget and as provided herein.

3.     Interim Budget; Use of Collateral Proceeds.

(a)     The Debtors' use of Cash Collateral shall be in accordance with and pursuant to the Interim Budget attached hereto as **Exhibit 1** (the "Interim Budget").  The Debtors shall provide a new Interim Budget to the Collateral Agent on the fourth business day of every fourth week (the "Interim Budget Period"), beginning with the first fourth business day of the fourth full week after the Petition Date and ending on the week during which the Confirmation Order is entered.  For each Interim Budget Period, the aggregate actual expenditures by the Debtors for Total Disbursements (as designated in the Interim Budget and which, for the avoidance of doubt shall include the fees budgeted and actually expended on the Debtor Professionals) shall not in any event exceed the aggregate amount budgeted therefor in the Interim Budget for such period by more than fifteen percent (15%) of the budgeted amount (the "Authorized Variance").

(b)     The authorization granted herein is solely with respect to the use of Cash Collateral.

(c)     Unless otherwise agreed to in writing by the Required First Lien Holders,[5] the Debtors shall not maintain any accounts except those identified in [Exhibit 2] to the order (the "Cash Management Order") granting the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. __].

(d)     Neither the consent to the Interim Budget nor anything else herein shall be deemed or construed as agreement by the Collateral Agent or the Prepetition Secured

---

[5]   "Required First Lien Holders" means "Required First Lien Debtholders" (as such term is defined under the First Lien Indenture); *provided* that, so long the Consenting First Lien Holders (as such term is defined in the RSA) that are parties to the RSA constitute Required First Lien Debtholders under the First Lien Indenture, the Required Consenting First Lien Holders (as such term is defined in the RSA).

Parties to be surcharged under section 506(c) or any other provision of the Bankruptcy Code or equitable doctrine.

4.     <u>Entitlement to Adequate Protection</u>.  The Collateral Agent and the Prepetition Secured Parties shall be entitled, pursuant to sections 361, 363(c)(2), and 363(e) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including Cash Collateral, in an amount equal to the aggregate postpetition diminution or decrease in value of the Collateral Agent's or Prepetition Secured Parties' interest in the Prepetition Collateral resulting from the sale, lease, or use by the Debtors of the Prepetition Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, from and after the Petition Date (such diminution in value, the "<u>Adequate Protection Obligations</u>").

5.     <u>Adequate Protection</u>.  As adequate protection, the [Prepetition Secured Parties] are hereby granted the following claims, liens, rights, and benefits:

(a)     [<u>Credit Agreement Section 507(b) Claim</u>.  The Adequate Protection Obligations due to the Credit Agreement Secured Parties (the "<u>Credit Agreement Adequate Protection Obligations</u>") shall constitute allowed joint and several superpriority administrative claims against the Debtors as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against the Debtors, now existing or hereafter arising in the Chapter 11 Cases (subject and subordinate only to the Carve Out), including all claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114, and shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in the Chapter 11 Cases or any subsequent proceedings, including without limitation any Chapter 11 proceeding, under the Bankruptcy Code (the "<u>Credit Agreement 507(b) Claim</u>"), which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors including, without limitation, and solely upon entry of the Final Order, the proceeds and property recovered in respect of any Avoidance Actions.]

(b)     <u>First Lien Notes Section 507(b) Claim</u>.  The Adequate Protection Obligations due to the First Lien Notes Secured Parties (the "<u>First Lien Notes Adequate Protection Obligations</u>") shall constitute allowed joint and several superpriority administrative claims against the Debtors as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against the Debtors, now existing or hereafter arising in the Chapter 11 Cases (subject and subordinate only to the Credit Agreement Section 507(b) Claim and the

Carve Out), including all claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113, or 1114, and shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in the Chapter 11 Cases or any subsequent proceedings, including without limitation any Chapter 7 proceeding, under the Bankruptcy Code (the "First Lien Notes 507(b) Claim" and, together with the Credit Agreement 507(b) Claim, the "507(b) Claims"), which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors including, without limitation, and solely upon entry of the Final Order, the proceeds and property recovered in respect of any Avoidance Actions.

(c)       Adequate Protection Liens.  Effective as of the Petition Date, solely to the extent of the Adequate Protection Obligations, the following security interests and liens (the "Adequate Protection Liens") are hereby granted to the Collateral Agent on behalf of the Prepetition Secured Parties, subject and subordinate only to the Carve Out (all property identified below being collectively referred to as the "Adequate Protection Collateral"):

(i)       First Priority Liens on Unencumbered Property.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-voidable first priority lien and/or replacement lien on, and security interest in, all of the Debtors' now owned and hereafter acquired real and personal property, tangible and intangible assets, and rights of any kind or nature, wherever located, including, without limitation, all prepetition and postpetition assets of the Debtors' estates, and all products, proceeds, rents and profits thereof, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to (x) valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date or (y) valid and unavoidable liens in existence for amounts outstanding as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property"), *provided* that the Unencumbered Property shall not include the Avoidance Actions, but, upon the entry of the Final Order, the Unencumbered Property shall include, and the Credit Agreement Lien Adequate Protection Liens shall attach to, any proceeds or property recovered in respect of any Avoidance Action;

(ii)      Liens Junior to Certain Existing Perfected Liens.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-voidable junior priority replacement lien on, and security interest in, all of Debtors' now owned and hereafter acquired real and personal property, tangible and intangible assets, and rights of any kind or nature, wherever located, including without limitation, all prepetition and postpetition property of the Debtors' estates, and all products and proceeds thereof, whether now existing or hereafter acquired (other than the property described in

clause (i) of this paragraph 5(c) of this Interim Order), that is subject to (x) valid, perfected and unavoidable liens in existence as of the Petition Date or (y) valid and unavoidable liens in existence for amounts outstanding as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which valid, perfected and unavoidable liens are senior in priority to the prepetition security interests and liens in favor of the Collateral Agent (the "Other Senior Liens"); and

(iii)   Liens Senior to Certain Existing Liens.  Pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected non-voidable priming lien on, and security interest in, the Prepetition Collateral and all of the Debtors' now owned and hereafter acquired real and personal property, tangible and intangible assets, and rights of any kind or nature, wherever located, including, without limitation, all prepetition and postpetition property of the Debtors' estates, and all products, proceeds, rents, and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise; *provided* that such liens and security interests shall not prime the Other Senior Liens.

6.     Perfection of Adequate Protection Liens.   The Adequate Protection Liens are perfected without the necessity of the execution (or recordation or other filing) by the Debtors of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by the Collateral Agent of any Adequate Protection Collateral.  The Collateral Agent, on behalf of the Prepetition Secured Parties, is hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted to each hereunder, respectively.  Whether or not the Collateral Agent, in its sole discretion, chooses to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination as of the date of entry of this Interim Order.  If the Collateral Agent determines to file any financing statements,

13

agreements, notice of liens or similar instruments, the Debtors shall cooperate and assist in any such filings as reasonably requested by the Collateral Agent, and the automatic stay shall be modified to allow such filings.

7.      A certified copy of this Interim Order may, in the discretion of the Collateral Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and recording; *provided* that, notwithstanding the date of any such filing, the date of such perfection shall be the date of entry of this Interim Order.

8.      Carve-Out.[6]

(a)      Carve Out.  As used in this Interim Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000.00 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and any official committee appointed in the Chapter 11 Cases (each, a "Committee")  pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the Collateral Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed [$1,500,000] incurred after the first business day following delivery by the Collateral Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the Collateral Agent (at the direction of the applicable Prepetition Secured Parties) to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of a

---

[6]      Note:  Carve-out professionals not subject to budget.

Termination Event and upon termination of the Debtors' right to use Cash Collateral by the Prepetition Secured Parties, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)      Carve Out Reserves.  On the day on which a Carve Out Trigger Notice is given by the Collateral Agent to the Debtors (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, after funding the Pre-Carve Out Trigger Notice Reserve, the Debtors shall utilize all remaining cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Collateral Agent for the benefit of the [Prepetition Secured Parties], unless the Prepetition Indebtedness has been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Debtors' creditors in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Collateral Agent for the benefit of the [Prepetition Secured Parties], unless the Prepetition Indebtedness has been indefeasibly paid in full, in cash, in which case any such excess shall be paid to the Debtors' creditors in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the Credit Agreement and First Lien Indenture, or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 8(b), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 8(b), prior to making any payments to the Collateral Agent or any of the Debtors' creditors, as applicable.  Notwithstanding anything to the contrary in the Credit Agreement and First Lien Indenture or this Interim Order, following delivery of a Carve Out Trigger Notice, the Collateral Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the Collateral Agent for application in accordance with the [Credit Agreement and First Lien Notes Indenture].  Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute Loans (as defined in the Credit Agreement), Obligations (as defined in the First Lien

15

Indenture), or increase or reduce the Prepetition Indebtedness, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the [Initial Budget, Budget], Carve Out, Post-Carve Out Trigger Notice Cap, or Carve Out Reserves be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or in any Credit Agreement Documents or First Lien Documents, the Carve Out shall be senior to all liens and claims securing the Prepetition Collateral, the Adequate Protection Liens, and the 507(b) Claims, and any and all other forms of adequate protection, liens, or claims securing the Prepetition Indebtedness.

(c)     Payment of Allowed Professional Fees Prior to the Termination Declaration Date. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)     No Direct Obligation To Pay Allowed Professional Fees. None of the [Prepetition Secured Parties] shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the [Prepetition Secured Parties], in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)     Payment of Carve Out On or After the Termination Declaration Date. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

9.     Additional Adequate Protection. As additional adequate protection:

(a)     Fees and Expenses: The Debtors are authorized and directed to pay, in accordance with this paragraph 9(a) of this Interim Order, all pre- and postpetition reasonable and documented fees and expenses, when due, of the (i) First Lien Notes Secured Parties (whether incurred directly or on their behalf) and their advisors, including, without limitation, the fees and expenses of all outstanding and unpaid amounts incurred since the inception of the applicable agreement fee or engagement letters of the attorneys, accountants, other professionals, advisors and consultants of the First Lien Notes Secured Parties, including the fees and expenses of: (i) the First Lien Ad Hoc Group, which shall include: (a) Milbank, as counsel to the First Lien Ad Hoc Group, (b) Porter Hedges LLP, as local counsel to the First Lien Ad Hoc Group, (c) Lazard, as investment banker to the First Lien Ad Hoc Group (including any success or transaction fees when earned), (ii) the Crossover Ad Hoc Group (as such term is defined in the RSA), which shall include: (a) Davis Polk & Wardwell LLP, as counsel, (b) Haynes and Boone, LLP, as local counsel to the Crossover Ad Hoc Group, and (c) Houlihan Lokey Capital Inc., as financial advisor, (iii) Katten Muchin Rosenman LLP as counsel to the First Lien Indenture Trustee, and

(iv) local counsel to the First Lien Indenture Trustee, if any, and (iv) the other fees and expenses of the Consenting Stakeholders in accordance with the RSA, in each case to the extent set forth thereunder, including that the Debtors shall not be required to pay the fees of the foregoing advisors following the Termination Date of the RSA (as such term is defined therein).

(b)    Other Covenants:  The Debtors shall maintain their cash management arrangements in a manner consistent with the Cash Management Order.  The Debtors shall not use, sell or lease any material assets outside the ordinary course of business, or seek authority of the Court to do any of the foregoing, without the consent of the Required First Lien Holders at least five (5) business days prior to the date on which the Debtors seek the authority of the Court for such use, sale or lease.  The Debtors shall comply with the covenants contained the First Lien Documents regarding the maintenance and insurance of the Prepetition Collateral and the Adequate Protection Collateral.

(c)    Limitation on Liens.  The Debtors shall not create, incur, or suffer to exist any postpetition liens or security interests other than: (i) those granted pursuant to this Interim Order; (ii) carriers', mechanics', operators', repairmen's, warehousemen's, or other similar liens arising in the ordinary course of business; (iii) pledges and deposits in connection with workers' compensation, unemployment insurance, and other social security legislation; and (iv) deposits to secure the payment of any postpetition statutory obligations and performance bonds.

(d)    Reporting:  The Debtors shall comply with the reporting requirements set forth in the Credit Agreement and the First Lien Indenture.

(e)    Access.  In addition to, and without limiting, whatever rights to access the Collateral Agent and Prepetition Secured Parties have under their respective First Lien Documents, upon reasonable prior written notice, at reasonable times during normal business hours, and otherwise not to be unreasonably withheld, the Debtors shall permit representatives, advisors, agents, and employees of the Consenting Stakeholders (i) to have access to and inspect the Debtors' properties, (ii) to examine the Debtors' books and records, and (iii) discuss the Debtors' affairs, finances, and condition with the Debtors' officers, management, financial advisors and counsel.

10.    Termination.  The Debtors' right to use Cash Collateral pursuant to this Interim Order shall terminate (the date of any such termination, the "Termination Date") (subject only to the Carve Out) without further notice or court proceeding on the earliest to occur of (i) the date that is 35 days after the Petition Date if the Final Order has not been entered by the Court on or before such date (unless such period is extended by mutual agreement of the Required First Lien Holders and the Debtors); and (ii) five (5) business days (any such five-business-day period of

time, the "Default Notice Period") following the delivery of a written notice (a "Default Notice")

by the Collateral Agent or the Required First Lien Holders to the Debtors, the U.S. Trustee, and

counsel to the Consenting Stakeholders of the occurrence of any of the events set forth below

unless such occurrence is cured by the Debtors prior to the expiration of the Default Notice Period

or such occurrence is waived by the Required First Lien Holders in their sole discretion; *provided*

that, during the Default Notice Period, the Debtors shall be entitled to continue to use the Cash

Collateral in accordance with the terms of this Interim Order; *provided*, *further*, that if a hearing

to consider any relief in connection with the delivery of the Default Notice or continued use of

Cash Collateral is requested to be heard within such Default Notice Period but is scheduled for a

later date by the Court, the Default Notice Period shall be automatically extended to the date of

such hearing (the events set forth in clauses (a) through (r) below are collectively referred to as the

"Termination Events"):

> (a)     Failure of the Debtors to make any payment under this Interim Order after such payment becomes due;

> (b)     Failure of the Debtors to comply with any material provisions of this Interim Order, or, prior to the entry of the Final Order, the Interim Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal;

> (c)     Except with respect to a termination under Section 12.01(o) solely based on the failure of the Company Parties to satisfy the Milestone (as defined in the RSA) in Section 4(a)(iv) of the RSA by the date specified therein, the RSA has been terminated with respect to the Consenting Stakeholders;

> (d)     The Company Parties have failed to make any payment contemplated under the RSA when due;

> (e)     The Debtors shall grant, create, incur, or suffer to exist any postpetition liens or security interests other than: (i) those granted pursuant to this Interim Order; (ii) carriers', mechanics', operator's, warehousemen's, repairmen's, or other similar liens arising in the ordinary course of business for amounts outstanding as of the Petition Date, even if recorded after the Petition Date; (iii) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation; (iv) deposits to secure the payment of any postpetition statutory obligations, performance

bonds, and other obligations of a like nature incurred in the ordinary course of business; and (v) any other junior liens or security interests that the Debtors are permitted to incur under the First Lien Documents;

(f)     An order shall be entered reversing, amending, supplementing, staying, vacating, or otherwise modifying this Interim Order without the written consent of the Required First Lien Holders;

(g)     The Debtors' commencing, or participating in furtherance of, any solicitation of any plan of reorganization unless it is the Plan (as defined in the RSA) or such other plan of reorganization as the Required First Lien Holders shall have expressly consented to in writing;

(h)     The Bankruptcy Court shall terminate or reduce the period pursuant to section 1121 of the Bankruptcy Code during which the Debtors have the exclusive right to file a plan of reorganization and solicit acceptances thereof;

(i)     The entry of an order in the Chapter 11 Cases charging any of the Prepetition Collateral or Adequate Protection Collateral under section 552(b) of the Bankruptcy Code or section 506(c) of the Bankruptcy Code or under which any person takes action against the Prepetition Collateral or Adequate Protection Collateral (in each case, that becomes a final non-appealable order), or the commencement of other actions that are materially adverse to any of the Collateral Agent or the Prepetition First Lien Secured Parties or their respective rights and remedies under the First Lien Documents in the Chapter 11 Cases;

(j)     The entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure (or granting of a deed in lieu of foreclosure) or other remedy against any Prepetition Collateral with a value in excess of $[-] million.

(k)     The entry of any postpetition monetary judgment against any Debtor in excess of $[-] million;

(l)     The payment of any prepetition claims that are junior in interest or right to the Prepetition Liens, other than as permitted by an order entered in the Chapter 11 Cases;

(m)     The existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than as permitted under the Interim Order, entitled to superpriority under section 364(c)(1) of the Bankruptcy Code *pari passu* or senior to the Prepetition Indebtedness, or there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code (other than the Carve Out), including the 507(b) Claims, or (ii) subject to the Other Senior Liens, any lien on the Prepetition Collateral or Adequate Protection Collateral having a priority senior to or *pari passu* with the liens and security interests granted herein, except as expressly provided in the First Lien Documents or in this Interim Order;

(n)     The Court shall have entered an order dismissing any of the Chapter 11 Cases;

(o)     The Court shall have entered an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(p)     The Court shall have entered an order appointing a chapter 11 trustee, responsible officer, or any examiner with enlarged powers relating to the operation of the Debtors' businesses or the Chapter 11 Cases, unless consented to in writing by the Required First Lien Holders;

(q)     A filing by any Debtor of any motion, pleading, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of the Prepetition Liens or asserting any other cause of action against and/or with respect to the Prepetition Indebtedness, the Prepetition Collateral, the Collateral Agent, or any of the Prepetition Secured Parties (or if the Debtors support any such motion, pleading, application, or adversary proceeding commenced by any third party); and

(r)     The Debtors shall obtain court authorization to commence, or shall commence, join in, assist, or otherwise participate as an adverse party in any suit or other proceeding against the Collateral Agent or any of the Prepetition Secured Parties relating to the Prepetition Indebtedness.

11.     <u>Remedies upon the Termination Date</u>.  Upon the occurrence of the Termination Date, (a) the Adequate Protection Obligations, if any, shall become due and payable, and (b) the Collateral Agent may exercise the rights and remedies available under the First Lien Documents, this Interim Order, or applicable law (subject only to the Carve Out), including, without limitation, foreclosing upon and selling all or a portion of the Prepetition Collateral or Adequate Protection Collateral.  The automatic stay under section 362 of the Bankruptcy Code is hereby deemed modified and vacated to the extent necessary to permit such actions, *provided* that during the Default Notice Period, unless the Court orders otherwise, the automatic stay under section 362 of the Bankruptcy Code (to the extent applicable) shall remain in effect.  The rights of the Debtors to oppose any relief requested by the Collateral Agent or Prepetition Secured Parties (and the rights of the Collateral Agent or Prepetition Secured Parties to oppose any request for relief by the Debtors) are fully reserved.  Any delay or failure of the Collateral Agent or Prepetition Secured

Parties to exercise rights under the First Lien Documents or this Interim Order shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable document. Without limiting the Debtors' rights under this Interim Order, the Collateral Agent shall be entitled to apply the payments or proceeds of the Prepetition Collateral and the Adequate Protection Collateral in accordance with the provisions of the First Lien Loan Documents and in no event shall the Collateral Agent or any of Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral, the Adequate Protection Collateral or otherwise.  Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights, remedies, benefits, and protections provided to the Collateral Agent and the Prepetition Secured Parties under this Interim Order shall survive the Termination Date.

12.     <u>Limitation on Charging Expenses Against Collateral</u>.  Subject to and effective upon entry of the Final Order, except to the extent of the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation or other proceeding under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the Adequate Protection Collateral, the Collateral Agent or the Prepetition Secured Parties pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the affected party, and no such consent shall be implied from any other action, inaction, or acquiescence by the Collateral Agent or any of the Prepetition Secured Parties.  Neither the [Consenting First Lien Noteholders'] consent to the Interim Budget nor anything else herein shall be deemed or construed as agreement by the

Prepetition Secured Parties to be surcharged under section 506(c) or any other provision of the Bankruptcy Code or equitable doctrine.

      13.    <u>Payments Free and Clear</u>.  Subject to and effective upon entry of the Final Order, any and all payments pursuant to paragraphs 5 and 9(a) of this Interim Order shall be irrevocable, received free and clear of any claim, lien, charge, assessment, or other encumbrance, including without limitation, subject to entry of the Final Order, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code.

      14.    <u>Bankruptcy Code Section 552(b)</u>.  The Collateral Agent and each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of them with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral or the Adequate Protection Collateral.

      15.    <u>Reservation of Rights of the Collateral Agent and Prepetition Secured Parties</u>. Notwithstanding any other provision hereof, the grant of adequate protection to the Collateral Agent and the Prepetition Secured Parties pursuant to this Interim Order is without prejudice to their respective rights to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, *provided* that the relative priority of all such additional adequate protections shall be the same as set forth in paragraph 5 of this Interim Order and without prejudice to the right of the Debtors or any other party in interest to contest any such modification.  Nothing herein shall be deemed to waive, modify, or otherwise impair the respective rights of the Collateral Agent, or the Prepetition Secured Parties under the First Lien Documents, under any applicable law or in equity, and the Collateral Agent and the Prepetition

Secured Parties expressly reserve all of their respective rights and remedies whether now existing or hereafter arising under the First Lien Documents, under any applicable law or in equity in connection with all Termination Events and Defaults and Events of Default (as defined in the applicable First Lien Documents, and whether arising prior to or after the Petition Date).

16.     <u>Debtors' Reservation of Rights</u>.  Notwithstanding anything to the contrary in this Interim Order, following receipt of a Default Notice, and at any time before or after the occurrence of the Termination Date, including without limitation as a result of a Termination Event pursuant to paragraph 10 of this Interim Order, the Debtors may seek authority to use Cash Collateral without the consent of the [Required Consenting First Lien Noteholders], and the [Consenting First Lien Noteholders] reserve all rights to contest such use.

17.     <u>Modification of Automatic Stay</u>.  The Debtors are authorized and directed to perform all acts and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby.  All parties to the RSA are also authorized to deliver any notices of termination of the RSA in compliance with the terms thereof.  The stay under section 362 of the Bankruptcy Code is hereby modified to permit the Debtors, the Collateral Agent, each of Prepetition Secured Parties, and the Consenting Stakeholders to accomplish the transactions contemplated by this Interim Order.

18.     <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)     Except as expressly provided in this Interim Order, no claim or lien having a priority senior to or *pari passu* with those granted by this Interim Order to the Prepetition Secured Parties shall be granted or allowed, and the Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or, except as set forth in the Collateral Agreement, subordinated to or made pari passu with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)     Notwithstanding any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise entered at any time, (x) the 507(b) Claims, the other administrative claims granted pursuant to this Interim Order, and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Adequate Protection Obligations shall have been paid and satisfied in full in cash (and such 507(b) Claims, the other administrative claims granted pursuant to this Interim Order and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, stay, modification, or vacatur shall not affect: (i) the validity, priority or enforceability of any Adequate Protection Obligations incurred prior to the actual receipt of written notice by the [First Lien Notes Trustee and the Credit Agreement Agent] of the effective date of such reversal, stay, modification or vacatur; or (ii) the validity, priority or enforceability of the Adequate Protection Liens. Notwithstanding any such reversal, stay, modification or vacatur, any use of the Prepetition Collateral (including Cash Collateral) or any Adequate Protection Obligations incurred by the Debtors hereunder, as the case may be, prior to the actual receipt of written notice by the [First Lien Notes Trustee and the Credit Agreement Agent], respectively, of the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the Collateral Agent and the Prepetition Secured Parties (subject to the provisions of the Collateral Agreement) shall be entitled to all of the rights, remedies, privileges, and benefits granted herein and to the protections afforded in section 363(m) of the Bankruptcy Code with respect to all uses of the Prepetition Collateral (including the Cash Collateral) and all Adequate Protection Obligations.

(d)     The adequate protection payments made pursuant to this Interim Order shall not be subject to counterclaim, setoff, subordination, recharacterization, defense, or avoidance in the Chapter 11 Cases or any subsequent chapter 7 cases (other than a defense that the payment has actually been made).

(e)     Except as expressly provided in this Interim Order, the Adequate Protection Obligations, the 507(b) Claims and the Adequate Protection Liens and all other rights and remedies of the Collateral Agent and the Prepetition Secured Parties granted by this Interim Order shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases (except to the extent such plan of reorganization (i) discharges the 507(b) Claims and the Adequate Protection Liens and (ii) is supported by the Required Consenting Stakeholders), and pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any Adequate Protection Obligations.  The terms and provisions of this Interim Order shall continue in any successor cases if the Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code,

and the Adequate Protection Liens, the 507(b) Claims, the other administrative claims granted pursuant to this Interim Order, and all other rights and remedies of the Collateral Agent and the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until all Adequate Protection Obligations are indefeasibly paid in full in cash.

19.    <u>Effect of Stipulations</u>.    As a result of the Debtors' review of the First Lien Documents and the facts and circumstances relating thereto, the Debtors have agreed to the various stipulations and made the various admissions contained in this Interim Order, including without limitation, the stipulations and admissions included in paragraph C, which stipulations and admissions shall be binding upon the Debtors and any successors thereto in all circumstances. The stipulations and admissions contained in this Interim Order, including without limitation, in paragraph C of this Interim Order, shall also be binding upon all other parties in interest, including any Committee or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "<u>Trustee</u>"), for all purposes unless (a) such party (subject in all respects to any agreement or applicable law which may limit or affect such entity's right or ability to do so), having obtained the requisite standing, has filed an adversary proceeding or contested matter, as required under the Bankruptcy Rules (subject in either case to the limitations contained herein, including, without limitation, in this paragraph 19 of this Interim Order) by no later than the date that is the earlier of (a) the effective date under a confirmed plan of reorganization and (b) the day that is 60 days from the date of the entry of the Final Order (as such date may be extended by the Required First Lien Holders) (the "<u>Challenge Period</u>") (x) challenging the amount, validity, enforceability, priority, or extent of the First Lien Notes Indebtedness, the Credit Agreement Indebtedness, or the liens on the Prepetition Collateral securing the First Lien Notes Indebtedness or the Credit Agreement Indebtedness, or (y) otherwise asserting any other claims, counterclaims, causes of action, objections, contests, or defenses against the Collateral Agent or any of the Prepetition Secured Parties on behalf of the Debtors' estates (collectively, the "<u>Claims and Defenses</u>"), and (b) the

Court rules in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding or contested matter; *provided* that, as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished effective as of the Petition Date.  If no adversary proceeding or contested matter is timely filed prior to the expiration of the Challenge Period, without further order of the Court: (w) the Debtors' stipulations and admissions contained in this Interim Order shall be binding on all parties in interest, including the Committee; (x) the First Lien Indebtedness shall constitute allowed claims, not subject to counterclaim, setoff, subordination, re-characterization, defense, or avoidance, for all purposes in the Chapter 11 Cases and any subsequent chapter 7 case; (y) the Collateral Agent's liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected, and of the priority specified in paragraph C, not subject to defense, counterclaim, re-characterization, subordination, or avoidance; and (z) the First Lien Indebtedness and the Collateral Agent's liens on the Prepetition Collateral shall not be subject to any other or further challenge by the Committee or any other party in interest, and any such Committee or other party in interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period) with respect thereto; *provided* that if the Chapter 11 Cases are converted to chapter 7 or a Trustee is appointed in the Chapter 11 Cases prior to the expiration of the Challenge Period, any Trustee shall receive the full benefit of any remaining Challenge Period, subject to the limitations described herein).  If any such adversary proceeding or contested matter is timely filed prior to the expiration of the Challenge Period, the stipulations and admissions contained in this Interim Order, including without limitation, in paragraph C of this Interim Order, shall nonetheless

remain binding and preclusive (as provided in the second sentence of this paragraph 19) on the Committee and any other person, including any Trustee, except as to any such findings and admissions that were expressly challenged in such adversary proceeding or contested matter. Nothing in this Interim Order vests or confers on any person, including the Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates.  In the event that there is a timely successful challenge brought pursuant to this paragraph 19, the Court shall retain jurisdiction to fashion an appropriate remedy.

20.     <u>Limitation on Use of Collateral</u>.  The Debtors shall use the proceeds of the Prepetition Collateral solely as provided in this Interim Order.  Notwithstanding anything herein or in any other order of the Court to the contrary, and subject to the Carve Out, no Cash Collateral may be used to: (a) object, contest, or raise any defense to, the validity, perfection, priority, extent, or enforceability of the Prepetition Indebtedness, the Prepetition Liens, or the liens or claims granted under this Interim Order; (b) assert any Claims and Defenses against The Collateral Agent or any of the Prepetition Secured Parties or their respective agents, affiliates, representatives, attorneys, or advisors; (c) seek to modify any of the rights granted to the Collateral Agents and the Prepetition Secured Parties hereunder, or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved by an order of the Court, *provided* that, notwithstanding anything to the contrary herein, no more than $10,000 in the aggregate of the Prepetition Collateral or the Carve Out may be used by any Committee to investigate the validity, enforceability or priority of the Prepetition Indebtedness or the Prepetition Liens, or investigate any Claims and Defenses or other causes action against the Collateral Agent or any of the Prepetition Secured Parties.

21.      <u>Binding Effect; Successors and Assigns</u>.   The provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including without limitation, the Collateral Agents and the Prepetition Secured Parties, any Committee and the Debtors and their respective successors and assigns (including any Trustee, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the Collateral Agent, the Prepetition Secured Parties, and the Debtors and their respective successors and assigns, *provided* that, except to the extent expressly set forth in this Interim Order, the Collateral Agent and the Prepetition Secured Parties shall have no obligation to permit the use of the Prepetition Collateral (including Cash Collateral) by the Debtors or by any Trustee or similar responsible person appointed for the estate of any Debtor.   For all adequate protection and stay relief purposes throughout the Chapter 11 Cases, the Collateral Agent and Prepetition Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection as of the Petition Date.   For the avoidance of doubt, such request will survive termination of this Interim Order.

22.      <u>Limitation of Liability</u>.   In permitting the use of the Prepetition Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, subject to entry of the Final Order, none of the Prepetition Secured Parties or the Collateral Agent shall (i) have liability to any third party or be deemed to be in control of the operation of any of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any of the Debtors (as such terms, or any similar terms, are used in the Internal Revenue Code, United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar

28

federal or state statute) or (ii) owe any fiduciary duty to any of the Debtors, their creditors, or their estates, or shall constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Collateral Agent or any of the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

23.     <u>Effectiveness</u>.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.  To the extent that any finding of fact shall be determined to be a conclusion of law it shall be so deemed and vice versa.

24.     <u>Proofs of Claim</u>.  None of the Prepetition Secured Parties shall be required to file proofs of claim in any of the Chapter 11 Cases or successor cases, and the Debtors' stipulations in paragraph C herein shall be deemed to constitute a timely filed proof of claim against the applicable Debtor(s).  Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation, administrative claims) in any of the Chapter 11 Cases or successor cases shall not apply to the Prepetition Secured Parties with respect to the Prepetition Indebtedness.  Notwithstanding the foregoing, each of the First Lien Notes Trustee (on behalf of itself and the other First Lien Notes Secured Parties) and the Credit Agreement Agent (on behalf of itself and the Credit Agreement Lenders) is hereby authorized, but not required, to file (and amend and/or supplement, as it sees fit) a master proof of claim for any claims of the applicable

Prepetition Secured Parties arising from the First Lien Documents; provided, that nothing herein shall waive the right of any Prepetition Secured Party to file its own proofs of claim against the Debtors.

25.     <u>Headings</u>.  The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

26.     <u>Final Hearing</u>.  The final hearing (the "<u>Final Hearing</u>") on the Motion shall be held on _____, 2019, at__:__ _.m., prevailing Central Time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Central Time, on _____, 2019, and shall be served on:  (a) the Debtors, 807 Las Cimas Pkway, Ste 350, Austin, Texas 78746, Attn: Thomas Hester; (b) proposed co-counsel to the Debtors, (i) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Anthony R. Grossi and Rebecca Blake Chaikin, and (ii) Jackson Walker L.L.P., 1401 McKinney Street, Suite 1900, Houston, Texas 77010, Attn: Matthew D. Cavenaugh; (c) the Office of the U.S. Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002; (d) counsel to the First Lien Ad Hoc Group, (i) Milbank LLP, 55 Hudson Yards, New York, New York 10001, Attn: Dennis F. Dunne, Evan R. Fleck, and Michael W. Price, and (ii) Porter Hedges, LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002, Attn: John F. Higgins; (e) counsel to the ad hoc group of certain crossover noteholders, (i) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Brian Resnick and Benjamin Schak, and (ii) Haynes and Boone, LLP, 1221 McKinney Street, Suite 2100, Houston, Texas 77010, Attn: Kelli Stephenson Norfleet and Charles A. Beckham, Jr.; and (f) counsel to any statutory committee appointed in these cases.

27.     <u>Jurisdiction</u>.  The Court shall retain jurisdiction to enforce the terms of this Interim Order and to adjudicate any and all matters arising from or related to the interpretation or implementation of this Interim Order.

28.     <u>Controlling Effect of Interim Order</u>.  To the extent any provision of this Interim Order conflicts or is inconsistent with any provision of the Motion, the provisions of this Interim Order shall control to the extent of such conflict.

IT IS SO ORDERED.

Dated: _____, 2019
Houston, Texas

_____
THE HONORABLE [●]
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Interim Budget**

## <u>Annex 3</u>

**Committed Exit Facility Term Sheet**

# EXIT FACILITY TERM SHEET

# JONES ENERGY HOLDINGS, LLC[1]

This term sheet (this "***Exit Facility Term Sheet***") is a summary of indicative terms and conditions for a proposed senior secured delayed draw first lien term loan facility that is materially consistent with the terms and conditions as set forth in this Exit Facility Term Sheet and otherwise reasonably acceptable in form and substance to the Loan Parties and the Lenders (each as defined below).

This Exit Facility Term Sheet is non-binding and is being presented for discussion and settlement purposes only. Consequently, this Exit Facility Term Sheet is entitled to protection from any use or disclosure to any person or entity pursuant to Federal Rule of Evidence 408 and any other rules or laws of similar import. This Exit Facility Term Sheet does not purport to summarize all of the terms, conditions, covenants and other provisions that may be contained in the fully negotiated and executed definitive documentation in connection with the Term Loan Facility (as defined below).

This Exit Facility Term Sheet and the information contained in this Exit Facility Term Sheet shall remain strictly confidential and may not be shared with any person or entity (other than the Loan Parties, the Lenders and their respective professionals and advisors), unless otherwise consented to by the Loan Parties or the Lenders, as applicable.

| | |
|---|---|
| **Borrower** | Jones Energy Holdings, LLC ("***JEH***") or another entity designated as the holding company of the reorganized Debtors (the "***Borrower***"). |
| **Guarantors** | All U.S. subsidiaries of the Borrower, including Nosley Assets, LLC, Nosley SCOOP, LLC, Nosley Acquisition, LLC, Nosley Midstream, LLC, Jones Energy, LLC, Jones Energy Finance Corp., the direct parent of the Borrower and any future U.S. subsidiaries of the Borrower (collectively, the "***Guarantors***" and, together with the Borrower, the "***Loan Parties***"). Criteria to designate excluded subsidiaries to be mutually agreed. For the avoidance of doubt, CCPR Sub LLC and JRJ Opco, LLC shall not be Guarantors so long as they satisfy the criteria to be designated as excluded subsidiaries. |
| **Administrative Agent** | A financial institution acceptable to the Required Consenting First Lien Noteholders in their reasonable discretion. |
| **Lenders** | Each Consenting Stakeholder that is a signatory to the Commitment Letter (or its designated affiliate entity) (the "***Lenders***"). Notwithstanding the foregoing, upon the direction of Lenders holding a majority in principal amount of the Term Loan Commitments, the Term Loans may initially be advanced by a fronting bank. Term Loan Commitments will be allocated among the Lenders ratably in accordance with their anticipated entitlements under the Plan to receive equity in the reorganized Borrower (which shall be calculated by reference to their respective holdings of First Lien Notes and Unsecured Notes as of April 10, 2019, as reported to the Borrower by Counsel to the First Lien Ad Hoc Group and Counsel to the Crossover Group no later than April 8, 2019). |
| **Term Loan Facility** | A senior secured delayed draw first lien term loan facility in an aggregate principal amount of $20 million (the "***Term Loan Facility***" and the term loans thereunder, the "***Term Loans***", with the aggregate principal amount of the |

---

[1] This Exit Facility Term Sheet is attached as <u>Annex 3</u> to the restructuring support agreement dated as of April 1, 2019 (the "***RSA***"), and is the Exit Facility Term Sheet referenced in the RSA. Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the RSA. Provisions herein purporting to be non-binding shall be removed prior to attachment to the RSA.

commitments under such facility, the "**_Term Loan Commitments_**"). Borrowings under the Term Loan Facility will be available upon at least 5 business days' notice, or such notice period as may be required by the Administrative Agent, in minimum increments of $5 million. There shall be no more than 3 borrowings under the Term Loan Facility.

**Maturity** ....................................   The Term Loans will mature on the 3rd anniversary of the Effective Date.

**Amortization** ............................   None.

**Interest** ......................................   The Term Loans will bear interest at a rate of adjusted LIBOR (subject to a 1.0% floor) plus 5.0% per annum in year 1, 6.5% per annum in year 2 and 8% in year 3. Interest shall be paid in cash quarterly and upon any repayment or prepayment.

Notwithstanding the foregoing, upon the occurrence of any event of default such interest rate margin shall increase by an additional 2.0% per annum (the "**Default Rate**").

A customary alternate base rate option will be available as an alternative to adjusted LIBOR.

**Fees** ...........................................   Delayed Draw Unused Fee:
- first 30 days after Closing Date (as defined in the Exit Commitment Letter): 0% per annum on undrawn amount of Term Loan Commitments
- days 31-120 after Closing Date: 2.5% per annum on undrawn amount of Term Loan Commitments
- days 121-365 after Closing Date: 5.0% per annum on undrawn amount of Term Loan Commitments
- year 2 after Closing Date: 6.5% per annum on undrawn amount of Term Loan Commitments
- year 3 after Closing Date: 8.0% per annum on undrawn amount of Term Loan Commitments

Commitment Premium: An amount equal to 5.0% of the Term Loan Commitments, (i) 75% of which will be earned and payable in cash on April 11, 2019, and allocated amongst the Lenders based on their respective allocation of Term Loan Commitments after all commitments have been received on April 10, 2019 and (ii) 25% of which will be earned and payable in cash on the Plan Effective Date only if an Alternative Exit Facility does not become effective on the Plan Effective Date.

Administrative Agency Fee: An annual amount to be agreed.

**Security** ......................................   The Term Loans will be secured on a perfected, first-priority basis by substantially all of the assets of the Borrower and the Guarantors, subject to certain customary and agreed exceptions (the "**_Collateral_**"). The Collateral will include the equity of the Borrower and the Guarantors and all deposit and security accounts (which shall be subject to control agreements), subject to certain customary and agreed exceptions.

**Guarantees** ...............................   All obligations of the Borrower under the Term Loan Facility will be unconditionally guaranteed on a joint and several basis by the Guarantors.

| | |
|---|---|
| **Ranking** | The Term Loans will be first-priority senior secured obligations. The indebtedness evidenced by the Term Loans and the guarantees of the Term Loans will be senior to all of the Borrower's and the Guarantors' other indebtedness (subject to certain customary exceptions). |
| **Use of Proceeds** | Proceeds of the initial and delayed draw Term Loans will be used for working capital and general corporate purposes. |
| **Exit Facility Documents** | The Exit Facility Documents (as defined in Annex A hereto) shall be based on the Credit Agreement, dated as of December 31, 2009, among JEH, as borrower, Wells Fargo Bank, N.A., as administrative agent, and the other parties thereto, as in effect immediately prior to Amendment No. 13 thereto, dated as of June 28, 2018 and the other "Loan Documents" (as defined therein), with modifications to reflect this Exit Facility Term Sheet and other adjustments customary to reflect a term loan facility and shall otherwise be acceptable to the Required Consenting First Lien Noteholders in their reasonable discretion. |
| **Voluntary Prepayments** | Voluntary prepayments of the Term Loans will be permitted, in whole or in part, at any time, in minimum principal amounts to be set forth in the Exit Facility Documents, without premium or penalty. |
| **Mandatory Prepayments** | Usual and customary for term loan facilities of this type, including 100% of net cash proceeds of non-ordinary course asset sales and casualty events (subject to reinvestment rights to be agreed) and issuances of unpermitted indebtedness. |
| **Commitment Termination Rights** | The Exit Facility Documents implementing this term sheet shall be acceptable to the Required Consenting First Lien Noteholders.  Notwithstanding anything to the contrary in the RSA, in the event that the Required Consenting First Lien Noteholders and the Company enter into, approve or consent to Exit Facility Documents (or agree to a modification of the terms of this Exit Term Sheet) that deviate materially from this Exit Term Sheet prior to the Closing Date, any Lender hereunder that is not a Consenting First Lien Noteholder shall have the right to terminate its Term Loan Commitments on notice to the other Lenders and the Borrower, which shall be such Lenders' sole remedy under such circumstance and shall not otherwise give rise to any termination rights or other rights under the RSA in favor of such parties (acting in their capacities as Consenting Stakeholders thereunder). For the avoidance of doubt, (i) no portion of the Commitment Premium that is due on the Plan Effective Date shall be payable to any such terminating Lender and (ii) if any Lender exercises their termination right described above, all other Lenders may increase their Term Loan Commitments on a *pro rata* basis so that the aggregate Term Loan Commitments will not be reduced as a result of any such termination provided that any such terminations and/or the failure of any Lenders to increase their Term Loan Commitments shall not prevent or delay the Closing Date. |
| **Conditions Precedent** | As set forth on Annex A hereto, subject to any such amendment, modification or waiver thereof as determined or agreed between the Company and the Required Consenting First Lien Noteholders; it being understood that, following the Closing Date, any amendment, modification or waiver of a condition precedent to a Credit Extension shall be determined in accordance with the Exit Facility Documents. |

| | |
|---|---|
| **Representations and Warranties** ............................... | Customary and appropriate representations and warranties for a term loan financing of this type reflecting the industry and business of the Loan Parties. |
| **Financial Covenants**................ | None. |
| **Covenants**.................................. | Negative and affirmative covenants customary for term loan facilities of this type, including: |

*Dispositions*

- Merge Assets Dispositions Basket. The asset sale covenant will include a carve-out for the sale of the Merge Assets subject to pro forma compliance with a 2.00x collateral coverage test.

- General Asset Sales. The asset sale covenant will permit non-ordinary course asset sales if at FMV and for at least 75% of consideration in cash, and subject to mandatory prepayment (with reinvestment rights to be agreed) of net cash proceeds and pro forma compliance with a 2.00x collateral coverage test.

*Restricted Payments/Investments*

- RP Builder Basket. The restricted payment covenant will include a builder basket substantially similar to that in the prepetition unsecured notes indentures based on, among other things, 50% of CNI and 100% of the proceeds of certain capital contributions and equity issuances and subject to a pro forma FCCR test of at least 2.25x.

- General RP Basket. The restricted payment covenant will include a general basket in the amount of $25 million.

- Investments in JVs. The investments covenant will include a carve-out for investments in JVs in connection with a disposition of the Merge Assets to such JV subject to pro forma compliance with a 2.00x collateral coverage test.

- Tax Distributions. The restricted payment covenant will include a basket for the payment of customary tax distributions.

*Indebtedness and Liens*

- Secured Hedges Basket. The debt covenant will include a basket permitting the incurrence of secured hedging obligations, subject to a customary intercreditor agreement.

- Junior/Unsecured Basket. The debt covenant will include a basket permitting junior lien or unsecured debt in the amount of $250 million, subject to a 13% per annum rate cap.

- Ratio Debt Basket. The debt covenant will include a debt basket permitting unsecured debt subject to a pro forma FCCR test of at least 2.25x.

- Cap Lease/Purchase Money Basket. The debt covenant will include a debt basket permitting capital lease obligations and/or purchase money

obligations capped at the greater of (x) $25 million and (y) 2.5% of Modified ACNTA.

- General Debt and Liens Basket. The debt covenant will include a general debt basket in the amount of $25 million, which debt shall not be subject to rate caps and the liens covenant will include a general liens basket in the amount of $10 million.

- Letters of Credit. The debt and liens covenants will include a basket in an amount to be agreed for the issuance of ordinary course letters of credit and for liens with respect to cash or other collateral with respect thereto.

| | |
|---|---|
| **Events of Default** | The Term Loan Facility will contain events of default customary for term loan facilities of this type, including Change of Control. |
| | "***Change of Control***" will be defined to include any "person" or "group", other than the Permitted Holders (as defined below), becoming the beneficial owner, directly or indirectly, of more than 50% of the voting stock of the Borrower . |
| | "***Permitted Holders***" means Oaktree Capital Management and their respective affiliates. |
| **Voting** | Amendments and waivers of the definitive credit documentation will require the approval of Lenders holding more than 50% of the aggregate amount of the loans and commitments under the Term Loan Facility, except that (a) the consent of each affected lender shall be required with respect to certain actions, including (i) increases in the commitment of such lender and (ii) reductions or forgiveness of principal, interest, fees or reimbursement obligations payable to such lender and (b) the consent of each lender shall be required with respect to certain actions, including (i) modification to voting requirements or percentages, (ii) modification to certain provisions requiring the pro rata treatment of Lenders, including with respect to prepayments and commitment reductions, (iii) extensions of final maturity of the loans or of any fixed date for payment to such lender of any interest or fees or any reimbursement obligation and (iv) releases of all or substantially all of the value of the guarantees, or all or substantially all of the collateral. |
| | For the avoidance of doubt, there shall be no restrictions on voting rights of affiliates of the Borrower which are Lenders under the Term Loan Facility. |
| **Assignments and Participations** | The Lenders will be permitted to assign loans under the Term Loan Facility with the consent of (i) the Borrower, unless an Event of Default has occurred and is continuing, and (ii) the Administrative Agent, in each case not to be unreasonably withheld or delayed. |
| | For the avoidance of doubt, there shall be no restrictions on assignments to affiliates of the Borrower (other than Permitted Holders or among institutions that are Lenders on the Closing Date, any direct or indirect parent of the Borrower, the Borrower and its subsidiaries). |
| **Defaulting Lenders** | Usual and customary for facilities and transactions of this type. |

**Expenses and**
**Indemnification**........................  Usual and customary for facilities and transactions of this type.

**Governing Law and Forum** ....  New York.

Annex A

# EXIT FACILITY TERM SHEET

# JONES ENERGY HOLDINGS, LLC

Conditions Precedent

The initial availability of the Term Loan Facility, and the obligation of each Lender to make any Term Loan (each, a "**Credit Extension**") shall be subject to the satisfaction or due waiver of the following conditions precedent:

(a)  The Borrower and each Guarantor shall have executed and delivered a satisfactory credit agreement (the "**Term Loan Credit Agreement**") and other definitive financing documentation with respect to the Term Loan Facility (together with the Term Loan Credit Agreement, the "**Exit Facility Documents**"), including security agreements, pledge agreements, control agreements, stock powers executed in blank, and other documentation reasonably satisfactory for the creation and perfection of the liens and security interests contemplated in the Term Sheet (subject to certain post-closing matters as may be mutually agreed).

(b)  The Administrative Agent shall have received all fees required to be paid hereunder on the Closing Date, and all expenses for which invoices have been presented at least two (2) business days prior to the Closing Date.

(c)  Except as would not reasonably expect to result in a Material Adverse Effect, all governmental and third-party approvals necessary in connection with the financing and transactions contemplated hereby shall have been obtained and be in full force and effect.

(d)  The Administrative Agent shall have received unaudited interim consolidated financial statements of the Borrower and its subsidiaries for each calendar month period ended subsequent to a date to be agreed] as to which such financial statements are available, accompanied by a certificate of a financial officer of the Borrower.

(e)  The Administrative Agent shall have received (i) a reasonably satisfactory opening balance sheet of the Borrower giving pro forma effect to the debt (if any) to be incurred on the Closing Date and (ii) projections of the revenues, expenses, and cash flows of the Borrower covering the period from January 1, 2019 through the Maturity Date, prepared on a quarterly basis.

(f)  The Administrative Agent shall have received customary certificate of the an authorized officer of the Borrower as to satisfaction of all conditions precedents to Closing, certificates of authorized officers of each Loan Party attaching certified organization documents of such Loan Party, resolutions or other action, incumbency certificates and/or other certificates of authorized officers of each Loan Party evidencing the identity, authority and capacity of each authorized officer thereof authorized to act as a authorized officer in connection with Term Loan Credit Agreement and the other Exit Facility Documents to which such Loan Party is a party or is to be a party, and good standing certificates in such Loan Party's jurisdiction of organization, satisfactory funds flow memorandum, insurance certificates and a solvency certificate from the Borrower's chief financial officer or treasurer (certifying that, after giving pro forma effect to the Transactions (as defined in the Commitment Letter) and after giving effect to each debtors' exit from the Chapter 11 Cases in

accordance with the Plan (each as defined in the RSA), that the Loan Parties, on a consolidated basis, are solvent).

(g) The Administrative Agent shall have received copies of recent lien, judgment and mortgage searches in each jurisdiction reasonably requested by the Administrative Agent with respect to the Loan Parties, to the extent requested by the Administrative Agent, no less than 30 days prior to the Closing Date;

(h) The Administrative Agent shall have received such legal opinions, including opinions of local counsel, as are reasonably satisfactory to the Administrative Agent.

(i) The Borrower's capital structure and financing plan shall be reasonably satisfactory to the Required Consenting First Lien Noteholders (it being agreed and understood that the capital structure and financing plan as set forth in the RSA as in effect on the Agreement Effective Date (as defined in the RSA), and as amended by any amendments consented to in writing by the Administrative Agent, is deemed satisfactory to the Required Consenting First Lien Noteholders).

(j) The Administrative Agent shall have received (at least five (5) business days prior to Closing Date to the extent requested at least ten (10) business days prior to the Closing Date) all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including but not restricted to the USA Patriot Act and the Beneficial Ownership Regulation (31 C.F.R. § 1010.230).

(k) The Bankruptcy Court (as defined in the RSA) shall have entered the Confirmation Order (as defined in the RSA), in form and substance reasonably satisfactory to the Required Consenting First Lien Noteholders, which shall include the approval of the Commitment Letter, and all conditions to the effectiveness of the Plan shall have been satisfied or waived in accordance therewith.

(l) Since the date of the Commitment Letter, there shall not have occurred any event or condition that has had or could be reasonably expected, either individually or in the aggregate, to have a Material Adverse Effect. "***Material Adverse Effect***" means any event, circumstance or condition that has had a materially adverse effect on (i) the business, operations, assets, liabilities (actual or contingent) or financial condition of the Borrower and its subsidiaries, taken as a whole, (ii) the ability of the Loan Parties (taken as a whole) to perform their respective payment obligations under any Exit Facility Document to which any of the Loan Parties is a party or (iii) the rights and remedies of the Lenders, the collateral agent under the Term Loan Credit Agreement or the Administrative Agent under any Exit Facility Document, but excluding, for the avoidance of doubt, any events resulting from, or contributing to, the commencement of the Chapter 11 Cases.

(m) On the Closing Date, immediately after giving effect to the consummation of the Transactions (as defined in the RSA), the issuance of the Term Loans, if any, to occur on the Closing Date and any other Transactions to occur on the Closing Date, the Borrower and its subsidiaries shall have outstanding no indebtedness for borrowed money other than the Term Loan Facility and any other indebtedness permitted under the Term Loan Credit Agreement.

(n) On the Closing Date, the representations and warranties of the Loan Parties contained in the Exit Facility Documents shall be true and correct in all material respects; provided that any representation or warranty that is qualified as to "materiality" or similar language shall be true and correct in all respects.

The availability of each Credit Extension on or after the Closing Date shall be subject to the following conditions:

(a)     At the time of making any Credit Extension and after giving effect thereto, the representations and warranties of the Loan Parties contained in the Exit Facility Documents shall be true and correct in all material respects; provided that any representation or warranty that is qualified as to "materiality" or similar language shall be true and correct in all respects.

(b)     No default or Event of Default shall then exist or result therefrom.

(c)     Delivery of a customary borrowing notice.

(d)     The occurrence of the Plan Effective Date (as defined in the RSA).

## **Annex 5**

**Management Compensation Term Sheet**

**FINAL RSA EXHIBIT**

## JONES ENERGY, INC.

## MANAGEMENT COMPENSATION ARRANGEMENTS

The following summarizes the principal terms of employment-related arrangements for certain executives of Jones Energy, Inc. (the "Company") following the consummation of the Restructuring Transactions. Capitalized terms used but not defined herein shall have the meaning set forth in the Plan that is attached as Annex 1 to the Restructuring Support Agreement to which this term sheet is attached as Annex 5.

**Management Incentive Plan**

| | |
|---|---|
| Overview: | "NewCo" shall mean the reorganized Company or another entity designated pursuant to the Plan to issue common stock on the Effective Date. |
| | General. On the Effective Date, NewCo will reserve exclusively for the participants in the Management Incentive Plan (such reserve, the "MIP Equity Pool") a pool of equity interests of NewCo representing no less than 5% of NewCo's equity interests (currently contemplated to be common stock), determined on a fully diluted and fully distributed basis (i.e., assuming conversion of all outstanding convertible securities and full distribution of the MIP Equity Pool). |
| | MIP Grants. The MIP Equity Pool shall be fully granted to employees of the Company and its subsidiaries within 24 months of the Effective Date. |
| | The New Board shall engage in good faith with the Chief Executive Officer, the Chief Financial Officer, and the Chief Operations Officer on the terms of the management incentive plan, the allocation of the MIP Equity Pool, and new employment agreements as soon as reasonably practicable and may utilize advice from Willis Towers Watson in such discussions as the New Board deems appropriate, in its sole discretion. |

## **Annex 6**

**Governance Term Sheet**

**FINAL RSA EXHIBIT**

### *REORGANIZED JONES ENERGY*

**Summary of Terms and Conditions –
Governance of Reorganized Jones Energy**

The following Summary of Terms and Conditions (this "Term Sheet") relates to the cases (the "Bankruptcy Cases") to be commenced under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") by Jones Energy, Inc. ("JEI") and certain of its direct and indirect subsidiaries (the "Sellers"), each of whom, including Jones Energy Holdings, LLC ("JEH"), will be debtors in possession in the Bankruptcy Cases.  This Term Sheet presents certain illustrative terms regarding the governance of the reorganized holding company ("New Holdco") that is proposed to emerge from the Bankruptcy Cases pursuant to a plan of reorganization (the "Plan"), which New Holdco shall be one of (1) reorganized JEH, (2) reorganized JEI or (3) one or more newly formed entities, as determined by the Required Consenting Pro Forma Equity Holders, in consultation with the Debtors, on or before the Plan confirmation hearing.

*Summary of Terms*

| | |
|---|---|
| **Reorganized Structure** | If reorganized JEH or another entity intended to be treated as a partnership for U.S. federal income tax purposes ("Reorganized JEH") is designated as New Holdco pursuant to the Plan, Plan distributions of equity and warrants will be made in the following form: (1) noteholders that certify that they are not subject to withholding obligations under section 1445 or 1446 of the Internal Revenue Code (e.g., U.S. holders of First Lien Notes, U.S. holders of Unsecured Notes, and foreign withholding partnerships) and who elect to receive units (the "Units") issued directly by reorganized JEH (collectively "Electing Noteholders") will receive Units and (2) all other holders of First Lien Notes or Unsecured Notes ("Blocker Noteholders") shall receive shares (the "Ordinary Blocker Shares"), and (3) all unsecured noteholders shall receive warrants in a, newly-formed entity treated as a corporation for U.S. federal income tax purposes (the "Blocker") that would hold the Units and warrants in Reorganized JEH allocated to such persons under the Plan.  The Ordinary Blocker Shares and warrants issued to the Blocker Noteholders will mirror, as closely as possible, the Units and warrants issued directly by Reorganized JEH to the Blocker. |

If reorganized JEI or a newly-formed entity treated as a corporation for U.S. federal income tax purposes ("Reorganized JEI") is designated as New Holdco pursuant to the Plan, all holders of First Lien Notes and all unsecured noteholders shall receive equity in such entity and the unsecured noteholders shall receive warrants in such entity.

In either case, no Units, Blocker Shares or warrants will be publicly traded upon consummation of the Plan.

Except as otherwise noted herein, this Term Sheet assumes that New

Holdco will be Reorganized JEH.  To the extent New Holdco is Reorganized JEI (or Reorganized JEH or JEI implements some alternative corporate structure), the form of the definitive documentation will be modified as the context requires to implement the terms hereof (including, but not limited to, providing all holders of First Lien Notes and Unsecured Notes the same substantive economic, voting and information rights and shareholder protections set forth herein).

**Investment Company Issues**

If Reorganized JEH is designated as New Holdco by the Plan, to prevent the Blocker from being deemed an "investment company" under the Investment Company Act of 1940 (the "'40 Act"), the Blocker would be designated the sole manager of, and thereby control the major decisions, of New Holdco. Electing Noteholders would receive direct economics, but limited direct voting rights, in Reorganized JEH through their Units and would also receive a special class of shares in the Blocker ("Special Blocker Shares", and together with the Ordinary Blocker Shares, the "Blocker Shares") entitling them to proportional voting rights in the Blocker (but no additional economics) and, if applicable, the right to designate or remove a Director (defined below). Units would be exchangeable for Blocker Shares on a one-to-one basis.

**Board of Directors:**

The Blocker (or Reorganized JEI if Reorganized JEI is designated as New Holdco) will be governed by a seven (7) member board of directors (each a "Director", and collectively, the "Board") constituted as follows:

- one (1) Director shall be the CEO of Reorganized JEH and the Blocker;

- two (2) Directors (the "Oaktree Directors") shall be designated by Oaktree Capital ("Oaktree") so long as Oaktree holds (directly or indirectly) at least 13% of the issued and outstanding voting interests in New Holdco, and one (1) Director shall be designated by Oaktree so long as Oaktree holds (directly or indirectly) less than 13% but at least 8% of the issued and outstanding voting interests in New Holdco;

- one (1) Director (the "Avenue Director") shall be designated by Avenue Capital Group ("Avenue" and together with Oaktree, the "Designating Holders") so long as Avenue holds (directly or indirectly) at least 8% of the issued and outstanding voting interests in New Holdco; and

- one (1) Director (the "SP Director" and, together with the Oaktree Directors and the Avenue Director, the "Designated Directors") shall be designated by Silver Point Capital ("Silver Point" and together with Oaktree and Avenue, the

2

"Designating Holders") so long as Silver Point holds (directly or indirectly) at least 8% of the issued and outstanding voting interests in New Holdco; and

- the remaining Directors (the "Remaining Directors") shall be initially selected by a vote of the members of Consenting Pro Forma Equity Holders other than the Designating Holders (the "Selecting Holders") that hold at least a majority of the aggregate Pro Forma Equity held by such Selecting Holders (with any replacements selected by holders other than the Designating Holders); *provided* that (i) the Remaining Directors shall be industry professionals, (ii) the Selecting Holders shall in good faith consult with and consider nominees proposed by the Designating Holders in selecting the initial Remaining Directors, (iii) the selection of such Remaining Directors shall be subject to a veto by Oaktree to be exercised reasonably for so long as Oaktree is a Designating Holder.

A Designated Director may only be removed, with or without cause, by the Designating Holder, and the Designating Holder will have the right to remove its Designated Director for any or no reason at any time and may designate a replacement Director in the event of the removal, resignation, retirement, death or incapacity of its designee. In the event that any Designated Director seat becomes vacant for any reason prior to the annual shareholders' meeting, such vacancy shall be filled until the next shareholder meeting by the Designating Holder. Notwithstanding the foregoing, if any Designating Holder loses its right to designate a Director, such Designating Holder shall cause its Designated Director to tender his or her resignation to the Board, or will cause such Designated Director to be removed. The resulting vacancy created on the Board shall be filled by the Board until the next annual meeting of members. Designation rights shall not be transferrable.

The Remaining Directors may only be removed for cause.

Except as otherwise provided herein, the Board will act by the affirmative vote of a majority of the Directors then in office or by unanimous written consent. Except as otherwise provided herein, the presence of at least a majority of the Directors then in office at a duly called meeting of the Board shall constitute a quorum; *provided* that a duly called meeting of the Board shall require reasonable prior notice to each Director; and *provided*, *further*, that Directors may attend meetings of the Board telephonically or by means of other remote communication.

The governing documents of Blocker or Reorganized JEI, as applicable (the "Governing Documents"), will provide that the Directors will be subject to the same fiduciary duties applicable to

directors of a Delaware corporation.

**Blocker Shareholder Action:**     All actions of the Blocker shareholders at any duly called meeting where quorum is established shall be determined by the majority of the affirmative votes of Blocker Shares entitled to vote thereat. The Blocker shareholders may also act without a meeting by written consent signed by the holders of Blocker Shares having not fewer than the minimum number of votes that would be necessary to authorize or take such action at a meeting.

**Dividends/Distributions:**     At the discretion of the Board, except that Reorganized JEH will be required to make customary tax distributions.

**Transfers:**     The Blocker Shares and the Units will not be listed or registered under the Exchange Act.   Direct and indirect transfers of Units (including transfers of Blocker Shares) shall be restricted to prohibit (1) transfers to foreign persons that would cause New Holdco to have to withhold for U.S. taxes with respect to the foreign transferee on a go-forward basis and (2) transfers that would cause New Holdco to be a publicly traded partnership taxed as a corporation.

**Change of Control Transactions:**     Any merger by New Holdco, sale of all or substantially of the New Holdco's assets, or other transaction by New Holdco or any stockholder thereof that results in any person or "group" (within the meaning of Section 13(d)(3) of the Securities Exchange Act) holding a majority of New Holdco's issued and outstanding Units will require the approval of both the majority of the disinterested Directors and the holders of a majority of the outstanding Units (other than Units held by interested parties).  There will be no drag-along or tag-along rights.

**Preemptive Rights:**     Each member (including, for the avoidance of doubt, the Blocker, which will provide pass-through preemptive rights to its holders) that, together with its affiliates, directly holds at least 2.5% (by voting power) of the outstanding Units will have preemptive rights to subscribe for its pro rata share of any equity securities (including securities convertible into or rights to subscribe for or purchase equity securities) issued by New Holdco or any of its subsidiaries, subject to customary exceptions.

**Information Rights:**     New Holdco will make available to each holder of Blocker Shares (i) within 90 days of the end of each fiscal year, all annual financial statements and similar information with respect to New Holdco and its subsidiaries that would be required to be contained in a filing with the SEC on Form 10-K if New Holdco were required to file such forms, excluding any "Management's Discussion and Analysis of Financial Condition and Results of Operations", and (ii) within 45 days of the end of each of the first three quarters or each fiscal year, all quarterly financial statements and similar information with respect to New Holdco and its subsidiaries that would be required to be contained in a filing with the SEC on Form 10-Q if New Holdco were required to file such forms, excluding a "Management's

4

Discussion and Analysis of Financial Condition and Results of Operations".   New Holdco shall as promptly as reasonably practicable (but in any event, no later than 5 business days after furnishing the annual and quarterly reports) hold a conference call to discuss the results of operations for the relevant reporting period and to answer questions posed by holders of Blocker Shares with regard to those results.   New Holdco will also make available to each person holding Units estimated, within 90 days of the end of each taxable year of New Holdco and final information regarding each such member's share of New Holdco income or loss for tax purposes.

At any time that neither New Holdco nor the Blocker is a public filer, subject to customary confidentiality obligations, each holder of Units or Blocker Shares (as applicable) may share such information concerning New Holdco or the Blocker (as applicable) with its managers, officers, partners, members, employees, investors and advisors, as well as any *bona fide* prospective purchaser of Blocker Shares that agrees to keep such information confidential; *provided* that if a holder is entitled to any such information pursuant to any other agreement or in any other capacity, this confidentiality obligation shall not restrict or affect such other agreement or capacity or their rights or obligation with respect thereto.

|                         |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                    |
|-------------------------|----|
| **Registration Rights:** | If New Holdco or the Blocker (as applicable) undertakes an underwritten public offering of its equity interests, all holders of more than 2% of the outstanding equity interests will have piggyback rights to include their Units or shares (as applicable) in the public offering, subject to the right of New Holdco or the Blocker (as applicable) to sell Units or shares (as applicable) first in any such public offering and other customary cutback provisions and limitations.  New Holdco or the Blocker (as applicable) shall only pay for the expenses of one counsel, to be selected by the holders of a majority of the Units or shares (as applicable) being so sold by selling holders.   Any other advisor fees in connection with an underwritten public offering shall be paid by the holders. |
| **Termination:**         | The terms herein regarding director designation, change of control transactions, preemptive rights and information rights shall terminate upon any public listing by New Holdco and/or the Blocker (as applicable). |

5

**Other Terms:**    The Governing Documents will also provide for other customary terms, including, but not limited to, the time, place and manner of calling of meetings of shareholders and the Board, the titles and duties of officers and the manner of appointment, removal and replacement thereof and indemnification and exculpation of directors, officers and other appropriate persons.

Any amendments or modifications to this Term Sheet, as well as the addition of any terms not provided for in this Term Sheet (including any determination to have a shareholders' agreement to implement the terms hereof and/or the inclusion therein of any terms of any such agreement(s) not specified herein) shall be subject to the approval of (i) all three Designating Holders and (ii) (ii) the Required Pro Forma Equity Holders; *provided* that an amendment or modification that would have a material and disproportionate effect on the economic, voting or information rights of one or more holders of First Lien Notes or Unsecured Notes (as compared to the rights of the Designating Holders or any other holders of First Lien Notes or Unsecured Notes) shall require the approval of a majority of the affected holders.

## **Annex 7**

**New Warrants Term Sheet**

**FINAL RSA EXHIBIT**

**Reorganized Jones Energy, Inc.**
**New Warrant Term Sheet**

| | |
|---|---|
| **Issuer** | "**Issuer**" is the entity that issues the Warrants and Common Stock, as will be determined in advance of the confirmation of the chapter 11 plan of reorganization (the "**Plan**") in accordance with the Plan, as described further in the Governance Term Sheet.[1]<br><br>"**Common Stock**" means the shares that are distributed to holders of allowed unsecured notes claims on account of such claims pursuant to and in accordance with the Plan.<br><br>"**Warrants**" means the warrants that are distributed to holders of allowed unsecured notes claims on account of such claims pursuant to and in accordance with the Plan. |
| **Underlying Security** | [__] shares (15%) of the Common Stock, calculated on a fully diluted basis (excluding equity issued pursuant to the management incentive plan). |
| **Term** | 5 years from Effective Date of the Plan. |
| **Exercise Price** | Par plus accrued interest plus make-whole claim, each calculated as of Effective Date of the Plan (approximately $530 million). |
| **Dilution** | Subject to dilution by management incentive plan, consistent with Management Incentive Plan Term Sheet.<br><br>Customary adjustments to the Exercise Price for dividends, stock splits and the like, substantially in the form listed on <u>Schedule I</u>. |
| **Conversion upon Sale** | In the case of any Reorganization (as defined below), following the effective time of such Reorganization, a Warrantholder's right to receive shares of Common Stock upon exercise of the Warrants shall be converted into the right receive, upon exercise of such Warrants, with respect to each share of Common Stock that would |

---

[1] For the avoidance of doubt, in the event that the Restructuring is implemented such that holders of first lien notes claims have the ability to elect to receive Units in reorganized JEH or another entity intended to be treated as a partnership for U.S. federal income tax purposes on the Plan Effective Date, then the "Issuer" will be the Blocker (in which case reorganized JEH or such other entity, as applicable, will issue underlying warrants to the Blocker, and the Blocker will issue the Warrants on a "back to back" basis to the holders of allowed unsecured notes claims on account of such claims).

| | |
|---|---|
| | have otherwise been deliverable, the type and amount of Exchange Property (as defined below) that the holder of one share of Common Stock would have been entitled to receive in such Reorganization; *provided* that if the Exchange Property consists solely of cash, on the effective date of such Reorganization, each Warrantholder shall receive, in respect of each of its Warrants, at the same time and upon the same terms as holders of Common Stock receive the cash in exchange for their shares of Common Stock, an amount of cash equal to the greater of (i) (x) the amount of cash that such Warrantholder would have received if such Warrantholder owned, as of the record date for such Reorganization, the number of shares of Common Stock underlying one Warrant, *minus* (y) the Exercise Price and (ii) $0, and upon Issuer's delivery of such cash (if any) in respect of such Warrant, such Warrant shall be deemed to have been exercised in full and canceled.<br><br>In the case of any Reorganization in which holders of Common Stock may make an election as between different types of Exchange Property (as defined below), a Warrantholder shall be deemed to have elected to receive upon exercise of the Warrants, the weighted average of the types and amounts of consideration actually received by the holders of Common Stock.<br><br>"**Reorganization**" means any consolidation, merger, statutory share exchange, business combination or similar transaction, any sale, lease or other transfer to a third party of all or substantially all of the consolidated assets of Issuer and its subsidiaries, or any recapitalization, reclassification, reorganization or change of the Common Stock (other than as described in paragraph 1(A) of Schedule 1), in each case, in which the Common Stock is converted into, is exchanged for or becomes the right to receive cash, securities or other property (the "**Exchanged Property**"). |
| **Settlement** | Full physical |

**Schedule I**

1. <u>Adjustments</u>.

     (A)    <u>Adjustments upon Certain Transactions</u>. The Exercise Price and the number of shares of Common Stock underlying one Warrant (initially, one share, the "**Warrant Share Number**") shall be adjusted pursuant to the formulas below in the event Issuer (i) pays a dividend or makes any other distribution with respect to its Common Stock solely in shares of its Common Stock, (ii) subdivides or reclassifies its outstanding shares of Common Stock into a greater number of shares or (iii) combines or reclassifies its outstanding shares of Common Stock into a smaller number of shares.

$$Ua = \quad Ub \ \times \ \frac{Oa}{Ob}$$

$$Pa = \quad Pb \ \times \ \frac{Ob}{Oa}$$

     Where:

Ub = Warrant Share Number before the adjustment

Ua = Warrant Share Number after the adjustment

Pb = Exercise Price before the adjustment

Pa = Exercise Price after the adjustment

Ob = Number of shares of Common Stock outstanding immediately before the transaction in question

Oa = Number of shares of Common Stock outstanding immediately after the transaction in question

     (B)    <u>Certain Rights, Options and Warrants</u>. The Exercise Price and Warrant Share Number shall be adjusted pursuant to the formulas below in the event Issuer issues to all or substantially all holders of the Common Stock any rights, options or warrants (other than in connection with a shareholder rights plan or management incentive plan) entitling them, for a period of not more than 60 calendar days after the announcement date of such issuance, to subscribe for or purchase shares of the Common Stock at a price per share that is less than the average of the fair market values of one share of Common Stock for the 10 consecutive trading day period ending on, and including, the trading day immediately preceding the announcement date of such issuance; *provided* that the Exercise Price shall not be increased (and Warrant Share Number shall not be decreased) as a result of this paragraph. For purposes of this paragraph 1(B) in determining whether any rights, options or warrants entitle the holders to subscribe for or purchase shares of the Common Stock at less than such average of the fair market values of one share of Common Stock for the 10 consecutive trading day period ending on, and including, the trading day immediately preceding the

announcement date of such issuance, and in determining the aggregate offering price of such shares of Common Stock, there shall be taken into account the fair market value of any consideration received by Issuer for such rights, options or warrants and any amount payable on exercise or conversion thereof.

$$Ua = \quad Ub \ \ x \quad \frac{Ob + X}{Ob + Y}$$

$$Pa = \quad Pb \ \ x \quad \frac{Ob + Y}{Ob + X}$$

Where:

Ub = Warrant Share Number before the adjustment

Ua = Warrant Share Number after the adjustment

Pb = Exercise Price before the adjustment

Pa = Exercise Price after the adjustment

Ob = Number of shares of Common Stock outstanding immediately before the transaction in question

X = Number of shares of Common Stock issuable pursuant to such rights, options or warrants

Y = Number of shares of Common Stock equal to (i) the aggregate price payable to exercise such rights, options or warrants *divided by* (ii) the average of the fair market values of one share of Common Stock over the 10 consecutive trading day period ending on, and including, the trading day immediately preceding the announcement date of the issuance of such rights, options or warrants

(C)    Certain Dividends and Distributions.  If Issuer shall fix a record date for the payment of a dividend or the making of a distribution with respect to the Common Stock of shares of securities, evidences of indebtedness, assets, rights, options or warrants (other than (i) dividends, distributions or issuances for which an adjustment is made pursuant to paragraph 1(A) or paragraph 1(B) and (ii) regular cash dividends paid out of earnings or earned surplus, determined in accordance with generally accepted accounting principles) to all or substantially all holders of the Common Stock, the Exercise Price and Warrant Share Number shall be adjusted pursuant to the formulas below.

$$Ua = \quad Ub \ \ x \quad \frac{M}{M-D}$$

$$Pa = \quad Pb \ \ x \quad \frac{M\text{-}D}{M}$$

Where:

Ub = Warrant Share Number before the adjustment

Ua = Warrant Share Number after the adjustment

Pb = Exercise Price before the adjustment

Pa = Exercise Price after the adjustment

M = fair market value per share of Common Stock determined as of the record date

D = fair market value of the dividend or distribution made per share of Common Stock

(D)     <u>Tender and Exchange Offers</u>.  If a publicly-announced tender or exchange offer made by Issuer or any of its subsidiaries for the Common Stock (other than a Reorganization) shall be consummated, to the extent that the cash and fair market value of any other consideration included in the payment per share of Common Stock exceeds the average of the fair market values of one share of Common Stock over the 10 consecutive trading day period ending on, and including, the tenth trading day immediately following the date on which such tender or exchange offer is consummated, then the Exercise Price and the Warrant Share Number shall be adjusted pursuant to the formulas below; *provided* that the Exercise Price shall not be increased (and Warrant Share Number shall not be decreased) as a result of this paragraph 1(E).

$$Ua = \quad Ub \ \ x \quad \frac{(Oa \ x \ M) + E}{Ob \ x \ M}$$

$$Pa = \quad Pb \ \ x \quad \frac{Ob \ x \ M}{(Oa \ x \ M) + E}$$

Where:

Ub = Warrant Share Number before the adjustment

Ua = Warrant Share Number after the adjustment

Pb = Exercise Price before the adjustment

Pa = Exercise Price after the adjustment

M = Average of the fair market values of one share of Common Stock over the 10 consecutive trading day period ending on, and including, the tenth trading day immediately following the date on which such tender or exchange offer is consummated

E = Aggregate fair market value of all cash and any other consideration paid or payable for shares of Common Stock in such tender or exchange offer

Ob = Number of shares of Common Stock outstanding immediately before giving effect to such tender or exchange offer

Oa = Number of shares of Common Stock outstanding immediately after giving effect to such tender or exchange offer

## **Annex 8**

**Transfer Agreement**

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of (the "**Agreement**"),[1] by and among Jones Energy, Inc. ("**JEI**") and its affiliates and subsidiaries bound thereby, the Consenting First Lien Noteholders, and the Consenting Unsecured Noteholders, including the transferor to the Transferee of any First Lien Notes, 2022 Notes, 2023 Notes, or any other claims against the Debtors (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "**Consenting First Lien Noteholder**" or "**Consenting Unsecured Noteholder**," as applicable, under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):
Telephone:
Facsimile:

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| First Lien Notes (if any) | $ |
| 2022 Notes (if any) | $ |
| 2023 Notes (if any) | $ |

---

[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

**<u>Annex 9</u>**

**Form of Joinder**

## Joinder

This joinder (this "**Joinder**") to the Restructuring Support Agreement (the "**Agreement**"), dated as of [__], 2019, by and among:  (i) Jones Energy, Inc. ("**JEI**"), a company incorporated under the Laws of Delaware, and each of Jones Energy, LLC, CCPR Sub LLC, Jones Energy Finance Corp., Jones Energy Holdings, LLC, JRJ Opco, LLC, Nosley Acquisition, LLC, Nosley Assets, LLC, Nosley Midstream, LLC, Nosley SCOOP, LLC, and Jones Energy Intermediate, LLC (together with JEI, collectively, the "**Company Parties**"); (ii) the Consenting First Lien Noteholders; and (iii) the Consenting Unsecured Noteholders, is executed and delivered by [_____] (the "Joining Party") as of [_____].  Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Agreement.

1.     Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as **Annex A** (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Consenting Stakeholders.

2.     Representations and Warranties.  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the First Lien Notes and/or Unsecured Notes identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in Section 10 hereof to each other Party.

3.     Governing Law.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.     Notice.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile: [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By: _____

Name:

Title:

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Notes (if any) | $ |
| 2022 Notes (if any) | $ |
| 2023 Notes (if any) | $ |

## Annex A

**Agreement**

**EXHIBIT B**

**Corporate Structure**

Jones Energy, Inc.
(Delaware)
100%
Jones Energy Intermediate, LLC
(Texas)
JEH Units (99%)
Preferred Units (99%)
JEH Units (1%)
Preferred Units (1%)
Jones Energy Holdings, LLC
(Delaware)
100%
CCPR Sub LLC
(Delaware)
Nosley Assets, LLC
(Delaware)
Nosley Midstream, LLC
(Delaware)
Jones Energy, LLC
(Texas)
Jones Energy Finance Corp.
(Delaware)
Nosley SCOOP, LLC
(Delaware)
Nosley Acquisition, LLC
(Delaware)
JRJ Opco, LLC
(Texas)
LEGEND
1L Notes, 2022 Notes, and 2023 Notes Issuer
1L Notes, 2022 Notes, and 2023 Notes Guarantor
TRA Obligor
ENTITY TYPE
Corporation
LLC

