**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| JONES ENERGY, INC., *et al.*,[1] | ) | Case No. 19-32112 (DRJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

**THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER ON APRIL 15, 2019, AT 2:30 P.M. (CT) BEFORE THE HONORABLE DAVID R. JONES, 515 RUSK STREET, COURTROOM 400, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state the following in support of this motion (this "Motion"):

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Jones Energy, Inc. (7968); Jones Energy, LLC (8861); CCPR Sub LLC (0942); Jones Energy Finance Corp. (6247); Jones Energy Holdings, LLC (5091); Jones Energy Intermediate, LLC (3552); JRJ Opco, LLC (1488); Nosley Acquisition, LLC (1548); Nosley Assets, LLC (6460); Nosley Midstream, LLC (8315); and Nosley SCOOP, LLC (1108). The location of Jones Energy, LLC's principal place of business and the Debtors' service address in these chapter 11 cases is: 807 Las Cimas Parkway, Suite 350, Austin, TX 78746.

**Relief Requested**

1. The Debtors seek entry of an order (the "Order"), substantially in the form attached hereto: (a) authorizing the Debtors to (i) pay prepetition and postpetition wages, salaries, other compensation, and reimbursable expenses and (ii) continue employee benefits programs in the ordinary course of business, including payment of prepetition obligations related thereto, and (b) granting related relief.

2. By this Motion, the Debtors seek authority to make the following payments related to prepetition amounts owed on account of the Employee Compensation and Benefits and the Non-Employee Workforce Obligations (each as defined below) and to continue to honor the Employee Compensation and Benefits and the Non-Employee Workforce Obligations in the ordinary course of business on a postpetition basis and in a manner consistent with the Debtors' prepetition policies and procedures; *provided* that no individual holder of a priority claim under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code will receive in the aggregate a payment in excess of $13,650 on account of such claim:

| | |
|---|---|
| **Employee Compensation and Benefits** | |
| Wage Obligations | $0 |
| Leave Benefits | $0 |
| Withholding Obligations | $0 |
| Expense Reimbursements | $60,000 |
| Health and Welfare Benefits | $0 |
| 401(k) Plan | $5,000 |
| Miscellaneous Benefits | $14,000 |
| Non-Insider Employee Incentive Programs | $0 |
| Non-Insider Severance | $0 |
| **Non-Employee Workforce Obligations** | |
| Non-Employee Workforce Obligations | $130,000 |
| **Total** | $209,000 |

**Jurisdiction and Venue**

3. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

6. On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Carl F. Giesler, Jr., Chief Executive Officer of Jones Energy, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein.

**The Debtors' Workforce**

7. As of the Petition Date, the Debtors employ approximately 84 individuals on a full-time basis (the "Employees"). Each of the Employees earns a yearly salary. None of the Employees are subject to a collective bargaining agreement.

8. In addition to the Employees, the Debtors occasionally supplement their workforce by utilizing independent contractors, who provide critical support to the Debtors' field operations (the "Independent Contractors" and together with the Employees, the "Workforce"). As of the Petition Date, the Debtors retain approximately 49 Independent Contractors. The Independent Contractors are critical to the operation of the Debtors' business and support the efforts of their Employees. The Debtors regularly evaluate the appropriate size and function of their Workforce, and as a result, when appropriate, locate, recruit, and maintain their Workforce, and incur amounts related thereto. As part of this Motion, the Debtors also seek authority to honor amounts owed on account of their Independent Contractors and costs incident to maintaining their Workforce.

9. The Debtors' Workforce performs a wide variety of functions critical to the Debtors' operations, the administration of these chapter 11 cases, and the Debtors' successful reorganization. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Debtors' Workforce includes highly trained personnel who are not easily replaced. Without the continued, uninterrupted services of their Workforce, the Debtors' reorganization efforts may be jeopardized.

**Employee Compensation and Benefits**

10. The Debtors provide wages and health and welfare benefits programs for their Employees. The Debtors' compensation obligations and benefits programs are comprised of (a) Wage Obligations, (b) Leave Benefits, (c) Withholding Obligations, (d) Expense Reimbursements, (e) Health and Welfare Benefits, (f) 401(k) Plan, (g) Miscellaneous Benefits, (h) Non-Insider Employee Incentive Programs, and (i) Non-Insider Severance (each as defined below, and collectively, the "Employee Compensation and Benefits"). The majority of the Debtors' Employees rely exclusively on the Employee Compensation and Benefits to pay their

daily living expenses and support themselves and their families. Thus, the Employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their compensation and providing benefits.

11. Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Employee Compensation and Benefits in the ordinary course of business. Out of an abundance of caution, the Debtors request the right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

12. By this Motion, the Debtors seek authority to continue to honor the Employee Compensation and Benefits in the ordinary course of business, including $209,000 in aggregate prepetition obligations that may come due in the first 21 days of these chapter 11 cases.

**A. Wage Obligations.**

13. In the ordinary course of the Debtors' business, the Debtors pay Employees' wages and salary obligations (collectively, the "Wage Obligations"). Over the last twelve months, the Debtors have paid an average of approximately $420,000 per semi-monthly pay period and $1.0 million per month for Wage Obligations. Payroll amounts often vary depending upon the season, taxes, overtime, and other factors.

14. Employees are paid at the end of a semi-monthly pay period for the work performed in the semi-monthly period immediately preceding payment. As such, certain Employees may be owed accrued but unpaid Employee Compensation as of the Petition Date.

15. As of the Petition Date, the Debtors do not believe that they owe any amounts to Employees on account of accrued Wage Obligations earned before the Petition Date. The Debtors request the authority, however, to honor any such obligations in the ordinary course of business.

**B. Leave Benefits.**

16. The Debtors offer their Employees certain paid and unpaid leave benefits (collectively, the "Leave Benefits").

17. In the ordinary course of business, the Debtors provide Employees with sick leave and vacation time ("PTO"), which accrues at a base rate of ten hours per month, up to a maximum of sixteen days per year. The accrual rate increases depending on the tenure and seniority level of the Employee. Employees can carry over up to forty hours of PTO into the subsequent year so long as the carry over amount is used during the first quarter of the rollover year. Employees who are terminated or resign can be paid out for unused PTO.

18. The Debtors also provide several other Leave Benefits, including:

- leave under the Family and Medical Leave Act of 1993 for: (a) birth, adoption, or foster care; (b) family care; (c) medical emergencies; (d) military exigencies; and (e) military caregiving needs; and
- other paid and unpaid leaves of absence for personal reasons, many of which are required by law, including missed work time in the ordinary course of business for time spent voting and unpaid leaves of absence for family medical emergencies and military service.

19. The Debtors believe that the continuation of the policies providing the Leave Benefits in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. The Debtors anticipate that their Employees will continue to utilize any accrued Leave Benefits in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations. The Debtors do not believe they presently owe any prepetition amounts on account of the Leave Benefits. Out of an abundance of caution, however, the Debtors seek authority to continue to offer the Leave Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

**C. Withholding Obligations.**

20. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, child support, and related fees and pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below) (collectively, the "Deductions"). Some of the Deductions are forwarded to various third-party recipients. During the twelve months preceding the Petition Date, monthly Deductions totaled approximately $1.3 million. As of the Petition Date, the Debtors do not believe that they currently owe any amounts on account of Deductions. The Debtors request the authority, however, to honor any such obligations.

21. The Debtors are also required by law to withhold from Wage Obligations amounts related to, among other things, federal and state income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes"), for remittance to the appropriate federal and state taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes" and together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal or state taxing authority at the same time Employees' payroll checks are disbursed. During the twelve months preceding the Petition Date, Employer Payroll Taxes were approximately $910,000, or approximately $40,000 semi-monthly.

22. As of the Petition Date, the Debtors do not believe that they owe any amounts for accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations"). The Debtors request the authority, however, to honor any such obligations in a manner consistent with historical practice and to continue to honor the Withholding Obligations in the ordinary course of business during these chapter 11 cases.

**D. Expense Reimbursements.**

23. In the ordinary course of business, the Debtors reimburse Employees for certain reasonable and customary expenses that such Employees personally incur in the scope of their employment (collectively, the "Expense Reimbursements"). Expense Reimbursements typically include expenses associated with travel, lodging, ground transportation, meals, and other business-related expenses related to the discharge of an Employee's duties.

24. The Debtors provide certain Employees with corporate credit cards (the "Corporate Cards") and fuel cards (the "Fuel Cards" and together with the Corporate Cards, the "Card Programs") for these business-related expenses. Approximately 15 Employees hold Corporate Cards issued by Wells Fargo Bank, National Association ("Wells Fargo"), which are typically used to cover Expense Reimbursements incurred in the ordinary course of business. The Debtors pay the outstanding balances directly to Wells Fargo. The Debtors have historically paid approximately $31,000 per month on account of the Corporate Cards. Approximately 35 Employees hold Fuel Cards through Universal Premium, which are used to cover fuel expenses incurred in the ordinary course of business. The Debtors have historically paid approximately $18,000 per month on account of the Fuel Cards. The Card Programs alleviate the need for Employees to carry the cost of business expenses while awaiting reimbursements. Given the importance of Employees' ability to use the Corporate Cards and the Fuel Cards for reimbursement, the Debtors request authority to continue utilizing and making payments on account of the Card Programs in the ordinary course of business.

25. Certain Expense Reimbursements are incurred through the use of personal funds, and the Employee may be held personally liable for unpaid obligations. The Debtors' inability to reimburse such expenses would impose hardship on such individuals where the obligations were incurred for the Debtors' benefit.

26. Due to the timing of when Employees submit expense reimbursements, it is difficult for the Debtors to precisely estimate the amount of prepetition Expense Reimbursements outstanding as of the Petition Date. Based on historical practice, however, the Debtors estimate that as of the Petition Date, the Debtors have accrued approximately $60,000 on account of Expense Reimbursements, all of which will become due within the first 21 days of these chapter 11 cases. By this Motion, the Debtors seek authority to pay the Employees' unpaid prepetition Expense Reimbursements that have accrued prior to the Petition Date and to continue paying prepetition and postpetition Expense Reimbursements in the ordinary course of the Debtors' business on a postpetition basis.

**E. Health and Welfare Benefits.**

27. The Debtors offer their Employees a suite of health and welfare benefits (the "Health and Welfare Benefits"), which are funded in whole or in part by the Debtors and the remainder of which are funded by Employee contributions. The Health and Welfare Benefits are an integral part of the Employees' compensation, and the Debtors intend to honor them in the ordinary course of business during the course of these chapter 11 cases. The Health and Welfare Benefits are provided by The Guardian Life Insurance Company of America ("Guardian") (collectively, the "Guardian Programs") and by UnitedHealth Group ("United") (collectively, the "United Programs"). The Debtors also maintain workers' compensation insurance for Employees in the states in which the Debtors operate (collectively, the "Workers' Compensation Program" and together with the Guardian Programs and the United Programs, the "Health and Welfare Programs"). The Debtors seek authority to continue to honor all obligations related to the Health and Welfare Programs and other human resources programs.

**1. Guardian Programs.**

28. The Guardian Programs include the Dental Plan, the Vision Plan, the Life and AD&D Insurance, and the Disability Benefits (each as defined herein). The Debtors make a monthly lump sum payment of approximately $20,000, or approximately $220,000 per year, to Guardian for the provision of the Guardian Programs.

29. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Guardian Programs. The Debtors request the authority, however, to pay any prepetition amounts owed on account of the Guardian Programs and to continue the Guardian Programs on a postpetition basis in the ordinary course of business and consistent with past practices.

**a. Dental Plan.**

30. The Debtors provide Employees with dental insurance through Guardian (the "Dental Plan"). The Dental Plan is fully insured through Guardian. There are approximately 80 Employees enrolled in the Dental Plan.

**b. Vision Plan.**

31. The Debtors also provide Employees with vision insurance through Guardian (the "Vision Plan"). The Vision Plan is fully insured through Guardian. There are approximately 80 Employees enrolled in the Vision Plan.

**c. Life and AD&D Insurance**

32. The Debtors provide life (the "Basic Life Insurance") and accidental death and dismemberment insurance coverage (the "Basic AD&D Insurance" and together with the Basic Life Insurance, the "Life and AD&D Insurance") to current and certain former Employees through Guardian. The Basic Life Insurance provides maximum coverage of $250,000 and the Basic AD&D Insurance provides maximum coverage of $100,000 in the event of an Employee's death

or dismemberment. Employees are eligible for company-sponsored Life and AD&D Insurance on the first day of the month following the date of hire. The Debtors are fully insured through the Life and AD&D Insurance.

**d. Disability Benefits**

33. The Debtors provide eligible Employees with short- and long-term disability benefits. Eligible Employees are entitled to, among other things, continuation of 60% of their weekly earnings up to a maximum of $3,000 per week for 13 weeks in the event of a short-term medical disability due to an illness, injury, or pregnancy-related condition (the "Short-Term Disability Benefits"). Under the long-term disability benefits program, Employees are entitled to, among other things, continuation of 60% of their wages, up to a monthly limit of $10,000, in the event of a long-term medical disability due to illness or injury (the "Long-Term Disability Benefits" and together with the Short-Term Disability Benefits, the "Disability Benefits"). The Disability Benefits are fully insured and administered through Guardian.

**2. United Programs.**

34. The United Programs include medical and prescription drug benefit programs. The coverage in the United Programs differs depending on the level of coverage Employees elect to receive. Monthly health care premiums also differ depending on which of the United Programs the Employee or former Employee is enrolled in and whether the Employee or former Employee has dependents covered by the applicable plan. The Debtors pay approximately $65,000 per month, or approximately $780,000 per year, to United for the provision of the United Programs.

35. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the United Programs. The Debtors request the authority, however, to pay any prepetition amounts owed on account of the United Programs and to continue the United Programs on a postpetition basis in the ordinary course of business and consistent with past practices.

36. The Debtors also provide Employees who participate in certain of the United Programs with access to a health savings account (the "HSA"), administered by United, which can be used to cover qualified medical expenses. Currently, approximately 68 Employees use the HSA for medical costs. The Debtors pay Optum Bank, on average, $125 per month for the administration of the HSA. The Debtors do not make any contributions to any Employee's HSA.

**3. Workers' Compensation Programs.**

37. The Debtors maintain workers' compensation insurance for Employees at the levels required by law in the states in which the Debtors operate. All Employees are entitled to participate in the Workers' Compensation Program. Currently, the Debtors maintain coverage under the Workers' Compensation Program through Berkley Regional Insurance Company. The Debtors use a guaranteed cost program with no deductible but subject to year-end adjustments. The annual cost of the Workers' Compensation Program is approximately $26,000. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Workers' Compensation Program.

38. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements during the pendency of these chapter 11 cases.[2] To the extent any Employees assert claims arising under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the

[2] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' requirements to abide by such laws and regulations. By this Motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary.

Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program. This required modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

39. Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that potentially could disrupt the reorganization process. As of the Petition Date, the Debtors do not believe any amounts are accrued and outstanding on account of the Workers' Compensation Program. By this Motion, the Debtors request the authority to continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis and to modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program to the extent applicable.

**F. 401(k) Plan.**

40. The Debtors offer their Employees the opportunity to participate in a tax-qualified defined contribution retirement plan (the "401(k) Plan"). Approximately 84 Employees currently contribute to the 401(k) Plan. The 401(k) Plan generally provides for pre-tax deductions of compensation up to limits set by the Internal Revenue Code, as well as for certain post-tax deductions. Each Employee's contributions under the 401(k) Plan are deducted automatically from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "401(k) Contributions"). The Debtors believe that the 401(k) Contributions generally are held in trust by the Debtors and are not property of their estates.

41. The Debtors match the Employees' 401(k) Contributions dollar-for-dollar in an amount up to 3% of an Employee's eligible compensation on a monthly basis and up to an additional 3% of an Employee's eligible compensation on an annual basis (the "401(k) Match"). On average, the Debtors' monthly payments and disbursements on account of the 401(k) Match

are approximately $80,000. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the 401(k) Match. The Debtors seek authority, however, to pay any accrued and unpaid 401(k) Matches and to continue the 401(k) Plan on a postpetition basis in the ordinary course of business and consistent with past practice.

42. The 401(k) Plan is administered by Fidelity Management Trust Company (as trustee and record keeper), to which the Debtors pay quarterly administrative fees of approximately $5,000 (the "401(k) Plan Fees"). As of the Petition Date, the Debtors estimate that they owe approximately $5,000 in 401(k) Plan Fees, all of which will become due and owing within the first 21 days of these chapter 11 cases.

**G. Miscellaneous Benefits.**

43. In addition to the foregoing, the Debtors provide their Employees with a range of ancillary benefits in addition to the other benefits described herein, including child care services, gym memberships, ad hoc bonuses, gift cards, etc. (the "Miscellaneous Benefits"). These Miscellaneous Benefits are important to maintaining Employee goodwill and productivity. On average, the Debtors pay approximately $21,000 per month on account of the Miscellaneous Benefits. The Debtors seek authority to pay up to $14,000 in unpaid Miscellaneous Benefits on account of prepetition obligations, all of which will become due and owing within the first 21 days of these chapter 11 cases, and to continue to honor their obligations to continue the Miscellaneous Benefits in a manner consistent with historical practice in the ordinary course of business during these chapter 11 cases.

**H. Non-Insider Employee Incentive Programs.**

44. The Debtors maintain incentive programs to drive performance among their Employees (collectively, the "Non-Insider Employee Incentive Programs").[3] Historically, the Debtors have offered incentive programs that provide eligible non-insider Employees with an opportunity to receive meaningful awards for achieving certain performance goals based upon targets established by the Debtors' compensation committee. For example, the Debtors have previously awarded bonuses to employees for achieving metrics related to base production, lease operating expense, drilling efficiency, general and administrative spending, and individual performance. The compensation committee also determines the type or types of awards to be made under the Non-Insider Employee Incentive Programs, which may include cash and/or stock awards. The Non-Insider Employee Incentive Programs are an integral part of the Employee Compensation and Benefits.

45. The Non-Insider Employee Incentive Programs align Employees' interests with those of the Debtors generally by linking payments under the Non-Insider Employee Incentive Programs to performance and overall efficiency of the Debtors' operations. The Debtors believe that it is important that they fulfill their obligations under the Non-Insider Employee Incentive Programs to reassure all Employees during the often-challenging postpetition period. Additionally, the Non-Insider Employee Incentive Program is narrowly tailored and reasonably designed to maintain workforce stability in the sensitive transition period after the Debtors' emergence from chapter 11 and to incent achievement of value-maximizing performance metrics.

[3] The relief sought under this Motion with respect to the Non-Insider Employee Incentive Programs does not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code) (the "Insiders"). The Debtors will seek separate authority for any proposed incentive and severance programs with respect to such parties and reserve all rights with respect to the "insider" status of such parties.

46. The Debtors do not believe they presently owe any prepetition amounts on account of the Non-Insider Employee Incentive Program and therefore do not seek to pay any prepetition amounts in connection with the Non-Insider Employee Incentive Programs. Out of an abundance of caution, however, the Debtors seek authority to continue the Non-Insider Employee Incentive Program on a postpetition basis in the ordinary course of business and consistent with past practices. For the avoidance of doubt, the Debtors do not propose to make any payment on account of the Non-Insider Employee Incentive Program to Insiders.

**I. Non-Insider Severance.**

47. In the ordinary course of business, the Debtors have provided severance benefits to certain non-insider Employees in the event of a termination by the Debtors that is neither for cause nor by reason of death or disability (the "Non-Insider Severance Program"). By this Motion, the Debtors do not request authorization to make any severance payments to any Insider pursuant to the Non-Insider Severance Program. Consequently, the Debtors submit that section 503(c)(2) of the Bankruptcy Code with respect to severance payments to insiders does not apply to the relief requested herein.

48. Under the Non-Insider Severance Program, severance payments are calculated based on the terminated Employee's job level and their time of service with the Debtors prior to termination. Severance payments are payable sixty days after departure for a minimum of eight weeks and a maximum of fifty-two weeks.

49. The Debtors' ability to pay and provide discretionary severance amounts and other benefits has been critical to maintaining Employee morale and loyalty. Increased instability in the Debtors' workforce will only undermine the Debtors' ability to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term success. As a condition to receiving any Non-Insider Severance Program payments, the Debtors typically require

that each Employee execute a release agreement, whereby the Employee releases any claims held against the Debtors. The Debtors believe that the Non-Insider Severance Program will help reduce the time and expense that could arise in the absence of the Non-Insider Severance Program to defend the assertion of claims by any severed Employees.

50. As of the Petition Date, the Debtors do not believe that any former Employees are eligible to receive payments under the Non-Insider Severance Program and, therefore, the Debtors do not believe that they owe any amounts on account of accrued but unpaid obligations under the Non-Insider Severance Program. In an abundance of caution, however, the Debtors are seeking the authority to pay Non-Insider Severance Program payments up to the statutory cap of $13,650 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

**Non-Employee Workforce Obligations**

51. In the ordinary course of business, the Debtors make payments to Independent Contractors and incur costs incident to maintaining their Workforce (the "Non-Employee Workforce Obligations"). The Debtors make payments to their Independent Contractors for their performance of certain services critical to the Debtors' operations, including, among other things, performing various field and other services, such as recruiting services and IT support, as needed. The Debtors also regularly evaluate the appropriate size and function of their Workforce, make necessary modifications following those evaluations, and incur amounts related thereto. The Debtors' Employees rely on the support of Independent Contractors. The Debtors believe the authority to continue paying their Independent Contractors is critical to minimize disruption of the Debtors' continued business operations.

52. The Debtors spent approximately $1.3 million on Independent Contractors in the aggregate during the twelve months preceding the Petition Date, and the Debtors owed Independent Contractors an average of $25,000 per week. As of the Petition Date, the Debtors

estimate that approximately $130,000 of Non-Employee Workforce Obligations is accrued and unpaid, which, on average amounts to approximately $3,000 for each Independent Contractor, all of which will become due within the first 21 days of these chapter 11 cases.

53. The Debtors do not believe they owe any individual Independent Contractor amounts in excess of $13,650 as of the Petition Date.

54. As described above, payment of Non-Employee Workforce Obligations is critical to the survival of the Debtors' business, and the Debtors seek the authority to pay them in the ordinary course of business during the course of these chapter 11 cases.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits and Non-Employee Workforce Obligations.

#### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.

55. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein only affects the timing of certain payments to the Employees and does not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. *See In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("The need to pay [employee wage] claims in an ordinary course of business time frame is simple common sense.

Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted.”).

**B. Payment of Certain Employee Compensation and Benefits Is Required By Law.**

56. The Debtors seek authority to pay the applicable Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d); *see also In re Equalnet Commc'ns*, 258 B.R. at 370 (noting that, for tax obligations where funds are held by the debtor in trust, "the legal right to payment of such claims at any time appears irrefutable.") (citing *Matter of Al Copeland Enters., Inc.*, 991 F.2d 233 (5th Cir. 1993)).

57. Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *DuCharmes & Co. v. Michigan (In re DuCharmes & Co.)*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes); *In re Chabrand*, 301 B.R. 468, 475–81 (Bankr. S.D. Tex. 2003) (same). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

58. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

## II. Payment of the Employee Compensation and Benefits and Non-Employee Workforce Obligations Is a Sound Exercise of the Debtors' Business Judgment.

59. Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns*, 258 B.R. at 369–70 (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers who were potential lien claimants). In doing so, these courts acknowledge that several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

60. Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor

to honor prepetition claims where supported by an appropriate business justification). In addition, under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. at 497). Moreover, under section 105(a) of the Bankruptcy Code, the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *In re CoServ, L.L.C.*, 273 B.R. at 497 (finding that sections 105 and 1107 of the Bankruptcy Code provide the authority for a debtor-in-possession to pay prepetition claims); *In re CEI Roofing, Inc.*, 315 B.R. at 59–60 (finding that "[b]ecause Congress has specifically provided that prepetition wage claims up to a certain amount per claim be elevated to priority status under § 503(1)(3)," the court's job is easier when it considers approval of such prepetition claims); *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003) (noting that non-payment of prepetition claims may seriously damage a debtor's business). The above-referenced sections of the Bankruptcy Code therefore authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate.").

61. Payment of the Employee Compensation and Benefits and Non-Employee Workforce Obligations is warranted under this authority and the facts of these chapter 11 cases. The majority of the Debtors' Workforce rely exclusively on the Employee Compensation and Benefits and Non-Employee Workforce Obligations to satisfy their daily living expenses.

Consequently, the Debtors' Workforce will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits and Non-Employee Workforce Obligations. Additionally, continuing ordinary course benefits will help maintain Workforce morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

62. Moreover, the Workforce provides the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits and Non-Employee Workforce Obligations owed to the Workforce, the Debtors may experience workforce turnover and instability at this critical time in these chapter 11 cases. The oil and gas industry is a highly specialized business that requires unique technical expertise. The Debtors believe that without these payments, their Workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships the Workforce may face. Such individuals may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their Workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits and Non-Employee Workforce Obligations is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Workforce as the Debtors seek to operate their business in these chapter 11 cases.

63. Indeed, bankruptcy courts in this district have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested herein.

*See, e.g.*, *In re Vanguard Natural Resources, LLC*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. Apr. 2, 2019) (authorizing the debtors to continue the employee compensation and benefits programs on a postpetition basis); *In re Parker Drilling Company*, No. 18-36958 (MI) (Bankr. S.D. Tex. Jan. 3, 2019) (same); *In re Westmoreland Coal Company*, No. 18-35672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (same); *In re Gastar Exploration Inc.*, No. 18-36057 (MI) (Bankr. S.D. Tex. Nov. 4, 2018) (same); *In re EXCO Resources, Inc.*, No. 18-30155 (MI) (Bankr. S.D. Tex. Feb. 22, 2018) (same).[4] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and continue the Employee Compensation and Benefits and Non-Employee Workforce Obligations in the ordinary course of business and consistent with past practice.

**III. A Limited Waiver of the Automatic Stay for Workers' Compensation Program Is Appropriate in This Case.**

64. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1). Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

65. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit their Employees to proceed with their claims against the Workers' Compensation Program in the appropriate judicial or administrative forum. Cause exists to modify the automatic stay

4 Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

because staying the Employees' workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture. Such departures could cause a significant disruption in the Debtors' business to the detriment of all stakeholders. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

**Emergency Consideration**

66. Pursuant to Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this Motion, the Debtors' Workforce is critical to an immediate and orderly transition into chapter 11, and any disruption in providing the Employee Compensation and Benefits could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases could disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

67. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. Under the Debtors' existing cash management system,

the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Employee Compensation and Benefits and Non-Employee Workforce Obligations, as applicable. Accordingly, the Debtors believe that checks or wire transfer requests that are not related to authorized payments will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

68. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

69. Nothing contained in this Motion or any actions taken by the Debtors pursuant to any order granting the relief requested by this Motion is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, including but not limited to any employment agreement; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid and the Debtors

and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

**Notice**

70. Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances. Without limiting the foregoing, due notice will be afforded, whether by facsimile, electronic mail, overnight courier, or hand delivery, to parties-in-interest, including: (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) Wells Fargo Bank, N.A. as administrative agent under the Debtors' credit agreement and collateral agent under the Debtors' 9.25% first lien secured notes; (d) UMB Bank, N.A. as indenture trustee under the Debtors' 9.25% first lien secured notes due 2023; (e) U.S. Bank National Association as successor trustee for (i) the 6.75% senior notes due 2022 and (ii) the 9.25% senior notes due 2023; (f) Milbank LLP, as counsel to the ad hoc group of certain first lien noteholders; (g) Davis Polk & Wardwell LLP, as counsel to the ad hoc group of certain crossover noteholders; (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (l) the state attorneys general for states in which the Debtors conduct business; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. The

Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Houston, Texas
April 14, 2019

*/s/ Matthew D. Cavenaugh*
**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
Email: jwertz@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian E. Schartz, P.C. (TX Bar No. 24099361)
Anna G. Rotman, P.C. (TX Bar No. 24046761)
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
Email: brian.schartz@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Christopher Marcus, P.C. (*pro hac vice* admission pending)
Anthony R. Grossi (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: christopher.marcus@kirkland.com
anthony.grossi@kirkland.com

-and-

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
James H.M. Sprayregen, P.C.
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**Certificate of Service**

I certify that on April 14, 2019, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh